J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Mitchell C. Stein, Esq. (*pro hac vice*)
  stein@braunhagey.com
Kirsten Jackson, Esq. (*pro hac vice*)
  dooley@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W. 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (646) 403-4089

ATTORNEYS FOR PLAINTIFF
TARI LABS, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARI LABS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>LIGHTNING LABS, INC.,<br><br>Defendant. | Case No. 3:22-cv-07789-WHO<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER TO PRESERVE THE STATUS QUO AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:<br>Time:<br>Judge:          Hon. William H. Orrick<br>Courtroom:   Via Zoom videoconference |

MEMORANDUM IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION TO PRESERVE STATUS QUO AND
FOR PRELIMINARY INJUNCTION

1

## <u>TABLE OF CONTENTS</u>

2   INTRODUCTION ................................................................................................. 1

3   FACTUAL BACKGROUND ............................................................................... 2

4         A.      The TARI® Federal Registered Trademark .......................................... 3

5         B.      Tari's Early Success ............................................................................ 4

6         C.      Defendant and Its Infringing TARO Products and Services ................ 4

7         D.      Defendant's Anticipated TARO Protocol and Products Will Compete and
                  Interact Directly with the TARI® Protocol and Products ..................... 5
8
          E.      Tari's Efforts to Cause Defendant to Do the Right Thing (and Avoid
9                 Litigation  and This Motion) ................................................................ 6

10        F.      Defendant's Accelerating Plans to Launch Its Infringing TARO Protocol............ 7

11        G.      Launch of Defendant's TARO Protocol Will Cause Widespread Confusion ........ 7

12        H.      Tari's Notice of This Motion................................................................ 8

13   ARGUMENT ....................................................................................................... 9

14   I.   TARI IS LIKELY TO PREVAIL ON THE MERITS OF ITS TRADEMARK
          INFRINGEMENT CLAIM TO ENJOIN THE TARO PROTOCOL ............... 9
15
          A.      Ownership of Valid Trademark .......................................................... 10
16
          B.      Likelihood of Confusion ................................................................... 10
17
                  1.      Strength of Marks: the TARI® Mark is Strong ..................... 11
18
                  2.      Similarity of Goods and Services: The Goods and Services are
19                        Similar 12

20                3.      Similarity of Marks: the Marks are Nearly Identical.............. 15

21                4.      Launch of Defendant's Infringing TARO Protocol Will Cause
                          Widespread Confusion............................................................ 16
22
                  5.      Marketing Channels: Plaintiff and Defendant Use the Same
23                        Marketing Channels................................................................ 17

24                6.      Type of Goods: Consumers Exercise a Relatively Low Degree of
                          Care    19
25
                  7.      Defendant's Intent: Defendant's Infringement is Willful....................... 19
26
                  8.      Expansion of Product Lines: The Parties Continue to Expand Product
27                        Lines   20

28

MEMORANDUM IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION TO PRESERVE STATUS QUO AND
FOR PRELIMINARY INJUNCTION

II.    A TEMPORARY RESTRAINING ORDER AND AN INJUNCTION WILL PRESERVE THE *STATU S QUO* AND PREVENT IRREPARABLE HARM.............. 20

III.   THE BALANCE OF EQUITIES FAVORS AN INJUNCTION ................................... 22

IV.    THE PUBLIC INTEREST FAVORS A TEMPORARY RESTRAINING ORDER AND INJUNCTION .................................................................................................... 24

V.     THE COURT SHOULD WAIVE ANY BOND REQUIREMENT UNDER RULE 65 .................................................................................................................................. 24

CONCLUSION.................................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

## <u>CASES</u>

4

*Adidas Am., Inc. v. Skechers USA, Inc.*,
  No. 16-35204, 2018 WL 2142648 (9th Cir. May 10, 2018).....................................................17

5

*Alibaba Grp. Holding Ltd. V. Alibabacoin Found.*,
  No. 18-CV-2897 (JPO), 2018 WL 5118638 (S.D.N.Y. Oct. 22, 2018) .....................................15

6

*AMF v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) .........................................................................................10, 20

7

*Bridgestone Brands, LLC v. Dastgah*,
  No. 16-CV-00906-BLF, 2016 WL 1070670 (N.D. Cal. Mar. 18, 2016) .....................................9

8

*Brookfield Commc'ns, Inc. v. West Coast Entertainment Corp.*,
  174 F.3d 1036 (9th Cir. 1999) .......................................................................................12, 16

9

*Century 21 Real Est. Corp. v. Sandlin*,
  846 F.2d 1175 (9th Cir. 1988) .............................................................................................21

10

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*,
  142 F.3d 1127 ....................................................................................................................11

11

*FAZE Apparel, LLC v. Faze Clan, Inc.*,
  No. 218CV02052-RGK-JEM, 2018 WL 3830027 (C.D. Cal. May 22, 2018)................11, 22, 24

12

*Fifty-Six Hope Road Music v. Avela*,
  778 F. 3d 1059 (9th Cir. 2015) .............................................................................................20

13

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,
  741 F.Supp.2d 1165  (S.D. Cal. 2010) ..................................................................................17

14

*Filipino Yellow Pages, Inc. v. Asian Journal Publs., Inc.*,
  198 F.3d 1143 (9th Cir. 1999) .............................................................................................10

15

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
  618 F.3d 1025 (9th Cir. 2010) .....................................................................................16, 19, 20

16

*Fox Television v. BarryDriller Content Sys.*,
  915 F. Supp. 2d 1138 (C.D. Cal. 2012)..................................................................................24

17

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) .............................................................................................19

18

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*,
  415 U.S. 423 (1974) ...........................................................................................................22

19

*Honor Plastic Indus. Co. v. Lollicup USA, Inc.*,
  462 F. Supp. 2d 1122 (E.D. Cal. 2006) ..................................................................................10

20

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
  2 F.4th 1150 (9th Cir. 2021) .........................................................................................passim

21

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
  828 F.3d 1098 (9th Cir. 2016) .......................................................................................12, 20

22

*Kendall-Jackson Winery, Ltd. V. E. & J. Gallo Winery*,
  150 F.3d 1042 (9th Cir. 1998) .............................................................................................11

23

*Laura Shin Media, LLC*,
  No. 91250132, 2021 WL 4473094 (TTAB Sept. 28, 2021) .....................................................15

24

*Lindy Pen Co. v. Bic Pen Corp.*,
  796 F.2d 254 (9th Cir.1986) ................................................................................................10

25

26

27

28

MEMORANDUM IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION TO PRESERVE STATUS QUO AND
FOR PRELIMINARY INJUNCTION

*Monster Energy Co. v. BeastUp LLC*,
    395 F. Supp. 3d 1334 (E.D. Cal. 2019) ................................................................. 10
*Napa Valley Publ'g Co. v. City of Calistoga*,
    225 F. Supp. 2d 1176 (N.D. Cal. 2002) .................................................................. 23
*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
    782 F.2d 1508 (9th Cir. 1986) ............................................................................... 16
*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) .............................................................. 9, 10, 18, 23
*Rearden LLC v. Rearden Com., Inc.*,
    683 F.3d 1190 (9th Cir. 2012) ............................................................................... 10
*Regents of the Univ. of Cal. v. Am. Broad. Cos.*,
    747 F.2d 511 (9th Cir. 1984) ................................................................................. 22
*Sutter Home Winery v. Madrona Vineyards*,
    No. C 05-0587 MHP, 2005 WL 701599 (N.D. Cal. Mar. 23, 2005) ....................... 15
*Synoptek, LLC v. Synaptek Corp.*,
    309 F. Supp. 3d 825 (C.D. Cal. 2018) .................................................................... 16
*Telegram Messenger Inc. v. Lantah, LLC*,
    No. 18-CV-02811-CRB, 2018 WL 3753748 (N.D. Cal. Aug. 8, 2018) .............. 15, 23
*Thane Int'l, Inc. v. Trek Bicycle Corp.*,
    305 F.3d 894 (9th Cir. 2002) ................................................................................. 17
*Triad Sys. Corp. v. Southeastern Express*,
    64 F.3d 1330 ......................................................................................................... 24
*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992) ............................................................................................... 11

**STATUTES**

15 U.S.C. § 1057(b) ................................................................................................... 10
15 U.S.C. § 1116(a) ................................................................................................. 9, 21
15 U.S.C. § 1125 ........................................................................................................ 10

**RULES**

Fed. R. Civ. P. 65 ................................................................................................... 9, 24

MEMORANDUM IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION TO PRESERVE STATUS QUO AND
FOR PRELIMINARY INJUNCTION

Plaintiff Tari Labs, LLC ("Tari Labs") respectfully submits this memorandum of points and authorities in support of its *ex parte* application for temporary restraining order to preserve the status quo and order to show cause why preliminary injunction should not ensue.

**INTRODUCTION**

Plaintiff Tari Labs is an Oakland, California startup that owns, develops and markets the TARI® platform of blockchain applications, products and services designed to allow users to create, buy and sell digital assets such as NFTs. Tari filed this lawsuit to protect its federally registered TARI® trademark from infringement by Defendant Lighting Labs, a larger competitor who is working on a competing "TARO" blockchain platform that threatens to confuse consumers and swamp TARI® in the marketplace. Despite Tari's numerous notices and the filing of this suit, in recent days, Defendant has announced that it imminently plans to launch its competing TARO protocol. On February 5, 2023, Defendant's Chief Technology Officer and Co-founder, Olaoluwa Osuntokum, announced that Defendant is planning to release a new version of the infringing TARO protocol within a month, *i.e.*, early March. (Declaration of Tari's CEO, Naveen Jain ("Jain Decl.") ¶32.) And on February 6, he confirmed on Twitter that the upcoming "release will have just about everything needed to fully get off the ground." (Jain Decl. ¶ 33.)

Defendant's impending launch of "TARO" clearly infringes the TARI® house mark and is a dangerous recipe for confusion certain to harm both Tari and consumers generally. Both protocols and use cases concern technologies that will facilitate users' creation, development, transfer and storage of digital assets worth millions of dollars. TARO and TARI® will appear alongside each other on various platforms where users browse and access blockchain protocols, digital assets, and related products. Users who confuse the nearly identical names will select the wrong protocol to create and hold digital assets, and risk permanently losing their assets due to the irreversible nature of blockchain transactions. Or, when consumers try and fail to consummate a transaction after accidentally mis-selecting TARO, the error messages and disruption will irreparably undermine TARI®'s name and goodwill, casting doubt on TARI®'s reliability and security. Software developers using the applications will avoid incorporating TARI® into products out of concern for the end user experience.

These commonsense examples of confusion (and the effects of confusion) are borne out by market experience.  Tari's marketing expert, Professor Robert Palmatier, Ph.D., conducted a scientific study of blockchain users to determine the scope of likely confusion.  The results of this *Squirt* survey are damning.  Blockchain users are confused by the presence of TARI® and TARO at nearly *double* the threshold established by federal courts to preliminarily enjoin infringing goods. More than 50% of blockchain users are likely to be confused, with a net confusion score of more than 35%.  Dr. Palmatier concludes that the danger posed by Defendant's confusing TARO protocol to TARI® and the user market is virtually certain and will irreparably harm the TARI® house brand and its investment in the space.  In fact, even Defendant's counsel has confused TARI® and TARO in correspondence responding to Tari's outreach and good faith efforts to avoid burdening the Court with this dispute.

To preserve the status quo, Tari respectfully seeks a modest interim restraining order set forth in the appended [Proposed] Order to prevent Defendant from launching or further marketing its competing TARO protocol until a hearing on Tari's request for a more comprehensive preliminary injunction pending final judgment in this matter.

## FACTUAL BACKGROUND

Plaintiff Tari is an innovative Oakland-based startup founded by blockchain and entertainment industry entrepreneurs Naveen Jain, Riccardo Spagni, and Dan Teree. (Jain Decl. ¶ 2.) Tari is the creator of a blockchain protocol – the TARI® protocol – that allows users to create and transfer digital assets on the blockchain. (*Id.* ¶ 2-3.) The TARI® protocol allows developers and other market participants to build the protocol into their technology and create their own tools for transferring digital assets – similar to how, for example, GORE-TEX® material is incorporated into clothing made by many different designers. (*Id* ¶ 2-7.)

Tari actively markets TARI® branded products and services on a wide variety of platforms. (*Id.* ¶ 10-14.)  For example, Tari markets the TARI® Aurora Mobile Wallet, a branded application available on iPhone and Android. (*Id.* ¶ 4.) The TARI® mobile wallet serves as a mobile wallet reference-design, a starting point for users to test the TARI® protocol and provide a reference for

MEMORANDUM IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION TO PRESERVE STATUS QUO AND
FOR PRELIMINARY INJUNCTION

1  developers to build their own TARI®-compatible applications. (*Id.* ¶ 4.) Below is the TARI®

2  mobile wallet's listing on the Apple's App Store (*Id.*):

3       Tari also issues and markets TARI® tokens, which are provided to miners that operate and



21  reinforce the protocol. (*Id.* ¶ 5.) TARI® tokens can currently be used to purchase merchandise from

22  the TARI® store. (*Id.*) Similar house-branded TARI® products and services are under development

23  to help users to create, hold, and transfer a variety of assets on the blockchain. (*Id.* ¶ 6.)

24       As the TARI® protocol is adopted and extended into different applications, it will allow

25  users to transfer ownership of virtually any digital asset on the blockchain, including non-fungible

26  tokens (NFTs), tickets, in-app purchases on mobile devices, loyalty points, and other assets. (*Id.* ¶

27  7.)

28      **A.**    **The TARI® Federal Registered Trademark**

Tari understood the importance of protecting its intellectual property and intended brand name.  On February 26, 2018, Tari filed an intent-to-use trademark application for TARI to cover cryptocurrency-related services in International Class 36.  (*Id*. Ex. 4.) The USPTO published the mark for opposition on December 18, 2018, giving any party – including Defendant – the opportunity to object. (*Id*. Ex. 5.) After no one objected, the USPTO issued a notice of allowance on February 12, 2019. (*Id*. Ex. 6.) Tari filed a Statement of Use on February 14, 2022, declaring its first use in commerce at least as early as April 29, 2020. (*Id*. Ex. 7.) On April 12, 2022, the USPTO issued Tari U.S. Trademark Registration No.  6,710,730, covering:

> Cryptocurrency trading and exchange services, namely, providing a digital currency or digital token for use by members of an on-line community via a global computer network; cryptocurrency trading and exchange services, namely, providing a digital currency or digital token, incorporating cryptographic protocols, used to operate and build applications and blockchains on a decentralized computer platform and as a method of payment for goods and services and as a method of transfer of digital assets.

(*Id*. Ex. 8.)

**B.     Tari's Early Success**

Tari already has developed a reputation for innovation and attracted widespread investment. (*Id*. ¶ 10-11.) It is led by a serious team with a demonstrated track record of success in traditional and blockchain industries. (*Id*. ¶ 9.) The TARI® protocol combines high performance, ease of integration with applications, stability, and well-developed documentation for use by developers. (*Id*. ¶ 8.) These features have inspired an enthusiastic community of developers and users, including thousands of users across platforms such as Discord, Substack, Telegram, IRC, Twitter, and Reddit. (*Id*. ¶ 10.)

Industry media and general-interest publications have given TARI® favorable coverage, including such outlets as *CoinDesk*, *Nasdaq.com*, *Merkle News*, *Fortune*, *Mashable*, and *Bitcoin Magazine*. (*Id*. Ex. 10.) Tari also extensively markets the TARI® protocol on social media, at trade shows and conferences, podcasts and on various developer fora and other online resources, including Reddit and GitHub. (*Id*. ¶ 10-13.)

**C.     Defendant and Its Infringing TARO Products and Services**

Defendant is a large, well-established blockchain technology firm with investors like former Twitter CEO Jack Dorsey. (*Id*. ¶ 15.) Defendant is the developer of the Lightning Network, a widely-used "second layer" protocol for processing payments on the Bitcoin blockchain and related products and services. (*Id*. ¶¶ 15-16.) Before its decision to work on TARO, Defendant's traditional products and services were for payment network technologies focused on facilitating quick and cheap transfers of Bitcoin from one place to another. (*Id*. ¶ 16.)

Recently, however, Defendant announced that it was expanding into the same market occupied by TARI® by launching its own "TARO" protocol for issuing digital assets on the blockchain and defining rules for their transfer – the exact service embodied by TARI®. (*Id*. ¶ 17.) Notwithstanding Defendant's knowledge and understanding of TARI® and Tari's leadership, Defendant elected to design its new system around a nearly identical trademark– TARO vs. TARI®. (*Id*. ¶ 17) According to Defendant's website, the TARO protocol, like TARI®, will allow users to create and exchange a wide variety of digital assets on the blockchain: "Taro lets you issue all kinds of assets on bitcoin, both unique and fungible. There are no technical limits to what these assets can represent, including stablecoins, shares, tickets, ownership rights or art." (*Id*. ¶19 Ex. 12.)

### D. Defendant's Anticipated TARO Protocol and Products Will Compete and Interact Directly with the TARI® Protocol and Products

The TARI® and TARO protocols will compete directly in the marketplace. (*Id*. ¶ 21.) They will serve the same function, enabling creators and developers to create digital assets and define rules for transferring them from one person to another. (*Id*.) They will compete head-to-head in their efforts to attract creators, developers and ultimately, end-users to build-upon and utilize their protocols. (*Id*.) They will even identify the same digital assets that their protocols will be used to create and trade: both parties identify tickets, art, game collectibles, and fungible assets such as tokens or stablecoins as targeted "use cases" for their protocols. (*Id*. ¶¶ 21-22.)

To help guide the Court's evaluation of this emerging market dynamic, Tari has identified at least five concrete, everyday examples where confusion between the TARI® and TARO protocols is likely to occur and negatively impact Tari's brand and potentially injure consumers.

These examples, which are explained in more detail in the Declaration of Tari's CEO Naveen Jain, include (1) confusion among consumers seeking to create non-fungible tokens (or "NFTs"), (2) confusion among consumers browsing digital assets for purchase, (3) confusion among consumers choosing "wallet" apps for their digital assets, (4) confusion among users of "smart contract" platforms, and (5) confusion among developers choosing blockchain protocols to incorporate into their own products. (Jain Decl. ¶¶ 35 - 45.) In each of these instances, confusion between TARI® and TARO will lead to users being unable to complete their intended transactions, and will likely discourage customer and developers from using TARI® products and services in the future.

### E. Tari's Efforts to Cause Defendant to Do the Right Thing (and Avoid Litigation and This Motion)

Prior to bringing suit and bringing this motion, Tari repeatedly sought to persuade Defendant to find a non-infringing name for its new protocol. On September 12, 2022, Tari sent a cease-and-desist letter warning Defendant against using the infringing TARO mark. (Hagey Decl. ¶2 Ex. 1.) Tari received a response from Defendant's counsel at Wilson Sonsini rejecting Tari's request. (*Id.* ¶3 Ex. 2..) While the Wilson Sonsini letter *said* that confusion was unlikely, it actually *demonstrated* the opposite: in closing, Defendant's counsel mixed-up TARI® and TARO, referring to Tari Labs as "Tar*o* Labs." (*Id.* (emphasis added).)

Prior to filing suit, Tari's counsel spoke by telephone with Defendant's then-counsel to request that Defendant agree to cease its infringement and change the name of its forthcoming protocol. (*Id.* ¶ 4..) The call was unsuccessful and Tari filed its Complaint in this action. (*Id.*)

Since filing suit, Tari has continued to request that Defendant voluntarily cease its infringement. On December 12, 2022, Defendant's counsel requested an extension of time to respond to the complaint. (*Id.* ¶ Ex. 3.) In response, Tari's counsel conveyed Tari's alarm at Defendant's use of the infringing TARO mark and renewed its request that the infringement cease. (*Id.*) And on January 20, 2023, in response to another request by Defendant for an extension, Tari's counsel reiterated Tari's objections and once again requested that Defendant cease its infringement to avoid the need for interim relief. (*Id.* ¶7 Ex. 4..) In response, Defendant has continued its infringement.

**F.      Defendant's Accelerating Plans to Launch Its Infringing TARO Protocol**

At the same time as it has rebuffed Tari's requests to cease and desist, Defendant has elected to accelerate its intended infringement of TARI®, including multiple steps taken in the days and weeks since Tari filed this suit.

On December 13, 2022, the week after Tari filed its Complaint, Defendant held its first "Taro Community Call," an event aimed at promoting TARO to users and soliciting user input on the forthcoming product. (Jain Decl. ¶ 28 Ex. 22.)

On January 26, 2023, Defendant held a second "Taro Community Call" event two days after its deadline to answer. (*Id.* ¶29 .) That same day, Defendant put out a press release promoting a "Taro startup accelerator," as well as an updated test version of Taro based on community feedback and available on GitHub. (*Id*. Ex. 24.)

In recent days, Defendant's efforts have accelerated further. On February 5, 2023, Defendant's Chief Technology Officer and Co-Founder, Olaoluwa Osuntokun promoted Taro's upcoming release during his featured speech at a popular developer conference Starkware Sessions, announcing that "the next version 0.2" is "coming out in like a month or so." (*Id*. ¶32)

In a separate Twitter announcement on February 6, 2023, Mr. Osuntokun stated on Twitter that the "next release will have just about everything needed to fully get off the ground . . ." (*Id*. ¶ 33.)

**G.      Launch of Defendant's TARO Protocol Will Cause Widespread Confusion**

TARO's new protocol, once it launches, will compete directly with TARI® and create a multitude of opportunities for confusion, mischief and outright misfortune. (Jain Decl. ¶¶ 35-45) As detailed above, consumers will encounter the TARI® and TARO protocols side by side in the marketplace in multiple situations. (*Id*..) Once they do, they are highly likely to be confused and to blame Tari for their adverse experiences, damaging its reputation and goodwill. (*Id*.)

To scientifically evaluate actual confusion, Tari commissioned a consumer survey by Dr. Robert Palmatier, a leading marketing scholar and Professor of Marketing at the University of Washington, Foster School of Business. Dr. Palmatier's survey showed that among 200 potential consumers, 51% mistakenly believed that Defendant's TARO product was made by the same

company as TARI® or otherwise affiliated with or authorized by the same company. (Palmatier Expert Decl. ¶ 77.) By contrast, the confusion produced by the "control" brands in the study was less than 16% on average. (*Id.* ¶ 80.)  Dr. Palmatier calculated that there was "net confusion" of 35.3% caused specifically by Defendant's use of the infringing TARO mark. (*Id.* ¶ 80.) Dr. Palmatier concludes that this is strong evidence of consumer confusion and is nearly double the threshold of around 20% that is typically considered a significant problem. (*Id.*.) These results show that when Defendant's infringing TARO products are released at scale, they will cause widespread confusion in the marketplace.

Defendant's impending launch of a competing, nearly identical blockchain brand is existential for Tari. (Jain Decl. ¶¶41-45.)  Consumers who have negative experiences seeking to create and trade TARI®-compatible assets and smart contracts based on confusion with Taro will conclude that Tari's technology did not work as intended. (*Id.*.) These consumers have many options in a rapidly-growing market and would never use Tari again, permanently destroying market opportunities amongst the most important set of early consumer adopters. (*Id.*; Palmatier Dec. ¶¶84-102.)  Similarly, developers who are confused or who are concerned about consumer confusion are likely to avoid using the TARI® platform rather than risk investing in using a protocol that is vulnerable to confusion caused by the presence of an infringing competitor. (Jain Decl.. ¶¶44-45.) Left unchecked, such confusion is likely to spiral into a self-sustaining cycle of losses, preventing TARI® from achieving widespread adoption or remaining viable at all. (*Id.*; Palmatier Dec. ¶¶84-102.)

### H.  Tari's Notice of This Motion

In addition to Tari's prior outreach requesting Defendant to halt development of TARO, on February 21, 2023, Tari's counsel sent a draft of Tari's [Proposed] Temporary Restraining Order and Order to Show Cause to Defendant's counsel in an effort to reach a voluntary resolution. (Hagey Decl. ¶ 8 Ex. 5.)  On the same day, counsel conducted a meet and confer regarding the requested relief.  Defendant's counsel indicated that its client was unlikely to agree to any interim injunction to refrain from launching or releasing TARO, but would reserve rights upon review of Tari's motion. (*Id.*) Tari's undersigned counsel then provided further information regarding

1  Defendant's public announcements of plans to launch TARO, and offered to meet and confer

2  further once Defendant has received the full briefing.  (*Id.*)

3                                              **ARGUMENT**

4          The Lanham Act and Fed. R. Civ. Proc. 65(b) provide the Court with "power to grant

5  injunctions, according to the principles of equity and upon such terms as the Court may deem

6  reasonable."  15 U.S.C. § 1116(a).  A moving party is entitled to a temporary restraining order

7  and/or preliminary injunction if it establishes that (1) it is likely to succeed on the merits, (2) it will

8  suffer irreparable injury if the relief is denied, (3) the balance of equities tips in its favor, and (4)

9  the relief is in the public interest.  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir.

10  2014).  "The substantive standard for issuing a temporary restraining order is identical to the

11  standard for issuing a preliminary injunction." *Bridgestone Brands, LLC v. Dastgah*, No. 16-CV-

12  00906-BLF, 2016 WL 1070670, at *1 (N.D. Cal. Mar. 18, 2016).

13  **I.      TARI IS LIKELY TO PREVAIL ON THE MERITS OF ITS TRADEMARK**
**          INFRINGEMENT CLAIM TO ENJOIN THE TARO PROTOCOL**

14          This is not a difficult case of infringement or unfair competition. Even Defendant's own

15  counsel has confused TARI® for TARO in correspondence, as will thousands of innocent users if

16  TARO is ever allowed to launch.  Such likely confusion and the clear irreparable harm to Tari's

17  business strongly favor an injunction to prevent harms that will be difficult to ever undo.  *See*

18  *Honor Plastic Indus. Co. v. Lollicup USA, Inc*., 462 F. Supp. 2d 1122, 1132 (E.D. Cal. 2006)

19  (citing *Lindy Pen Co. v. Bic Pen Corp.,* 796 F.2d 254, 257 (9th Cir.1986) ("the Ninth Circuit has

20  said it is clear error for a trial court to find no likelihood of confusion when two products with

21  virtually identical marks are in the same market.")  To prevail, Tari must show that it is likely to

22  prevail on both elements of trademark infringement: "(1) that [plaintiff] has a protectible ownership

23  interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer

24  confusion." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) (citations

25  omitted).[1]

26  _____

27  [1] Likelihood of success for infringement also establishes Tari's claims for false designation of
origin and unfair competition. *See Monster Energy Co. v. BeastUp LLC*, 395 F. Supp. 3d 1334,

28

MEMORANDUM IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION TO PRESERVE STATUS QUO AND
FOR PRELIMINARY INJUNCTION

### A.  Ownership of Valid Trademark

Tari owns exclusive trademark rights in the TARI® mark, which it has used in commerce since at least as early as April 29, 2020 and for which it owns U.S. Trademark Registration No. Registration No. 6,701,730. (Jain Decl. ¶ 14, Ex 4-8).) Tari's Certificate of Registration for TARI® constitutes "prima facie evidence of the validity of the trademark and of the facts stated in the certificate." 15 U.S.C. § 1057(b). Thus, Tari's registered TARI® mark is presumed valid and Defendant bears the burden of disproving its validity and enforceability.  *See Filipino Yellow Pages, Inc. v. Asian Journal Publs., Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999).

### B.  Likelihood of Confusion

Tari also will succeed in proving that Defendant's use of TARO is likely to cause consumer confusion. Courts evaluate likelihood of confusion using the non-exhaustive list of "Sleekcraft" factors in *AMF v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), which are addressed in turn below. It is not necessary to prove every factor, or even a majority of factors.  *Pom Wonderful v. Hubbard*, 775 F.3d at 1125 ("Because the factors are fluid, a plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them.").

Courts also "have recognized two distinct claims in the trademark infringement context: forward confusion and reverse confusion." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1159 (9th Cir. 2021).  Both forms of confusion are implicated in this case.  "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder." *Id*. at 1159-60. "By contrast, reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Id*. In other words, "[r]everse confusion occurs where the "trademark infringer so saturates the market with promotion of his trademark that consumers come to believe that the infringer, rather than the plaintiff, is the source of the trademarked product." *FAZE Apparel, LLC v. Faze Clan, Inc.*, No. 218CV02052-RGK-JEM, 2018 WL 3830027, at *4 (C.D. Cal. May 22, 2018).

---

1349–50 (E.D. Cal. 2019) ("A claim for false designation of origin under 15 U.S.C. § 1125 requires proof of the same elements as a claim for trademark infringement").

### 1.   Strength of Marks: the TARI® Mark is Strong

The TARI® mark is inherently distinctive and particularly strong.  The conceptual strength of a trademark is based on its distinctiveness.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).  The distinctiveness spectrum ranges from the weakest generic or descriptive marks, which merely describe the product being sold, to the strongest arbitrary or fanciful marks, which do not inherently describe the product.  *Kendall-Jackson Winery, Ltd. V. E. & J. Gallo Winery,* 150 F.3d 1042, 1047 (9th Cir. 1998).  Arbitrary and fanciful marks are the strongest class of trademarks because "their intrinsic nature serves to identify a particular source of a product," rather than a quality of the product itself.  *Two Pesos*, 505 U.S. at 769.  Such marks "are deemed inherently distinctive and are entitled to protection."  *Id.*

TARI® is an arbitrary and fanciful mark.  The word "Tari" does not describe Tari's products.  Its etymology is Arabic or Italian relating to a Mediterranean gold coin used during the Middle Ages. (Jain Decl. ¶ 14..) Seven hundred years hence, the typical U.S. consumer is not aware of the term's arcane meaning and would consider "Tari" to be a fanciful, original creation, like "Xerox" or "Kodak."  This places the TARI® brand at the highest level of conceptual distinctiveness as a matter of law.  *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1131 n. 7 (9th Cir. 1998) ("Arbitrary or fanciful marks deserve wide protection because the trademark holder can properly expect to run into very little confusion from honest competitors.") Even for consumers aware of the term's etymology, they would encounter the mark as an arbitrary reference disconnected from any particular product or service, and certainly would not expect it to describe or suggest the TARI® protocol and related products and services.

TARI® has been strengthened in the marketplace by Tari's substantial investments in promoting the TARI® brand and developing high-quality product and services. "Commercial strength is based on actual marketplace recognition." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016) (citations omitted). Even in its start-up phase, Tari has already inspired a growing community of developers and received favorable coverage in industry press, further strengthening its mark. (Jain Decl. ¶ 11.) This strength of the mark factor weighs heavily in favor of Tari..

And while TARI® is not yet as well known as leading blockchain protocols, like ETHEREUM, Courts regularly protect freshly registered marks from likely consumer confusion. Courts recognize that the potential for confusion is particularly acute with those consumers who might be unfamiliar with the brand. *Ironhawk*, 2 F.4th at 1163. The doctrine of "reverse confusion" helps protect smaller, newer marks from being swamped by larger competitors intent on snatching a good idea without payment. *Id.* ("in a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark").

## 2.    Similarity of Goods and Services: The Goods and Services are Similar

Turning to the similarity of goods factor, confusion is highly likely because Defendant intends to use its "TARO" mark to market the same type of products and services that Tari markets under the TARI® mark. "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield Commc'ns, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1055 (9th Cir. 1999). Tari "need not establish that the parties are direct competitors to satisfy the proximity or relatedness factor." *Ironhawk*, 2 F.4th at 1163 (citations omitted). "Instead, "related goods (or services) are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Id.*

Here, the similarity of the goods and services is demonstrated by the fact that the products will appear side-by-side in the marketplace. As detailed in the accompanying Declaration of Naveen Jain, confusion is likely in multiple scenarios where consumers will encounter the TARI® and TARO marks together.

***Example #1:  Confusion in Creating NFTs***. Confusion is likely among consumers seeking to create non-fungible tokens (or "NFTs"), which are unique digital assets that can take the form of artwork, other computer files, digital collectibles, or any other unique asset. Today, consumers can create their own NFTs using online websites such as www.Opensea.com ("OpenSea") that simplify the process and do not require technical understanding or coding ability. (Jain Decl. ¶ 36.) Both TARI® and TARO will ultimately be used in creating NFTs. (*Id.*.)

When creating NFTs, users must choose which protocol to use, pitting Tari and Taro against each other on these consumer-facing websites. (*Id.* The Jain Declaration provides an illustration of where the protocols would appear side-by-side on OpenSea as a user chooses to create and NFT) and then selects the intended blockchain or protocol (*Id.*.)

If users become confused based on the similarity between the names Tari and Taro, it will result in them choosing the wrong protocol for their NFT. (*Id.*.) This decision is irreversible and will limit the ways in which the asset can be held and transferred going forward. (*Id.*.)

***Example #2: Confusion in Browsing NFTs for Purchase***. Confusion is also likely among consumers browsing digital assets to purchase and trade online. In online NFT marketplaces such as OpenSea, consumers can also browse digital assets for purchase. (*Id.* ¶ 37.) These sites allow users to sort and filter available assets according to the blockchain and protocol that was used to create them, as illustrated in the Jain Declaration.  As Taro and Tari are adopted, users of sites like OpenSea will need to choose between Tari and Taro correctly as they browse digital assets to purchase. (*Id.*) If users become confused between Tari and Taro, they may purchase digital assets that are based on the wrong protocol. (*Id.*) Again, this will limit the ways in which their assets can be held and transferred going forward and could damage the TARI® brand. (*Id.*)

***Example #3: Confusion in Choosing Digital Wallets***. Confusion is also likely among consumers looking for digital wallet apps compatible with Tari. (*Id.* ¶ 38.) Consumers looking to buy and sell digital assets must choose a wallet compatible with the appropriate protocol for the assets they wish to hold. (*Id.*) As a result, consumers will need to choose between wallets that are compatible with Tari, Taro, or both. (*Id.*.) The Jain Declaration provides an example of how popular wallet apps advertise their compatible protocols and blockchains to potential users. (*Id.*)

Based on the confusing similarity of the names, consumers looking to download a Tari-compatible wallet are likely to mistakenly select a Taro-compatible wallet, and vice-versa. Consumers are unable to hold, accept, or even interact with their digital assets, unless their digital wallet supports the digital asset's protocol. (*Id.*) Additionally, if wallet developers think that the inclusion of the TARI® protocol in their wallets will cause confusion with Taro among their

1  customers, they may be unwilling to incorporate Tari's protocol into their wallets in the future,

2  thereby threatening the success of the protocol's adoption amongst consumers. (*Id*.)

3       ***Example #4:  Confusion in Creating Smart Contracts***. Confusion is also likely among

4  users seeking to create "smart contracts." (*Id*. ¶ 39.) Protocols like Tari and Taro may be used to

5  create "smart contracts," which are agreements between two or more counterparties in the form of

6  computer code programmed to execute automatically and to be verified on the blockchain. (*Id*.)

7  Third-party services like OpenZeppelin simplify the process of creating smart contracts, allowing

8  users to choose between protocols and simply click the contracts' desired features. Then

9  OpenZeppelin automatically loads the appropriate computer code. (*Id*.) Below is an example of the

10 interface with available protocols displayed side by side: (*Id*.)

11      As the Tari and Taro protocols are adopted more widely, users creating smart contracts will

12 need to choose between them on these third-party services, presenting the risk that users will

13 erroneously select Taro when seeking to select Tari or vice-versa. (*Id*.) This will prevent their smart

14 contracts from being successfully created or working as intended. (*Id*.)

15      ***Example #5:  Confusion in Selecting Development Tools***. Confusion is also likely among

16 developers who must select between Tari and Taro when developing applications that use

17 blockchain protocols. (*Id*. ¶ 40) Given the identical intended uses for Tari and Taro, developers are

18 likely to encounter both when researching available protocols and seeking to incorporate them into

19 applications. (*Id*.) The Jain Declaration provides an illustration of where the protocols would likely

20 appear side by side on Alchemy, a popular platform for developers. (*Id*.)

21      Developers are likely to experience confusion in several ways. First, developers looking to

22 use Tari may experience "initial interest" confusion in which they are led to consider using Taro

23 based on the mistaken belief that they are the same protocol. (Palmatier Expert Decl. ¶¶ 98-100.)

24 Second, developers may actually begin incorporating incorrect technical elements from TARO into

25 their applications meant to be compatible with TARI®, for example by downloading incorrect

26 repositories of computer code from GitHub or other sites used by developers to select pre-existing

27 code for incorporation into their own applications. (Jain Decl. ¶ 40.) And third, developers may

28 avoid using Tari entirely in order to avoid potential confusion among end users of their products

who may be confused about whether the product is compatible with the TARI® or "TARO" networks. (*Id.* ¶ 43.)

The fact that the products and services are used for the same purposes and marketed to the same classes of potential consumers far exceeds the degree of relatedness necessary to establish a likelihood of confusion because "[t]he Ninth Circuit defines 'relatedness' broadly, typically requiring only that the parties participate in the same general industry." *Sutter Home Winery v. Madrona Vineyards*, No. C 05-0587 MHP, 2005 WL 701599, at *9 (N.D. Cal. Mar. 23, 2005).

Accordingly, both courts and the United States Patent and Trademark Office have found products and services in the blockchain industry to be related to one another and to other e-commerce products. *Telegram Messenger Inc. v. Lantah, LLC*, No. 18-CV-02811-CRB, 2018 WL 3753748, at *6 (N.D. Cal. Aug. 8, 2018), *aff'd*, 782 F. App'x 528 (9th Cir. 2019) (granting preliminary injunction, holding that relatedness of goods "favor[ed] an injunction" where both parties marketed cryptocurrencies); *Alibaba Grp. Holding Ltd. V. Alibabacoin Found.*, No. 18-CV-2897 (JPO), 2018 WL 5118638, at *6 (S.D.N.Y. Oct. 22, 2018) (granting preliminary injunction, finding likelihood of confusion between cryptocurrency venture and online retail services); *Laura Shin Media, LLC*, No. 91250132, 2021 WL 4473094, at *10 (TTAB Sept. 28, 2021) (finding goods and services "legally identical or otherwise highly related" where parties both provided "goods and services that provide, through a variety of means, news and information in the blockchain and cryptocurrency field"). Defendant's use of a virtually identical trademark to sell an identical type of products and services shows that confusion is highly likely.

### 3. Similarity of Marks: the Marks are Nearly Identical

The marks at issue are nearly identical, establishing a clear likelihood of confusion. "Three general principles help determine whether marks are similar." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032 (9th Cir. 2010) (citations omitted). "First, similarity is best adjudged by appearance, sound, and meaning." *Id.* "Second, the marks must be considered in their entirety and as they appear in the marketplace." *Id.* "Third, similarities are weighed more heavily than differences." *Id.*

1    Here, the TARI® mark and infringing TARO mark are nearly identical in terms of sight and

2    sound because they differ by only one letter. Both are four-letter, two-syllable words, sharing the

3    same first three letters in identical order. The only difference is that Plaintiff's TARI® mark ends

4    in "I", whereas Defendant's infringing TARO mark ends in an "O." Where, as here, the majority of

5    the marks are identical except for a slight change in a single letter, the marks are considered

6    confusingly similar. *See, e.g., Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 836 (C.D.

7    Cal. 2018) (finding that SYNOPTEK and SYNAPTEK are "virtually identical in appearance and

8    only differ by one single letter, 'O' versus 'A.'); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 782

9    F.2d 1508, 1509 (9th Cir. 1986) (affirming injunction because "Park 'N Fly" and "Park and Fly"

10   were "virtually identical, and the services provided by the two parties are precisely the same").

11   This risk of confusion due to the similarity of the marks is further heightened because the

12   only letters that are different between the marks – "O" and "I" – are next to one another on a

13   standard keyboard. The likelihood that a simple typographical error can create even temporary

14   confusion among users and developers gives rise to "initial interest confusion," a form of

15   trademark infringement that arises when a potential consumer mistakenly investigates the

16   infringing product based on the similarity of the marks, even if they later realize their mistake.  *See*

17   *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1063–64, 50

18   U.S.P.Q.2d 1545, 1564–65 (9th Cir. 1999) (reversing with instructions to enter preliminary

19   injunction where defendant's use of infringing internet meta-tags similar to plaintiff's mark was

20   likely to cause "initial interest confusion" by causing potential customers to visit infringer's

21   website ). Accordingly, given the near-identical appearance and sound of the marks, this factor

22   strongly favors a preliminary injunction.

23          **4.     Launch of Defendant's Infringing TARO Protocol Will Cause**
                     **Widespread Confusion**
24

25   "Evidence of actual confusion by consumers is strong evidence of likelihood of confusion."

     *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4[th] 1150, 1165 (9th Cir. 2021). Here, in addition to the
26
     incidents of actual confusion already identified, including confusion of the names by defendants'
27

28

prior counsel, Dr. Palmatier's survey demonstrates conclusively that there will be actual confusion among consumers.

Courts routinely rely on survey evidence as credible evidence of actual consumer confusion. *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) ("Survey evidence may establish actual confusion") (collecting cases). Here, Dr. Palmatier's survey showed that when shown images of the marks alongside a control group, 51% of consumers mistakenly believed that Defendant's TARO product was made by the same company as TARI® or by a company affiliated with or authorized by the same company as TARI®. (Palmatier Expert Decl. ¶ 77.) When compared to control brands, this represents "net confusion" of 35.3% attributable to the infringing mark. (*Id*. ¶ 79.)

These survey results demonstrate that, once Defendant's infringing products are launched at scale, consumer confusion is highly likely to occur. The marketplace scenarios discussed above show that the parties' products will appear in close proximity where the similarity of the marks will make it easy for consumers to mistake the two brands. Given the results of Dr. Palmatier's survey, it is clear that confusion is inevitable. Such results are strong evidence of actual confusion. *See Adidas Am., Inc. v. Skechers USA, Inc.*, No. 16-35204, 2018 WL 2142648, at *5 (9th Cir. May 10, 2018) (affirming preliminary injunction in part where "actual confusion" evidence consisted of survey showing 20% confusion); *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F.Supp.2d 1165, 1179  (S.D. Cal. 2010) (preliminary injunction granted where sole "actual confusion" evidence was survey showing 24.3% net confusion);  *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) (survey showing 27.7% net confusion was sufficient on its own to support finding of likely confusion at trial).  While evidence of actual confusion is not necessary, *see Ironhawk*, 2 F.4th at 1165, its presence here strongly supports issuance of a preliminary injunction.

     **5.**     **Marketing Channels: Plaintiff and Defendant Use the Same Marketing Channels**

Confusion is also likely because marketing channels for TARI® and TARO overlap. "Just as visual, aural, and semantic similarities between marks increase the likelihood of confusion, so

too do convergent marketing channels." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014) (citations omitted). "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Id.*  A party's customer base includes not only actual customers, but also the "potential customers" that the party intends to target for its products. *Ironhawk*, 2 F.4th at 1161 ("[I]t is well established that confusion on the part of potential consumers may be relevant").

Here, there is a close overlap between the parties' customer bases because both parties market their products and services to users interested in creating and transferring digital assets on the blockchain. (Jain Decl. ¶ 21.) As detailed above, the parties' intended customers include both developers interested in integrating TARI® and TARO technology into their own products and consumers who will encounter the marks in the marketplace as they create digital assets like NFTs, buy and sell digital assets, and select third-party applications such as wallets integrating the parties' technology. (*Id.*)  Moreover, even technical differences or barriers between the products would not matter because "[m]arketing channels can converge even when different submarkets are involved so long as the general class of ... purchasers exposed to the products overlap." *Pom Wonderful LLC v. Hubbard*, 775 F.3d at 1130.

The parties' advertising channels are also virtually identical because TARI and TARO rely on the same platforms and outlets to advertise their products, particularly online. Courts have recognized that "the Web, as a marketing channel, is particularly susceptible to a likelihood of confusion since, as it did in this case, it allows for competing marks to be encountered at the same time, on the same screen" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). Here, both Tari and Defendant offer their software on GitHub, an online developer platform that releases open-source software, and facilitates collaboration on software development, including version control, task management, and discussion boards. (Jain Decl. ¶ 20.) They utilize the same social media platforms, including Twitter, Reddit, Messari, GitHub, Freenode, Substack, and Slack. (*Id.*) They also appear in the same industry press publications, both appearing in *Bitcoin Magazine* and other outlets. (*Id.* ¶ 26.) And both are marketed at the same trade shows and conferences,

1  including speaking appearances by both companies' leaders as the Magical Crypto Conference in

2  back-to-back years. (*Id.* ¶ 27.)

3      The extensive overlap between the parties' customers bases and marketing channels further

4  demonstrates that confusion is likely, supporting a temporary restraining order and preliminary

5  injunction.

6          **6.**    **Type of Goods: Consumers Exercise a Relatively Low Degree of Care**

7      The degree of care expected to be exercised by consumers is relatively low, favoring a

8  finding of confusion. When considering this factor, courts consider the "relative sophistication of

9  the relevant consumer, and the degree of care likely to be exercised by that consumer. The

10 reference point for this factor 'is the typical buyer exercising ordinary caution.'" *Fortune Dynamic*,

11 618 F.3d at 1038.

12     Here, the potential customers for both Tari and Taro include relatively unsophisticated

13 consumers, much in the way, for example, credit card companies expect their cards to be used by

14 consumers who do not understand the intricacies of how the credit cards actually work.  Defendant

15 claims, for example, that its ideal user is "somebody who doesn't want to understand the protocol

16 or bitcoin.  It's just somebody who wants to transact cheaply and globally without holding bitcoin

17 themselves."  (*Id.* ¶ 22.) Likewise, Tari defines the mission for its platform is to become "the most

18 useful decentralized platform that empowers *anyone* to create digitally scarce things people love,"

19 (*id.*) (emphasis added)) and has affirmed that "Tari is not just for developers or corporations, as it

20 targets consumers as well." (*Id.*) Additionally, both protocols are open-source, and Tari's wallet is

21 free to download.  The free availability of TARI® and TARO goods and services heightens the

22 likelihood of confusion because "[w]hen dealing with inexpensive products, customers are likely to

23 exercise less care, thus making confusion more likely." *Fortune Dynamic*, 618 F.3d at 1038.

24         **7.**    **Defendant's Intent: Defendant's Infringement is Willful**

25     Confusion is likely because Defendant's infringement is knowing and intentional. "This

26 factor favors the plaintiff 'where the alleged infringer adopted his mark with knowledge, actual or

27 constructive, that it was another's trademark." *Ironhawk*, 2 F.4th at 1167 (quoting *JL Beverage Co.,*

28 *LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1111 (9th Cir. 2016). Defendant has long been aware

1   of Tari, and the parties' leaders know one another and have appeared together at conference and

2   industry events. (Jain Decl. ¶ 27.) Prior to bringing this suit, Tari reached out to Defendant on

3   several occasions, and then sent a letter notifying Defendant that it was infringing the TARI® mark

4   and demanded that such infringement cease. (Hagey Decl. ¶¶ 2, 4 6-8.) In response, Defendant

5   disregarded these warnings and pressed ahead with its plans to launch the infringing Taro platform.

6   Continuing to infringe in the face of warnings is evidence of willful infringement. *Fifty-Six Hope*

7   *Road Music v. Avela*, 778 F. 3d 1059, 1074 (9th Cir. 2015) ("Use of an infringing mark, in the face

8   of warnings about potential infringement, is strong evidence of willful infringement"). Because

9   Defendant was acutely aware of Tari and the TARI® mark well before it decided to launch a

10  product confusingly named TARO, this factor also favors a preliminary injunction.

### 8.   Expansion of Product Lines: The Parties Continue to Expand Product Lines

12          Finally, the expansion of business by either party to compete with the other weighs in favor

13  of finding trademark infringement.  *Sleekcraft*, 599 F.2d at 354. "[A] 'strong possibility' that either

14  party may expand his business to compete with the other will weigh in favor of finding that the

15  present use is infringing." *Id.* Here, such expansion is not only possible, it is already occurring.

16  Through the launch of its TARO product, Defendant has expanded from its core business of

17  operating the Lightning Network into the same territory occupied by Tari – providing a blockchain

18  protocol that will allow users to create and transfer a variety of digital assets. Because the parties'

19  products already compete – and occupy a rapidly-changing market in which further product

20  expansions and developments are constantly occurring – this factor also favors a finding of

21  confusion.

22          In sum, every single factor under the Ninth Circuit's *Sleekcraft* test shows that confusion is

23  likely. Tari is highly likely prevail on the merits of its trademark infringement claims, weighing in

24  favor of a temporary restraining order and preliminary injunction to prevent consumer confusion.

## II.   A TEMPORARY RESTRAINING ORDER AND AN INJUNCTION WILL PRESERVE THE *STATU S QUO* AND PREVENT IRREPARABLE HARM

27          A temporary restraining order and an injunction are necessary because Tari will suffer

28  irreparable harm if Defendant's infringement is allowed to proceed. Because the harms caused by

1   trademark infringement are both highly damaging and difficult to quantify, they cannot be

2   adequately remedied after the fact. "Injunctive relief is the remedy of choice for trademark and

3   unfair competition cases, since there is no adequate remedy at law for the injury caused by a

4   defendant's continuing infringement." *Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1180

5   (9th Cir. 1988).

6         Here, Tari is entitled to a presumption of irreparable harm as a matter of law. The Lanham

7   Act provides that a plaintiff who establishes likelihood of confusion at the preliminary injunction

8   stage is entitled to a rebuttable presumption of irreparable harm as a matter of law *See* 15 U.S.C. §

9   1116(a). Defendant bears the  burden to show why such harm will not occur.

10        The evidence amply demonstrates, however, that Tari will suffer irreparable harm if

11   Defendant's infringement is not enjoined. As explained by Dr. Palmatier, these include damage to

12   Tari's goodwill and reputation, destruction of the value of the Tari trademark, and initial interest

13   confusion and missed market opportunities. (Palmatier Expert Decl. ¶¶ 84-102.) "These harms to

14   Tari's brand and trademark are very difficult to repair, will play out over a long-term time horizon,

15   and cannot be easily calculated or reduced to a monetary figure." (*Id*.) And Tari's CEO explains

16   that consumer confusion now may prevent Tari from ever reaching widespread adoption:

17
18
19
20
21
> Because the success of the Tari protocol relies on adoption by a
> network of users, each of these losses has a dramatic effect: not only
> does each loss represent a lost business opportunity for us, but each
> user who is driven away from the platform actually makes the
> platform less useful by reducing the "network effect" enjoyed by
> other users, which makes them less likely to continue using it in turn.
> This confusion threatens to spiral out of control, preventing Tari from
> achieving widespread adoption or achieving a viable launch at all

(Jain Decl. ¶ 44)

22
23        Such harm is irreparable and cannot be reduced to money damage, requiring injunctive

24   relief. *See FAZE Apparel, LLC v. Faze Clan, Inc.*, No. 218CV02052RGKJEM, 2018 WL 3830027,

25   at *7 (C.D. Cal. May 22, 2018) ("[e]vidence of loss of control over business reputation and damage

26   to goodwill can constitute evidence of a likelihood of irreparable harm").

27        Equally damaging and irreparable is the harm to Tari from reverse confusion. If Defendant

28   is permitted to launch its infringing "TARO" product at scale using its vastly superior marketing

resources, it will swamp TARI® in the marketplace and prevent it from developing goodwill under

its mark. "Reverse confusion can foreclose the senior user from expanding into related fields and

could place the senior company's goodwill in the hands of the junior user." *Ironhawk Techs., Inc.*

*v. Dropbox, Inc.*, 2 F.4th 1150 at 1160. "The result of reverse confusion 'is that the senior user

loses the value of the trademark—its product identity, corporate identity, control over its goodwill

and reputation, and ability to move into new markets'" *Id.* The damage from such reverse

confusion is irreparable, requiring a preliminary injunction.

   Given the imminent launch of Defendant's infringing products and services, issuing a

temporary restraining order would serve the parties and public by "preserv[ing] the status quo until

there is an opportunity to hold a hearing on the application for a preliminary injunction." *Granny*

*Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974).

The status quo here, meaning "the last uncontested status which preceded the pending

controversy," is before Defendant's infringement. *Regents of the Univ. of Cal. v. Am. Broad. Cos.*,

747 F.2d 511, 514 (9th Cir. 1984). Because Defendant has not yet launched its infringing protocol,

a temporary restraining order pending a hearing on Tari's motion is appropriate to prevent

irreparable harm before the motion can be heard. *Cognizant Tech. Sols. U.S. Corp. v. McAfee*, No.

14-CV-01146-WHO, Dkt. No. 15 (N.D. Cal. Mar. 21, 2014) (Orrick, J.) (granting temporary

restraining order prohibiting defendant from releasing software application under infringing

trademark pending hearing on motion for preliminary injunction, finding that balance of equities

tipped in favor of plaintiff who owned federal registration).

## III.  THE BALANCE OF EQUITIES FAVORS AN INJUNCTION

   The balance of the equities also favors a temporary restraining order and injunction,

particularly in light of the fact that Defendant's infringing product has not yet launched at scale.

To prevail, Tari need only show that "the balance of equities tips in its favor." *Pom Wonderful LLC*

*v. Hubbard*, 775 F.3d 1118, 1122 (9th Cir. 2014) (reversing denial of preliminary injunction). Here,

granting a temporary restraining order and preliminary injunction serves the equities of this dispute

because it maintains the *status quo* pending resolution of this dispute. *Napa Valley Publ'g Co. v.*

*City of Calistoga*, 225 F. Supp. 2d 1176, 1180 (N.D. Cal. 2002) ("A preliminary injunction is a

1  provisional remedy, the purpose of which is to preserve status quo and to prevent irreparable loss

2  of rights prior to final disposition of the litigation.").

3      Defendant's TARO platform has not yet launched at full scale, despite Defendant's public

4  statements threatening to do so. As a result, the burden on *both* parties if an injunction issues now

5  is less than it would be if a Defendant were permitted to proceed with a full-scale launch now, then

6  enjoined later. *See, e.g., Telegram Messenger Inc. v. Lantah, LLC*, No. 18-CV-02811-CRB, 2018

7  WL 3753748, at *8 (N.D. Cal. Aug. 8, 2018), *aff'd*, 782 F. App'x 528 (9th Cir. 2019) (granting

8  preliminary injunction where "it would be easier for [defendant] to change its mark" because

9  defendant had not yet begun selling product).

10     By contrast, Defendant's knowing infringement threatens to wipe out the TARI® brand and

11  destroy its business before it has an opportunity to establish itself in the marketplace. (Jain Decl.

12  ¶45; Palmatier Expert Decl. ¶¶ 84-102.) Tari has devoted considerable resources developing the

13  TARI® protocol, obtained a federal trademark registration, and extensively promoted its products

14  under the TARI® mark. (Jain Decl. ¶¶10-14.)  By contrast, Defendant only recently adopted the

15  "TARO" mark with knowledge that Tari was already using the TARI® mark. Defendant could

16  easily rebrand its product using a different non-infringing name – unlike Tari, whose TARI® mark

17  is not only the name of a product, but also the "house mark" on which Tari's entire business is

18  built.

19     Defendant can claim virtually no hardship from abiding an injunction.  To begin, Defendant

20  can easily change the branding of its new protocol before launch with minimal, if any, disruption to

21  its business.  (Jain Decl. ¶46.) In any event, Defendant's interest in engaging in confusing misuse

22  of a trademark deserve little weight:  "Where the only hardship that the defendant will suffer is"

23  due to cessation of infringement, "such an argument in defense merits little equitable

24  consideration" because an infringer "cannot complain of the harm that will befall it when properly

25  forced to desist from its infringing activities." *Triad Sys. Corp. v. Southeastern Express*, 64 F.3d

26  1330, 1338. Defendant has "no equitable interest in continuing an infringing activity." *Fox*

27  *Television v. BarryDriller Content Sys.*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012).

28

In sum, an injunction preserves the *status quo*, helps save Tari's business, and poses little, if any, imposition on Defendant.

## IV.   THE PUBLIC INTEREST FAVORS A TEMPORARY RESTRAINING ORDER AND INJUNCTION

Finally, a temporary restraining order and preliminary injunction preserving the status quo and preventing consumer confusion serves the public interest.  "When a trademark is said to have been infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control his products' reputation" *FAZE Apparel*, 2018 WL 3830027, at *8. The confusion at issue here is particularly ripe for injunction because of the likely harm that will befall consumers who would mistakenly use Defendant's TARO protocol believing it is the TARI® protocol, or *vice-versa*.  Indeed, the entire blockchain industry is under pressure to weed out bad actors and build consumer trust.  Defendant's reckless efforts will only engender further potential losses and frustration amongst an innocent public and should be enjoined if for no other reason than this.

## V.   THE COURT SHOULD WAIVE ANY BOND REQUIREMENT UNDER RULE 65

Tari should not be required to post security under Fed R. Civ. P. 65(c) given Defendant's knowing misconduct, opportunities to avoid and cease infringement, and because Defendant has not yet even publicly launched its competing protocol   *See 2Die4Kourt v. Hillair Capital Mgmt., LLC*, 692 F. 'pp'x 366, 369 (9th Cir. 2017) ("Rule 65(c) invests the district court with discretion as to the amount of security required, if any. […] The likelihood of success on the merits, as found by the district court, tips in favor of a minimal bond or no bond at all.") (citations and internal quotation signals omitted). This Court has imposed a minimal bond in the case of pre-release injunctions against infringing software products. *Cognizant Tech. Sols. U.S. Corp. v. McAfee*, No. 14-CV-01146-WHO, Dkt. No. 15 (N.D. Cal. Mar. 21, 2014) (Orrick, J.) ($100 bond for pre-release TRO against infringing software product).

## <u>CONCLUSION</u>

Plaintiff Tari Labs respectfully requests that the Court enter a modest temporary restraining order and order to show cause why preliminary injunction should not issue in the form as set forth in the appended [Proposed] Order that Defendant cease further infringement of the TARI® mark.

Dated:  February 21, 2023

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:   _/s/ J. Noah Hagey_____
J. Noah Hagey

*Attorneys for Plaintiff*
*Tari Labs, LLC*

MEMORANDUM IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION TO PRESERVE STATUS QUO AND
FOR PRELIMINARY INJUNCTION