Christopher S. Ford (State Bar No. 337795)
    csford@debevoise.com
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, CA 94108
Tel: 415-644-5628

Megan K. Bannigan (*Pro Hac Vice*)
    mkbannigan@debevoise.com
Timothy Cuffman (*Pro Hac Vice*)
    tcuffman@debevoise.com
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: 212-909-6000

*Attorneys for Defendant*
*Lightning Labs, Inc.*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

------------------------------------------------- x
                                          :
TARI LABS, LLC,                           :
                                          :
                Plaintiff,                :
                                          :
            -against-                     :
                                          :
LIGHTNING LABS, INC.                      :
                                          :
                Defendant.                :
                                          :
------------------------------------------------- x

CASE NO.: 3:22-CV-07789-WHO

**DEFENDANT LIGHTNING LABS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

FACTS ............................................................................................................................. 3

    I.      Lightning Labs and the TARO Protocol ...................................................... 3

    II.     Tari Labs and Its Months of Awareness of TARO ..................................... 5

ARGUMENT .................................................................................................................... 6

    I.      Tari Labs Is Unlikely to Succeed on the Merits of Its Claims. ................... 7

               1.      The TARI Mark Is Weak. .............................................................. 8

               2.      Tari Labs' and Lightning Labs' Services Are Not Proximate........... 9

               3.      The Marks Differ in Sight, Sound, and Especially Meaning. ......... 12

               4.      There Is No Evidence of Actual Confusion, Nor Has Tari
                       Labs Submitted Any Reliable Evidence of Likely Confusion. ....... 14

               5.      The Parties Market to Different Consumers, and Any
                       Overlap in Their Marketing Channels Is Immaterial. .................... 17

               6.      Lightning Labs' Developer End-Users Exercise a High
                       Degree of Care. ............................................................................. 17

               7.      Lightning Labs Acted in Good Faith in Adopting the TARO
                       Name. ............................................................................................ 19

               8.      Lightning Labs Is Not Likely to—and in Some Respects
                       Cannot—Expand into Tari Labs' Core Business. .......................... 20

    II.     Tari Labs' Purported Irreparable Harm is Undercut by Its Delay............................ 20

    III.    The Balance of Equities Tips Sharply in Lightning Labs' Favor. ......................... 23

    IV.    A TRO Is Not in the Public Interest. ......................................................... 24

CONCLUSION ............................................................................................................... 25

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3
*3M Co. v. Ugly Juice, LLC*, 21-CV-2338, 2021 WL 1947579 (N.D. Cal. May 14, 2021) ............ 22

4
*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, 18-CV-2897, 2018 WL 5118638 (S.D.N.Y.
5
   Oct. 22, 2028) ................................................................................................................ 12

6
*Aliign Activation Wear, LLC v. Lululemon Athletica Can., Inc.*, 21-CV-55775, 2022 WL 3210698
   (9th Cir. 2022) ................................................................................................................ 14

7
*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) ......................................................... 7
8
*Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115 (C.D. Cal. 2009) ........................................ 8
9
*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036 (9th Cir. 1999) ..................... 7
10
*Cognizant Technology Solutions v. McAfee*, 14-CV-1146 (N.D. Cal. Mar. 21, 2021) ................... 25
11
*Collins v. U.S. Dep't of Veterans Affs.*, 497 F. Supp. 3d 885 (S.D. Cal. 2020) ............................. 9
12
*Componentone, L.L.C. v. Componentart, Inc.*, 05-CV-1122, 2008 WL 4790661 (W.D. Pa. Oct. 27,
   2008) ............................................................................................................................... 18
13

14
*Coop. Regions of Organic Producer Pools v. Stueve's Certified Organic Dairy*, 14-CV-1123,
15
   2014 WL 12571393 (E.D. Cal. July 25, 2014) ............................................................... 21

16
*Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, 14-CV-2770, 2014 WL 5361548
17
   (N.D. Cal. Oct. 20, 2014) ................................................................................................ 23

18
*D.Light Design, Inc. v. Boxin Solar Co.*, 13-CV-5988, 2014 WL 12659909 (N.D. Cal. Feb. 3,
   2014) ............................................................................................................................... 22
19

20
*Dfinity Found. v. Meta Platforms, Inc.*, 22-CV-2632, 2022 WL 16857036 (N.D. Cal. Nov. 10,
   2022) ......................................................................................................................... 18, 19

21
*Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*, 17-CV-6393, 2018 WL 659105 (N.D. Cal.
22
   Feb. 1, 2018) ......................................................................................................... 12, 15, 22

23
*FieldTurf USA Inc. v. Tencate Thiolon Middle E.*, 945 F. Supp. 2d 1379 (N.D. Ga. 2013) ..... 12, 13

24
*Fifty-Six Hope Rd. Music, Ltd. v. AVELA, Inc.*, 778 F.3d 1059 (9th Cir. 2015) ............................. 20

25
*First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*, 356 F. Supp. 2d 1048 (C.D. Cal. 2005).... 13

26
*Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180 (N.D. Cal. 2015) ................................................. 19

27
*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415
28
   U.S. 423 (1974) ................................................................................................................ 7

ii

*Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067 (N.D. Cal. 2012) ................................... 18

*Haven Cap. Mgmt., Inc. v. Havens Advisors, L.L.C.*, 965 F. Supp. 528 (S.D.N.Y. 1997) ............ 12

*Hershey Co. v. Promotion in Motion, Inc.*, 07-CV-1601, 2013 WL 12157828 (D.N.J. Jan. 18, 2013) ...................................................................................................................................... 16

*iCall v. Tribair, Inc.*, 12-CV-2406, 2012 WL 5878389 (N.D. Cal. Nov. 21, 2012) ................ 12, 13

*Jackpocket, Inc. v. Lottomatrix NY LLC*, 22-CV-5772, 2022 WL 17733156 (S.D.N.Y. Dec. 7, 2022) ...................................................................................................................................... 13

*JIPC Mgmt., Inc. v. Incredible Pizza Co., Inc.*, 08-CV-4310, 2008 WL 11336396 (C.D. Cal. Aug. 26, 2008) .................................................................................................................................. 15

*JL Beverage Co., LLC v. Jim Beam Brands Co.*, 815 F. App'x 110 (9th Cir. 2020) ..................... 19

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 04-CV-7203, 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006) ...................................................................................................................................... 16

*Khadavi v. Stagi, Inc.*, 20-CV-7948, 2021 WL 4057526 (C.D. Cal. Apr. 8, 2021) ....................... 21

*Lasco Fittings, Inc. v. Lesso Am., Inc.*, 13-CV-2015, 2014 WL 12570930 (C.D. Cal. Jan. 16, 2014) ............................................................................................................ 19

*Laura Shin Media, LLC v. Mary Pura Sendra*, No. 91250132, 2021 WL 4473094 (T.T.A.B. Sept. 28, 2021) .................................................................................................................................. 12

*Matrix Motor Co. Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d (C.D. Cal. 2003) ... 15

*MKS Instruments, Inc. v. New Power Plasma*, 09-CV-2297, Dkts. 6 & 7 (N.D. Cal. June 18, 2009) ............................................................................................................ 22

*Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930 (9th Cir. 2015) .................................. 14

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011) ...... 8, 17

*Oculu, LLC v. Oculus VR, Inc.*, 14-CV-196, 2015 WL 3619204 (C.D. Cal. June 8, 2015) ........... 18

*One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154 (9th Cir. 2009) ................................ 9

*Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.*, 782 F.2d 1508 (9th Cir. 1986) .............................. 14

*Perez v. City of Petaluma*, 21-CV-6190, 2021 WL 3934327 (N.D. Cal. Aug. 13, 2021) .............. 21

*PerkinElmer Health Scis., Inc. v. Atlas Database Software Corp.*, No. 92046554, 2011 WL 7005538 (T.T.A.B. Dec. 22, 2011) ........................................................................................ 9

*Playtext Prods, Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158 (2d Cir. 2004) .............................. 16

RESPONSE IN OPPOSITION TO MOTION FOR TRO                    Case No. 3:22-cv-07789-WHO

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014) ................................................. 17

*R.F. by Frankel v. Delano Union Sch. Dist.*, 224 F. Supp. 3d 979 (E.D. Cal. 2016)........................ 6

*Ramirez v. Navarro*, 20-CV-2408, 2023 WL 1806847 (C.D. Cal. Jan. 5, 2023)............................. 8

*Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190 (9th Cir. 2012) ............................................... 7

*Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086 (N.D. Cal. 2012) ...................... 21

*Sarieddine v. Vaptio, Inc.*, 20-CV-7785, 2021 WL 4731341 (C.D. Cal. June 15, 2021)................. 8

*Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013 (N.D. Cal. 2017)...................... 8

*Sebastian Brown Prods. LLC v. Muzooka Inc.*, 15-CV-1720, 2016 WL 949004 (N.D. Cal. Mar. 14, 2016) .................................................................................................................................................. 7

*Stone Brewing Co., LLC v. MillerCoors LLC*, 18-CV-331, 2022 WL 4596570 (S.D. Cal. Aug. 4, 2022) ................................................................................................................................................ 16

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ................... 6

*Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825 (C.D. Cal. 2018)...................................... 14

*TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88 (2d Cir. 2001)....................................... 13

*Telegram Messenger Inc. v. Lantah, LLC*, 18-CV-2811, 2018 WL 3753748 (N.D. Cal. Aug. 8, 2018) ................................................................................................................................................ 12

*Warner Bros. Ent. v. Global Asylum, Inc.*, 12-CV-9547, 2012 WL 6951315 (C.D. Cal. Dec. 10, 2012) ................................................................................................................................................ 22

*Waterloo Sparkling Water Corp. v. Treaty Oak Brewing & Distilling Co., LLC*, 21-CV-161, 2021 WL 5568159 (W.D. Tex. Nov. 28, 2021)...................................................................................... 16

*Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7 (2008) ................................................................ 6

**Statutes**

15 U.S.C. § 1060(a)(1) ..................................................................................................................... 7

**Treatises**

5 McCarthy on Trademarks and Unfair Competition § 30:51 (5th ed.).......................................... 24

**PRELIMINARY STATEMENT**

Plaintiff Tari Labs, LLC's ("Tari Labs") request for emergency relief to enjoin Defendant Lightning Labs, Inc. ("Lightning Labs") from continuing to work on its TARO protocol—which Tari Labs has known about for nearly ten months—is meritless. Tari Labs' entire motion is premised on the false and unsupported assertion that there is overlap between two entirely separate blockchain products, or their users. There is not: the parties provide their products to different consumers in a highly specialized and technical field, rendering confusion virtually impossible. It is thus hardly unsurprising that, in the ten months since TARO was publicly announced, and the five months since Lightning began publicly releasing TARO code, there has been no evidence whatsoever of any actual confusion.

The TARO protocol is software targeted to sophisticated Bitcoin software developers. TARO is not, and will not be, marketed to developers on other blockchains (because TARO does not work on any blockchain other than Bitcoin) or to ordinary consumers (because TARO is a highly sophisticated set of developer tools for creating digital assets). While it is not entirely clear what Tari Labs is doing, it is clear that, whatever its purported product is, it neither works on Bitcoin nor targets its products to Bitcoin developers.

TARO also is not the name of a consumer-facing blockchain, or the name of a consumer-facing cryptocurrency. TARO allows developers to create new digital assets, but those assets will not be called TARO, they will be given whatever names their developers choose. While Tari Labs seeks to paint with a broad brush—lumping together the entire cryptocurrency industry, different types of software, and different developer communities—the reality is that there is not just one uniform crypto industry or one uniform type of software developer. Different blockchains have distinct communities, and the Bitcoin software developer community has a reputation for working exclusively on Bitcoin.

If that were not enough, the parties also use entirely different blockchain technology, rendering confusion even less likely. The TARI blockchain and digital asset are being created on the Monero blockchain, while the TARO protocol will exist only on the Bitcoin blockchain. Just like Windows developers do not write code for Apple computers, different blockchains are

1

1   incompatible, distinct universes.  The Bitcoin developers who will work on TARO do not write

2   code for the Monero blockchain that will power TARI (and vice versa).

3        Developers are also sophisticated, careful users who will not confuse entirely separate

4   protocols for entirely separate blockchains.  The TARO protocol requires a specific feature of the

5   Bitcoin blockchain—called Taproot—to function.  TARO cannot, and will not, function on

6   Monero or the TARI blockchain.  Software developers are careful in choosing the software

7   programs and tools they use to do their jobs, and will not be confused into using a tool designed to

8   create digital assets on Bitcoin when they want to use the Monero-based TARI.

9        Tari Labs' meritless claims are underscored by the lack of any evidence of actual

10   confusion over the last ten months.  Instead of providing any such evidence, Tari Labs has

11   submitted a survey conducted by Dr. Robert Palmatier that purports to test for likelihood of

12   confusion.  But Dr. Palmatier's survey is fatally flawed because it violates the most basic

13   principles of survey design, rendering it effectively worthless, as Defendant's expert Dr. Sarah

14   Butler explains.  Dr. Palmatier's survey repeats the same flaws that have caused courts in other

15   cases to exclude his surveys entirely.

16        Tari Labs' failure on the merits by itself is sufficient to deny the motion.  But Tari Labs'

17   months-long delay before bringing this case, and then further months of delay before seeking a

18   TRO, is independently a basis to deny the requested relief.  Courts in this Circuit have denied

19   TROs based on a delay of mere weeks, a significantly shorter amount of time than the months that

20   Tari Labs has been aware of the TARO project.  In an effort to exclude its delay, Tari Labs

21   fabricates an argument that Lightning Labs has "accelerated" its development of TARO.  That is

22   not true: Lightning Labs has been publicly working on the steady development of the open-source

23   TARO code, with no change in pace since making the code public last September.

24        By contrast, Lightning Labs will suffer harm if an injunction enters—and, in fact, is

25   already being irreparably harmed by the Court's present order intended to preserve the status quo.

26   Because the entire software development process for TARO has *only* happened in a public, shared

27   Github code repository since the code became open-source last September, the Court's order

28   prohibiting Lightning Labs from continuing public work on TARO had the effect of significantly

1    hindering all of Lightning Labs' work on TARO.  And, because an active external community of

2    software developers is working on TARO alongside Lightning Labs, the sudden halt to Lightning

3    Labs' work is similarly public and damages Lightning Labs' reputation and credibility within that

4    developer community.  Given the weakness of Tari Labs' claims on the merits, and the absence of

5    any credible argument that Tari Labs has been or will be harmed (at all, let alone irreparably), the

6    bar to Lightning Labs' ordinary software development should not continue.  Tari Labs' motion for

7    a temporary restraining order should be denied, and the current order vacated.

8                                            **FACTS**

9    **I.      Lightning Labs and the TARO Protocol**

10            Lightning Labs was founded in 2016 with the goal of making it easier to send and receive

11   value using cryptocurrency.  Decl. of Elizabeth Stark ("Stark Decl.") ¶¶ 13–14.  Elizabeth Stark

12   and Olaoluwa ("Laolu") Osuntokun are co-founders of Lightning Labs.  *Id.* ¶ 13.  Today,

13   Lightning Labs works to bring the benefits of Bitcoin to a broad community of users, especially

14   those left behind by—or who do not have access to—the traditional financial system.  *Id.* ¶ 11.

15   Lightning Labs' mission is to build technology to help bring financial freedom to the world,

16   especially emerging markets across Africa, Latin America, and Southeast Asia.  *Id.* ¶¶ 11, 27.

17            To advance that mission, Lightning Labs builds software for sophisticated Bitcoin and

18   Lightning Network software developers.  The "Lightning Network" is an open-source protocol

19   that is built on top of the Bitcoin blockchain.  *Id.* ¶ 14.  Lightning Labs builds tools that help

20   developers enable instant, high-volume, low-fee transactions, with the goal of enabling people to

21   send money over the Internet as easily as they can send an email or photograph.  *Id.*

22            On April 5, 2022, Lightning Labs published a blog post (and a set of detailed technical

23   specifications) announcing TARO: a software protocol for developers to build new digital assets

24   on the Bitcoin blockchain and transact with them over the Bitcoin blockchain or the Lightning

25   Network.  *Id.* ¶¶ 36, 41.  TARO stands for "Taproot Asset Representation Overlay," because

26   TARO's core functionality was enabled by an upgrade to the Bitcoin blockchain called Taproot.

27   *Id.* ¶ 19.  The TARO name was selected because taro root is a common ingredient used in Latin

28   American, Southeast Asian, and African cuisines—which were three key regions for the growth of

                                                3

Lightning Labs' technology—and also is a major ingredient in Nigerian cuisine—which appealed to Mr. Osuntokun given his Nigerian heritage. *Id.* ¶ 39. The TARO announcement was well-publicized, with coverage in major news outlets including Bloomberg, CNBC, and Axios. *Id.* ¶ 42.

Like all of Lightning Labs' products, the TARO protocol is solely intended to be used by Bitcoin blockchain and Lightning Network developers, who are Lightning Labs' core users. Those developers will use the TARO protocol to create digital assets on the Bitcoin blockchain, which the developers will brand however they choose. Although ordinary consumers might ultimately buy and sell those digital assets, they are highly unlikely to come into contact with the TARO name, since it is the name of a tool used by developers, not what the developers use the tool to create. *Id.* ¶¶ 16–23, 31–38; *see also* Declaration of JP Singh ("Singh Decl."), at ¶¶ 22–29, 32–34. Contrary to Tari Labs' assertions, TARO is not—and will never be—a blockchain or a digital asset: it is a tool that will allow Bitcoin developers to create new digital assets. Stark Decl. ¶¶ 18, 30, 32, 73–74, 82.

Between April 2022 and September 2022, the TARO protocol was under early, initial development within Lightning Labs. Developers in the industry were widely aware of TARO, but the software code was visible only to Lightning Labs employees and contractors and select external contributors while Lightning Labs did initial work to develop the protocol. Stark Decl. ¶¶ 43–44.

That changed on September 28, 2022, when Lightning Labs made the initial TARO code base for the Bitcoin test network ("testnet") public on Github (a commonly used platform for storing and working on code) under an open source MIT license. *Id.* ¶ 45. Since then, all coding work on TARO, and updates to the protocol, have been public—any developers who wished could work on, and experiment with, the protocol. *Id.* ¶¶ 46–47. Today, TARO remains in its early "alpha" stage of development, and Lightning Labs has been working continuously and publicly to update the protocol, adding features and responding to ongoing feedback from developers. *Id.* ¶¶ 48–62.

Lightning Labs hoped to release version 0.2 alpha of the TARO software within a few

4

months.  Since all of the TARO code has been public since September 2022, including most of the code that is expected to be part of version 0.2 alpha, a "release" in this context simply means that a certain version of the code will be designated as version 0.2 alpha, and further changes to the code will happen on top of that version.[1]

The community of Bitcoin software developers has responded to TARO with significant interest.  Since September 2022, third-party developers have used and contributed to TARO, which is common for open-source protocols.  *Id.* ¶ 47.  In response to this developer interest, in December 2022, Lightning Labs began holding calls (one in December 2022 and one in January 2023) to bring the developer community together to discuss TARO.  During these calls, which are typical for open-source software development, Lightning Labs describes the progress being made on the protocol and gets feedback from the developer community.  *Id.* ¶ 58.

Other third parties have also begun projects to support the TARO protocol.  In August 2022, two prominent companies in the Bitcoin space (NYDIG and Stone Ridge) announced Wolf, a startup accelerator for companies that were interested in building on the Lightning Network and using the TARO protocol.  *Id.* ¶ 47.

The principal new feature that TARO version 0.2 alpha will enable on the Bitcoin test network is a highly technical concept within the protocol called "universes", which will allow developers to build software that interacts with groups of assets.  The ability to create, send, and receive new assets—which is the core functionality of the TARO protocol—has existed within the software since the initial alpha version of TARO was publicly released for the Bitcoin test network back in September 2022.  Osuntokun Decl. ¶ 34.

## II.      Tari Labs and Its Months of Awareness of TARO

Tari Labs holds a federal trademark registration (No. 6,701,730) for TARI for a variety of

---

[1] Tari Labs has made much of a casual reference in a single reply Tweet sent in early February by Osuntokun, which Tari Labs mischaracterizes as an "announcement."  Mr. Osuntokun's reply merely explained to a fellow sophisticated developer that the technical features planned for the version 0.2 alpha release would let developers "get off the ground" in testing the protocol. Declaration of Olaoluwa Osuntokun ("Osuntokun Decl.") ¶¶ 33–34.  What Mr. Osuntokun was referring to was no secret: the features of version 0.2 alpha have been publicly available and described on the public TARO Github page for months.  *Id.*; Stark Decl. ¶ 46.

"cryptocurrency trading and exchange services."  After initial announcements in 2018 about a Tari-branded blockchain and digital asset, Tari Labs has to date released only an early test version of its blockchain that allows users to trade in what Tari's website calls "fake Tari" with "no monetary value."  *Id.* ¶¶ 65, 99.  While Tari Labs points to a number of other purported TARI-branded projects in their papers, the unifying feature of all of them is that they only work on or with the Monero-based TARI blockchain, not Bitcoin.

Uncontested documentary evidence establishes that Tari Labs' co-founder learned of the TARO project in April 2022.  *Id.* ¶¶ 66–67.  At the time, Lightning Labs responded to Tari Labs' general expression of concern by pointing out that no confusion was likely among the sophisticated developer community between the TARO protocol for the Bitcoin blockchain and whatever software Tari Labs may be developing for a separate blockchain, Monero.  *Id.* ¶¶ 67–70.

It was not until September 2022, *five months* after first learning about TARO and shortly before TARO's initial code was publicly released, that Tari Labs sent Lightning Labs a letter requesting that it change the name of the TARO protocol.  *Id.* ¶¶ 61, 110.  When Lightning Labs declined to do so, Tari Labs then waited *three more months*, until December 2022, before filing this trademark infringement action.  *Id.* ¶ 110.  After filing its complaint, Tari Labs then waited *two more months*, until late February 2022, before suddenly filing an *ex parte* motion for a temporary restraining order, alleging that Lightning Labs is suddenly "accelerating" plans to launch TARO, despite the fact that ordinary development on TARO has proceeded publicly and no actual acceleration or change had taken place in the weeks or months prior to Tari Labs' filing.

## ARGUMENT

A temporary restraining order ("TRO") is "an extraordinary remedy that may only be rewarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7, 22 (2008); *see Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (applying the preliminary injunction standard to TROs).  TROs are reserved for "true emergenc[ies] which require[] 'preserving the status quo and preventing irreparable harm.'"  *R.F. by Frankel v. Delano Union Sch. Dist.*, 224 F. Supp. 3d 979, 987 (E.D. Cal. 2016) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto*

*Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974)).  To obtain a TRO, Tari Labs must show

(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of

preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in

the public interest.  *Winter*, 555 U.S. at 20.

## I.   Tari Labs Is Unlikely to Succeed on the Merits of Its Claims.

To prevail on its trademark infringement claim, Tari Labs must prove (1) that it has a

protectible ownership interest in the TARI mark, and (2) that Lightning Labs' use of the TARO

mark is likely to cause consumer confusion.  *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190,

1198–99 (9th Cir. 2012).  Tari Labs has failed to demonstrate a likelihood of confusion.[2]

To determine whether consumer confusion is likely, the Ninth Circuit applies the eight

factors laid out in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979): (1) similarity of the

marks; (2) strength of the mark allegedly infringed upon; (3) proximity between the two entities'

goods and services; (4) likelihood that the defendant will expand into the plaintiff's market; (5)

degree of care likely to be exercised by purchasers of the services; (6) evidence of actual

confusion in the marketplace; (7) similarity of the marketing channels used; and (8) defendant's

intent in selecting the mark.  *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036,

1053–54 (9th Cir. 1999) (citing *Sleekcraft*, 599 F.2d at 348–49).  This test is "pliant": "Some

factors are much more important than others, and the relative importance of each individual factor

will be case-specific"—especially "in the Internet context," where "emerging technologies require

---

[2] Lightning Labs has serious questions about whether Tari Labs owns protectible trademark rights, but given the early stage of these proceedings, Lightning Labs has not yet obtained necessary discovery.  Tari Labs' rights to the TARI trademark derive from a 2018 assignment of interest from AccessCoin, LLC to Tari, LLC (the prior name of Tari Labs), which was filed with the U.S. Patent and Trademark Office ("USPTO").  That assignment occurred two years before Tari Labs claimed to have ever used the TARI mark.  But "an intent-to-use applicant may not assign an intent-to-use application before filing an allegation of use, unless the application is transferred with at least part of the applicant's 'ongoing and existing' business to which the mark pertains." *Sebastian Brown Prods. LLC v. Muzooka Inc.*, 15-CV-1720, 2016 WL 949004, at *8 (N.D. Cal. Mar. 14, 2016); *see also* 15 U.S.C. § 1060(a)(1).  There is no evidence that any business assets of AccessCoin, LLC were transferred to Tari, LLC in connection with the assignment of rights in the TARI trademarks, thus calling into question the validity of the assignment—and the validity of the registration.  *Muzooka*, 2016 WL 949004, at *8.

7

1   a flexible approach." *Id.* at 1054.  No factor favors Tari Labs in this case.

2       **1.  The TARI Mark Is Weak.**

3       There is no evidence that TARI is a commercially strong mark.  "Commercial strength is

4   based on 'actual marketplace recognition,'" *Network Automation, Inc. v. Advanced Sys. Concepts,*

5   *Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (citation omitted), and "may be demonstrated by

6   commercial success, extensive advertising, length of exclusive use, and public recognition,"

7   *Ramirez v. Navarro*, 20-CV-2408, 2023 WL 1806847, at *6 (C.D. Cal. Jan. 5, 2023) (citation and

8   quotation marks omitted).

9       Tari Labs' evidence on this factor consists of news articles from 2018 and a handful of

10  screenshots of Tari Labs own social media posts.  ECF No. 28-1; ECF No. 28-2.  Neither of these

11  submissions shows that Tari Labs has achieved "actual marketplace recognition."  *See Aurora*

12  *World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115, 1159 (C.D. Cal. 2009) (plaintiff had not

13  demonstrated commercial strength where it had not "proffered evidence regarding its U.S. sales,

14  the size of the relevant market or its market share" and had not demonstrated that its advertising

15  expenditures were significant); *Sarieddine v. Vaptio, Inc.*, 20-CV-7785, 2021 WL 4731341, at *5

16  (C.D. Cal. June 15, 2021) (plaintiff's mark lacked commercial strength because plaintiff provided

17  no evidence of "actual marketplace recognition" and did not support his claim that he had

18  "invested hundreds of thousands of dollars into the advertising and promotion" of his marks);

19  *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1036 (N.D. Cal. 2017) (Orrick,

20  J.) (trade dress not commercially strong, in spite of continuous and exclusive use, millions in sales,

21  and extensive advertising, because of evidence that "indicated that consumers had low awareness

22  of the brand" and an absence of industry recognition of the brand); *Ramirez*, 2023 WL 1806847, at

23  *6 (finding weak commercial strength because the "plaintiffs fail[ed] to present evidence showing

24  the scope of advertising, exclusivity, and/or public use").

25      While Tari Labs' co-founder claims to have "inspired and attracted an enthusiastic

26  community of software developers and users," Decl. of Naveen Jain ("Jain Decl.") ¶ 11, ECF No.

27  28, Tari Labs has not submitted any actual evidence of that community beyond Mr. Jain's say-so,

28  and the evidence Lightning Labs has been able to locate indicates that the Tari Labs community

8

1 mostly spends its time asking when an actual Tari product will be released.  *See* Stark Decl. ¶¶ 93–

2 100.  A community of 'users' who constantly note that no product has been released for them to

3 use does not evidence commercial strength.[3]

4         **2.   Tari Labs' and Lightning Labs' Services Are Not Proximate.**

5       Lightning Labs and Tari Labs build fundamentally different software on different

6 blockchains for different communities.  "The mere fact that two products or services fall within

7 the same general field . . . does not mean that the two products or services are sufficiently similar

8 to create a likelihood of confusion."  *Collins v. U.S. Dep't of Veterans Affs.,* 497 F. Supp. 3d 885,

9 898 (S.D. Cal. 2020) (citation, quotation marks, and alteration omitted); *see also PerkinElmer*

10 *Health Scis., Inc. v. Atlas Database Software Corp.*, No. 92046554, 2011 WL 7005538, at *14

11 (T.T.A.B. Dec. 22, 2011) ("The mere fact that the parties' goods fall under the broad category of

12 software for use in laboratories is not a sufficient basis upon which to find that they are related for

13 purposes of likelihood of confusion").  When viewed from the perspective of the end users likely

14 to interact with both marks, the differences between the two parties' services are far more striking

15 than any similarities.

16       TARO is a protocol for developers to use on the Bitcoin blockchain.  It cannot be used

17 outside the Bitcoin blockchain.  As discussed in the accompanying Expert Declaration of JP

18 Singh, a Professor of Computer Science at Princeton University with extensive experience in

19 software development and with the Bitcoin developer community in particular, Bitcoin

20 developers, who will be the actual users of TARO, are a sophisticated community that tends to

21 work exclusively on Bitcoin projects.  Singh Decl. ¶ 22–24.  TARO will not be used as the name

22 for a blockchain, or a cryptocurrency, or an NFT.  It is solely a tool that developers can use to

23 create things on the Bitcoin blockchain.  Stark Decl. ¶¶ 21, 29–30, 35–37.

24       Tari Labs does not develop on the Bitcoin blockchain—rather, it claims that it is building a

25

26 ───────────────
[3] Though both TARO and TARI are arbitrary marks for software protocols, that "is only the first
27 step of the inquiry [into strength of the mark].  The second step is to determine the strength of
this mark in the marketplace," which is entirely lacking here.  *One Indus., LLC v. Jim O'Neal*
28 *Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009) (citation and quotation marks omitted)).

"merge-minded sidechain of Monero," which is a separate blockchain from Bitcoin.  Stark Decl.
¶ 71.  While it is not entirely clear from the record what TARI services actually exist, it appears
that the TARI services—like a TARI blockchain, a TARI wallet, TARI tokens, and other TARI-
branded products—will be separate and distinct from what TARO is intended to do.  Jain Decl.
¶¶ 4–7.  Lightning Labs does not offer, and has no plans to ever offer, a TARO-branded
blockchain, a TARO-branded wallet, or a TARO-branded token.

For those in the cryptocurrency and software development communities, these are not
merely technical differences: the difference between a blockchain or token and a software
development protocol is a clear and obvious one.  And *consumer-facing* companies in the crypto
space virtually uniformly reference *blockchains*, not protocols.  For these reasons, none of the
examples Tari Labs provides of potential confusion withstand scrutiny, as explained below:

1.    **Creating NFTs.**  Tari Labs asserts that consumers may see both the TARI and
TARO marks when they try to create NFTs on platforms like OpenSea.  To start, OpenSea does
not support the Bitcoin or Monero blockchains used by TARO and TARI, respectively.  And even
if OpenSea did expand, as Tari Labs' own evidence shows, the OpenSea site asks consumers what
*blockchain* they want to use to create their NFT.  *See* ECF No. 28-28 (pointing to the word
"blockchain").  That is unsurprising, as consumer-facing platforms like OpenSea reference
consumer-facing brands like the names of blockchains, not the names of technical protocols.
TARO is not a blockchain (Bitcoin is), so TARO would not be referenced by OpenSea.  *See* Stark
Decl. ¶¶ 82–83.

2.    **Browsing NFTs.**  Tari Labs also asserts that consumers may be confused when
browsing NFTs for purchase on OpenSea.  But once again, Tari Labs' evidence does not support
their argument: (1) OpenSea lets consumers filter by *chain*, and TARO is not a blockchain; and (2)
OpenSea uses images or logos to represent different blockchains, and TARO is just the name of a
protocol, with no associated logo.  *See* ECF No. 28-29 (pointing to the words "All chains").  *See
id.*

3.    **Digital Wallets.**  Tari Labs next asserts that there might be confusion around
digital wallet apps.  Once again, Tari Labs solely submits evidence that wallet applications are

marketed based on the *blockchain* with which they are compatible.  The screenshot Tari Labs

provides, for Coinbase Wallet, notes that it works with "Ethereum, Polygon, and more."  ECF No.

28-30.  Those are the names of blockchains, and TARO is not, and will not be, a blockchain.   If

Coinbase Wallet supported digital assets created with TARO, it would add "Bitcoin" and/or

"Lightning" to its list.  *See id.* ¶ 84.

       4.    **Smart Contracts.**  Tari Labs next points to OpenZeppelin as an example of

potential confusion among those looking to create smart contracts.  But OpenZeppelin solely

supports Ethereum, not Bitcoin or Monero.  OpenZeppelin is also not a company that builds

products for ordinary consumers: the "clients and partners" listed on the OpenZeppelin website are

large, sophisticated companies like Coinbase and the Ethereum Foundation.[4]  OpenZeppelin

invites its users to "Start Coding" and notes that its platform can help "reduce the risk of

vulnerabilities *in your applications* by using standard, tested, community-reviewed code."[5]

Insofar as Tari Labs speculates that OpenZeppelin might one day add support for Bitcoin and

Monero asset creation protocols, which Tari Labs offers no reason to believe will occur, that only

proves that Lightning Labs' point that such protocols are known to sophisticated developers when

they code applications, not ordinary consumers.  *See id.* ¶¶ 85–88.

       5.    **Development Tools.**  Finally, Tari Labs points to the developer platform Alchemy

as a place where TARO might appear alongside TARI.  But once again Tari Labs' evidence shows

a reference to *blockchains*, not token protocols.  ECF No. 28-32 (pointing to "chain collections"

including Ethereum and Polygon).  And once again Tari Labs' evidence relates to a platform that

does not offer integration with either Bitcoin or Monero.  It is accordingly unlikely that TARO

will ever appear on the Alchemy site, even if one day it lists Bitcoin among its "chain collections."

*See id.* ¶ 89.

       The TARO protocol and any TARI services will also be used by fundamentally different

consumers.  "[E]ven where services are marketed to the same industry, several federal courts have

---

[4] OpenZeppelin, *About*, https://www.openzeppelin.com/about (last visited Feb. 27, 2023).
[5] OpenZeppelin, *Contracts*, https://www.openzeppelin.com/contracts (emphasis added) (last visited Feb. 27, 2023).

11

held that such services are not related where the parties target different types of customers." *Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*, 17-CV-6393, 2018 WL 659105, at *5 (N.D. Cal. Feb. 1, 2018).  The TARO protocol is intended for and marketed exclusively to sophisticated Bitcoin blockchain software developers.  Whatever Tari Labs is building is not being marketed to Bitcoin developers (or users) at all: it is a separate blockchain for a separate community.

The cases Tari Labs cites concerning "products and services in the blockchain industry" are not to the contrary.  In *Telegram Messenger Inc. v. Lantah, LLC*, 18-CV-2811, 2018 WL 3753748, at *6 (N.D. Cal. Aug. 8, 2018), the court found the products were similar where both parties offered cryptocurrency tokens (which Lightning Labs does not and will not offer under the TARO name).  Similarly, in *Laura Shin Media, LLC v. Mary Pura Sendra*, No. 91250132, 2021 WL 4473094, at *9 (T.T.A.B. Sept. 28, 2021), the parties were media companies that offered an "identical" service: providing "news and information in the blockchain and cryptocurrency field."  And in *Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, 18-CV-2897, 2018 WL 5118638, at *6 (S.D.N.Y. Oct. 22, 2028), the defendants took advantage of the plaintiff's famous mark by launching a cryptocurrency token with the same name and engaging in deliberately misleading marketing to suggest the plaintiff was behind it.  All three cases are accordingly inapposite here: the facts of *Alibaba* are unique, and both *Telegram* and *Laura Shin* involved *identical* goods and services, unlike this case.  Any overlap in Lightning Labs' and Tari Labs' "general field" is significantly outweighed by the different services they provide to different end users.

### 3.  The Marks Differ in Sight, Sound, and Especially Meaning.

Tari Labs overstates the similarities between the TARI and TARO marks.  Even single-letter differences are significant when they change the look and sound of a mark.  *See, e.g., iCall v. Tribair, Inc.*, 12-CV-2406, 2012 WL 5878389, at *8 (N.D. Cal. Nov. 21, 2012) (finding an "important visual difference" and an "aural difference that is not insignificant" between ICALL and WICALL); *FieldTurf USA Inc. v. Tencate Thiolon Middle E.*, 945 F. Supp. 2d 1379, 1390 (N.D. Ga. 2013) (consumers unlikely "to be deceived by the similar sound of two very different words" that differed by a letter—EVOLUTION and REVOLUTION); *Haven Cap. Mgmt., Inc. v. Havens Advisors, L.L.C.*, 965 F. Supp. 528, 531 (S.D.N.Y. 1997) ("[E]ven though the words

12

1   'haven' and 'havens' are different only as to one letter, there is little likelihood of confusion in the

2   use of these names or marks.").

3   The two marks also have fundamentally different meanings.  As Mr. Jain explains, TARI

4   "derives from Arabic or Italian, referring to a gold coin used in the Mediterranean during the

5   Middle Ages."  Jain Decl. ¶ 14.  TARO, meanwhile, refers to a root vegetable common in

6   Nigerian and other cuisines and cultures.  Stark Decl. ¶¶ 39, 41.  TARO also clearly evokes the

7   Taproot update to the Bitcoin blockchain that makes the protocol possible, as it uses the starting

8   letters of its two component words (**Ta**p**ro**ot).

9   TARO and TARI are therefore different in sight, sound, and especially meaning.  When

10  one hears the word "taro," a distinct set of associations based on the existing meaning of "taro"

11  come to mind, which are not interchangeable with any associations that come to mind when one

12  hears "tari."  *See iCall*, 2012 WL 5878389, at *8 (addition of single letter caused "significant and

13  salient difference in meaning between" the two marks).

14  It is also important to consider that individuals in the cryptocurrency space are accustomed

15  to encountering—and differentiating between—similar or even identical marks used by different

16  companies offering different services.  Just by way of example, the crypto space includes two

17  different companies called PARADIGM; both GENESIS and GENESIS DIGITAL ASSETS; both

18  BITGO and BITSO; both AVA and AAVE; both COINBASE and COINDESK; and all three of

19  THE BLOCK, BLOCK, and BLOQ.  There are also tokens with names highly similar to TARI,

20  including a TARA token issued by TARAXA, an ATARI token, and a TAKI token.  Consumers

21  and even more sophisticated developers are accordingly used to sorting carefully among brand

22  names, even those with one-letter differences.  *See* Stark Decl. ¶ 91; *see also, e.g.*,  *FieldTurf*, 945

23  F. Supp. 2d at 1390 ( "[S]ophisticated purchasers of highly technical products" are "unlikely to be

24  confused" by two marks that differ by one letter.); *Jackpocket, Inc. v. Lottomatrix NY LLC*, 22-

25  CV-5772, 2022 WL 17733156, at *51 (S.D.N.Y. Dec. 7, 2022) ("The more sophisticated the

26  consumers, the less likely they are to be misled by similarity in marks.'" (quoting *TCPIP Holding*

27  *Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 102 (2d Cir. 2001))); *First Franklin Fin. Corp. v.*

28  *Franklin First Fin., Ltd..*, 356 F. Supp. 2d 1048, 1052 (C.D. Cal. 2005) ("While both parties may

13

deal with mortgage brokers acting on behalf of consumers, such sophisticated parties are even less likely to be confused by any alleged similarity between the marks.").

The two cases Tari Labs cites are not persuasive.  In *Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825 (C.D. Cal. 2018), the two marks at issue were SYNOPTEK and SYNAPTEK. There, the one letter that distinguished those marks was insignificant: they were "phonetically equivalent made-up words," pronounced the same way, with the same meaning to consumers. *Id.* at 836–37.  None of that is true of TARO and TARI.  The same can be said of PARK 'N FLY and PARK AND FLY, in which the difference between the two marks was essentially a different spelling of "and"—the marks were pronounced the same way and had the same meaning.  *See Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.*, 782 F.2d 1508, 1509 (9th Cir. 1986).

TARI and TARO are two completely different words, separated not merely by a change in spelling but by a fundamental difference in sound, pronunciation, and meaning.[6]  They exist in a market where many other identical or similar marks coexist, and where sophisticated market participants are accustomed to exercising care.  This factor does not indicate likely confusion.

### 4. There Is No Evidence of Actual Confusion, Nor Has Tari Labs Submitted Any Reliable Evidence of Likely Confusion.

Unsurprisingly, Tari Labs has not submitted any evidence of actual consumer confusion. Instead, it argues that actual confusion is demonstrated by (1) a typo by Lightning Labs' former counsel that mistakenly referred to "Tari Labs" as "Taro Labs," and (2) a survey designed by Dr. Robert Palmatier that purports to show confusion (the "Palmatier Survey").  Neither is probative.

---

[6] Tari Labs also refers to the risk of "initial interest confusion" based on the possibility a consumer will accidentally type "taro" when she means "tari" and be taken to Lightning Labs' website or products.  But if this theory of trademark infringement were taken seriously, any time a consumer makes a typographical error that leads her to a different website than the one she intended, the owner of the website she intended to visit could bring suit.  In any event, any consumer who mistakenly types "taro" would at most be taken to a website that is clearly labeled as TARO and would not find any services or products offered by Tari Labs or even any services or products that could serve as a substitute.  *See Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937 (9th Cir. 2015) ("[C]lear labeling can eliminate the likelihood of initial interest confusion."); *Aliign Activation Wear, LLC v. Lululemon Athletica Can., Inc.*, 21-CV-55775, 2022 WL 3210698, at *2 (9th Cir. 2022) ("Such unambiguous labeling significantly reduces any confusion for the prudent consumer.").

1    That Lightning Labs' former counsel—who is not a relevant consumer of TARO—

2  mistyped a word does not reflect anything other than carelessness or inattention, which is not

3  evidence of confusion.  *See JIPC Mgmt., Inc. v. Incredible Pizza Co., Inc.*, 08-CV-4310, 2008 WL

4  11336396, at *19 (C.D. Cal. Aug. 26, 2008) ("[Plaintiff] has presented no evidence that the

5  misdirected emails and inquiries were the result of actual customer confusion regarding the marks

6  as opposed to carelessness or inattention.").  The absence of any other evidence of confusion after

7  ten months of coexistence indicates that relevant consumers have no problem distinguishing the

8  TARI and TARO marks.  *See Equinox*, 2018 WL 659105, at *8 (eleven instances of confusion

9  over thirty months were "sporadic" and "insufficient to support a finding of actual confusion");

10  *Matrix Motor Co. Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1093 (C.D.

11  Cal. 2003) ("The Ninth Circuit has held that 'lack of evidence about actual confusion after an

12  ample opportunity for confusion can be a powerful indication that the junior trademark does not

13  cause a meaningful likelihood of confusion.'" (citation omitted)).

14    The Palmatier Survey, meanwhile, violates basic principles of survey design and renders

15  the results meaningless; it should be discarded outright.  As constructed, the Palmatier Survey is

16  simply a matching test between abstract words that does not reflect any real-world scenario.  The

17  survey showed respondents the TARI mark in isolation (misleadingly referred to as "Product 1"),

18  and subsequently showed an array of four other marks, also in isolation: Defendant's TARO and

19  three additional marks: CORDA, POLYGON, and ECHO.  Respondents were then asked a series

20  of questions to determine which of the "products" (though no products were shown, only marks)

21  are likely made by the same company that makes "Product 1" (again, no product was shown, just

22  the name "Tari"), are likely affiliated, associated, or connected to the same company making

23  Product 1, or are likely to have the authorization, approval, or endorsement of the same company

24  that makes Product 1.  Based on responses to these flawed questions, Dr. Palmatier concluded that

25  of 35.3% of respondents were confused.

26    No consumer, however, will ever encounter the words tested in the Palmatier Survey

27  divorced from any marketplace context, and the survey thus cannot provide reliable data reflecting

28  how consumers would react to seeing the marks in the real world.  Declaration of Sarah Butler

RESPONSE IN OPPOSITION TO MOTION FOR TRO          Case No. 3:22-CV-07789-WHO

("Butler Decl.") ¶ 28 ("A survey that tests or evaluates a completely fabricated world, unrelated to actual circumstances, cannot provide data to inform estimates of confusion that could occur in real life.").  Indeed, courts frequently reject such word association surveys as worthless in assessing the question of likelihood of confusion.  *See, e.g.*, *Hershey Co. v. Promotion in Motion, Inc.*, 07-CV-1601, 2013 WL 12157828, at *15 (D.N.J. Jan. 18, 2013) ("[S]urveys based on word association tests divorced from marketplace context, are not probative as to the issue of likelihood of confusion in the real-world marketplace since they fail to simulate the real world setting in which instances of actual confusion would occur." (citations and quotation marks omitted) (collecting cases)); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 04-CV-7203, 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006) (rejecting survey that was "[e]ssentially . . . a word association test, in which respondents were shown a card with the word Juicy and repeatedly asked questions in which the word Juicy appeared."); *Playtext Prods, Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 167–68 (2d Cir. 2004) (rejecting "index card survey" that failed to display products as they are "presented and packaged").

In addition to this fatal flaw, as Ms. Butler explains, the Palmatier Survey (i) employed an inappropriate *Squirt* design for testing the TARO and TARI protocols, which do not appear in close proximity in the marketplace (Butler Decl. ¶¶ 17–27); (ii) included leading and biased questions (*id.* ¶¶ 37–39); (iii) lacked an appropriate control, which is an essential element of a properly conducted survey (*id.* ¶¶ 40–45); and (iv) did not survey the correct population (*i.e.*, the Bitcoin developers who use Lightning Labs' TARO protocol) (*id.* ¶¶ 46–60).  Dr. Palmatier has designed surveys in the past that courts have rejected because they contained the same flaws as the survey here; this court should similarly reject the Palmatier Survey.  *See, e.g.*, *Stone Brewing Co., LLC v. MillerCoors LLC*, 18-CV-331, 2022 WL 4596570, at *1 (S.D. Cal. Aug. 4, 2022) ("The expert testimony of Dr. Palmatier was based on seriously flawed survey methodology, including the way the Keystone Light can was presented to survey subjects (*i.e.*, not in a manner that consumers would normally encounter the product in the marketplace)."); *Waterloo Sparkling Water Corp. v. Treaty Oak Brewing & Distilling Co., LLC*, 21-CV-161, 2021 WL 5568159, at *9 (W.D. Tex. Nov. 28, 2021) (finding that Dr. Palmatier's survey "ha[d] flaws," including its misuse

16

of a *Squirt*-style design, and declining to rely on it).

Because Tari Labs has offered no reliable evidence of either likely or actual confusion, this factor favors Lightning Labs.

### 5.   The Parties Market to Different Consumers, and Any Overlap in Their Marketing Channels Is Immaterial.

"In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014).  As to the first of these factors, the parties' customer bases do not overlap at all.  While TARI is aimed at end-users of digital assets and developers on the Monero blockchain, TARO is aimed exclusively at Bitcoin blockchain developers.  The events Lightning Labs employees have recently spoken at, and the content of those presentations, makes that clear.  *See* Osuntokun Decl. ¶¶ 35–38.  While Tari Labs tries to lump all "developers" into a single category, the reality—as Professor Singh makes clear—is that Bitcoin developers are a distinct community that does not overlap with developers on other blockchains, like Ethereum or Monero.  *See* Singh Decl. ¶¶ 23–24; Stark Decl. ¶¶ 22, 87.

As for marketing channels, although Lightning Labs has promoted TARO in industry publications and on platforms including Twitter, Substack, and Github, *all* companies in the software development and cryptocurrency spaces use these common online platforms.  It stretches credulity to even refer to Github as a marketing platform: Github is where code is stored.

Tari Labs cites a case to argue that overlap in "the Web" as a marketing channel is significant, *see* Tari Labs Mem. ("Mem.") 18, ECF No. 25-1, but more recent Ninth Circuit caselaw makes clear that "the shared use of a ubiquitous marketing channel [like the Internet] does not shed much light on the likelihood of consumer confusion." *Network Automation*, 638 F.3d at 1151.  This factor accordingly does not weigh in favor of a likelihood of confusion.

### 6.   Lightning Labs' Developer End-Users Exercise a High Degree of Care.

Software developers are a particularly sophisticated group, and take great care in selecting the technologies they use to develop their products.  Tari Labs' claim that both parties' users are unsophisticated and likely to exercise a low degree of care is simply wrong and ignores reality.

17

1   Tari Labs incorrectly asserts that the consumers who will see the TARO marks are ordinary

2   consumers that are transacting in digital assets like bitcoin.  This assertion, which Tari Labs bases

3   many of its arguments on, has no basis in fact.  Unlike the ordinary consumers who would use

4   Tari Labs' TARI-branded blockchain to trade in digital assets or NFTs, such as its "fake Tari"

5   token or Cryptokitties, Lightning Labs does not make (or intend to make) anything under the

6   TARO mark that will be directly used or seen by ordinary consumers.  To use the metaphor Tari

7   Labs has employed, the TARO protocol is equivalent to industrial sewing machines, not the

8   resulting clothing.  Or, to use a better analogy, it is like the SMTP email protocol, not applications

9   like Gmail that ordinary consumers use.  Consumers may 'use' SMTP every day, but they are not

10   aware of its name.  *See* Singh Decl. ¶ 26; Osuntokun Decl. ¶¶ 19, 37.

11       In reality, the TARO protocol will be and is used exclusively by software developers, who

12   are passionate and knowledgeable about their work, used to parsing through cryptocurrency

13   brands with very similar names, and highly sophisticated within the industry.  Stark Decl. ¶¶ 18–

14   23, 30–38.  "If web purchasers, particularly purchasers of sophisticated items, exercise a higher

15   degree of precision in their dealings with and understanding of the internet, the ***developers*** to

16   which [Lightning Labs] markets its software are perhaps ***multitudes more sophisticated*** and

17   exercise a correspondingly higher degree of care."  *Dfinity Found. v. Meta Platforms, Inc.*, 22-CV-

18   2632, 2022 WL 16857036, at *9 (N.D. Cal. Nov. 10, 2022) (emphasis added); *see also Oculu,*

19   *LLC v. Oculus VR, Inc.*, 14-CV-196, 2015 WL 3619204, at *16 (C.D. Cal. June 8, 2015)

20   ("Defendant's current customers are ***tech-savvy developers*** who are designing VR video games,

21   apps, and experiences for retail end users.  It is unlikely that these types of ***sophisticated***

22   ***purchasers*** will confuse Plaintiff's services with Defendant's goods and services." (emphasis

23   added)); *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1080 (N.D. Cal. 2012)

24   ("Consumers of business software, such as Groupion's customers, generally exercise a

25   higher degree of care than a typical consumer."); *Componentone, L.L.C. v. Componentart, Inc.*,

26   05-CV-1122, 2008 WL 4790661, at *14 (W.D. Pa. Oct. 27, 2008) ("Software developers

27   who prototype a product they are considering purchasing are certainly more careful and attentive,

28   in the aggregate, than purchasers of artificial sweeteners or women's swimwear."); *Lasco Fittings,*

18

*Inc. v. Lesso Am., Inc.*, 13-CV-2015, 2014 WL 12570930, at *7 (C.D. Cal. Jan. 16, 2014) ("When purchasers are 'knowledgeable, sophisticated specialists in their area,' there is an assumption that these buyers will exercise a higher degree of care in their purchases compared to the general public."). Any suggestion that these consumers are careless belies both common sense and the record. *See Dfinity Found.*, 2022 WL 16857036, at *10 ("That these sophisticated people, immersed in the intricacies of the tech world, would be duped . . . borders on implausible."). This factor favors Lightning Labs.

### 7. Lightning Labs Acted in Good Faith in Adopting the TARO Name.

Lightning Labs chose TARO as the name for its protocol for reasons entirely unrelated to Tari Labs' mark. Stark Decl. ¶¶ 39–40. TARO stands for "Taproot Asset Representation Overlay," because TARO's core functionality was enabled by an upgrade to the Bitcoin blockchain called Taproot. *Id.* ¶ 29. The TARO name was also selected because of its meaning (in reference to the taro root vegetable), as discussed above. Although Ms. Stark had heard of Tari Labs before Lightning Labs announced TARO, neither she nor Mr. Osuntokun ever considered Tari Labs when choosing the TARO name. *Id.* ¶¶ 66–70. And when Tari Labs initially raised concerns, Lightning Labs made clear that it did not think any confusion was possible because TARO would not be consumer-facing, unlike Tari Labs' products. Lightning Labs executives consistently and reasonably believed that the sophisticated software developers who will use TARO will not be confused or believe it is associated with TARI. *Id.* ¶¶ 63–100.

Where, as here, an alleged infringer has a "good faith belief that its use is not infringing and [there is] nothing showing a wrongful intent of capitalizing on [the plaintiff's] good will," the alleged infringer did not engage in willful or intentional infringement. *Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1196 (N.D. Cal. 2015) (citation and quotation marks omitted); *see also Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993) ("[A] knowing use in the belief that there is no confusion is not bad faith."); *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 815 F. App'x 110, 113 (9th Cir. 2020) ("[T]he evidence in the record indicating that [the defendant] had a good faith belief that it was not infringing further supports that" the district court

1  was justified in treating the intent factor as neutral).[7]

2  Far from willfully infringing on the TARI mark, Lightning Labs proceeded in the good

3  faith—and correct—belief that the two marks could coexist, as no reasonable software developer

4  would actually confuse them.  This factor also favors Lightning Labs.

5  ### 8.  Lightning Labs Is Not Likely to—and in Some Respects Cannot—Expand into Tari Labs' Core Business.

6

7  In addressing the eighth *Sleekcraft* factor, Tari Labs has merely described what both parties

8  *already* do (which is covered by the "proximity of goods and services" factor) and offered

9  unsupported and inaccurate speculation on what Lightning Labs *might* do.  *See* Pl.'s Mem. at 20.

10 But Tari Labs seems to misunderstand the basic technology involved.

11 As explained above, Tari Labs works exclusively on the Monero blockchain.  TARO is

12 exclusively for the Bitcoin blockchain.  Lightning Labs cannot expand into Tari Labs' business

13 because TARO *cannot* be expanded to the Monero blockchain.  TARO is reliant on Bitcoin's

14 Taproot update, which does not exist on Monero and will not exist on Tari Labs' TARI

15 blockchain.  As for the ordinary consumers Tari Labs seeks to market a TARI-branded blockchain

16 and token to, Ms. Stark has made clear in public statements and in her sworn declaration that

17 Lightning Labs has no intention of ever making TARO-branded products available to this group.

18                                        * * *

19 In sum, every *Sleekcraft* factor favors Lightning Labs.  Tari Labs' arguments are based on

20 a misunderstanding of the TARO protocol and inaccurate hypotheticals that attempt to obfuscate

21 the clear and meaningful differences between the marks, the services the parties offer, and the

22 consumers they are directed to.  A clear-sighted understanding of how TARO and TARI operate

23 within the world of cryptocurrency demonstrates that no confusion is likely.

24 ## II.   Tari Labs' Purported Irreparable Harm is Undercut by Its Delay

25 Given that Tari Labs has failed to clearly prove it is likely to succeed on the merits, the

26 ───────────────

[7] Tari Labs' citation to *Fifty-Six Hope Rd. Music, Ltd. v. AVELA, Inc.*, 778 F.3d 1059 (9th Cir.
27 2015) is entirely inapposite.  That case involved infringing manufacturing of Bob Marley products
in the face of a clear warning by the owner of the exclusive rights to make Bob Marley products.
28 *Id.* at 1074.  Lightning Labs has never used, and will never use, the TARI mark.

court can and should end its analysis and deny Tari Labs' motion.

The complete absence of irreparable harm to Tari Labs provides another independent reason to deny Tari Labs' motion for a TRO.  Tari Labs was aware of Lightning Labs' plans to develop TARO ten months ago—in April 2022—yet made no serious effort to contact Lightning Labs about its plans until September 2022, five months later, when it sent a demand letter. Despite the fact that Lightning Labs released the initial open-source TARO code later in September, Tari Labs continued to sit on its hands, waiting three additional months until December 2022 before even filing this lawsuit.  And then Tari Labs waited two more months before seeking a TRO.

During the months that Tari Labs slept on its purported rights, Lightning Labs continued to develop updates for its protocol, promote it within the Bitcoin developer community, and proceed toward the eventual future launch that Tari Labs seeks to stop.  Though Tari Labs claims that it was "attempting to persuade [Lightning Labs] to abandon" its use of TARO, Pl.'s Reply in Support of *Ex Parte* TRO ("Reply") 2, ECF No. 31, there is no evidence that it was doing anything to "persuade" Lightning Labs over these three months.  There were no settlement negotiations between the parties: Lightning Labs told Tari Labs that it would not change the name of the TARO protocol because no confusion was likely.

Tari's ten-month delay—from April 2022 until filing its motion on February 15, 2023— eviscerates Tari Labs' argument that it is likely to face irreparable harm absent a preliminary injunction, let alone a TRO.  "Parties spurred on by the threat of or actual immediate irreparable harm file for TROs *as quickly as possible* to head or stave it off."  *Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1097 (N.D. Cal. 2012) (emphasis added) (collecting cases and finding that a delay of six months militated against a finding of irreparable harm); *Perez v. City of Petaluma*, 21-CV-6190, 2021 WL 3934327, at *1 (N.D. Cal. Aug. 13, 2021) (denying TRO where plaintiff waited one month to file); *Coop. Regions of Organic Producer Pools v. Stueve's Certified Organic Dairy*, 14-CV-1123, 2014 WL 12571393, at *2 (E.D. Cal. July 25, 2014) (denying TRO where plaintiff waited three weeks to file); *Khadavi v. Stagi, Inc.*, 20-CV-7948, 2021 WL 4057526, at *3 (C.D. Cal. Apr. 8, 2021) (denying TRO where plaintiff waited three weeks to file).

21

Tari Labs does not even attempt to defend its months of inaction.  Instead, Tari Labs tries to allege a change in circumstances that is belied by the record, stringing together a series of unremarkable statements to suggest that Lightning Labs suddenly accelerated its plans for TARO. Lightning Labs has been working on the code for TARO entirely in the open since September; it has not accelerated development and it has not announced an imminent launch.  The same software development work that was announced in April 2022 and made public in September 2022 has simply continued, as Lightning Labs works with the developer community to test and refine the early alpha versions of TARO's code.  *See* Stark Decl. ¶¶ 48–62, 110; Osuntokun Decl. ¶¶ 15–20, 27–34.

The cases Tari Labs cites to excuse its delay, Reply at 2, are completely distinguishable. *See Warner Bros. Ent. v. Global Asylum, Inc.*, 12-CV-9547, 2012 WL 6951315, at *21 (C.D. Cal. Dec. 10, 2012) (excusing a four-month delay during which the parties were engaged in negotiations); *D.Light Design, Inc. v. Boxin Solar Co.*, 13-CV-5988, 2014 WL 12659909 (N.D. Cal. Feb. 3, 2014) (granting TRO following one-month delay in which the plaintiffs, with leave of the court, filed second TRO motion following their first, which was filed days after the complaint); *MKS Instruments, Inc. v. New Power Plasma*, 09-CV-2297, Dkts. 6 & 7 (N.D. Cal. June 18, 2009) (granting TRO filed one month after the complaint, during which time the defendants had "taken steps to attack [the plaintiffs'] market position" and intended to move key evidence outside the country); *3M Co. v. Ugly Juice, LLC*, 21-CV-2338, 2021 WL 1947579, at *1 (N.D. Cal. May 14, 2021) (granting motion for TRO filed less than one month after the complaint).

Putting aside Tari Labs' delay, its purported irreparable harm is entirely speculative and unsupported.  The TARO protocol has been widely publicized since April 2022 and Lightning Labs executives have discussed TARO at developer conferences and in publications.  Yet, despite all of that public activity, Tari Labs has cited *not one example* of consumer confusion, lost sales, lost investment, or other business harm over this period of public coexistence.  Instead, Tari Labs relies on rank speculation that TARO will "wipe out the TARI® brand and destroy its business." Mem. at 23.  That is insufficient to establish irreparable harm.  *See Equinox*, 2018 WL 659105, at

1   *9 ("To establish a likelihood of irreparable harm, conclusory or speculative allegations are not

2   sufficient.").

3       For example, Mr. Jain speculates about hypothetical confusion, but offers no basis—

4   either from his own experience or the experiences of other companies in this world—to believe

5   that any *actual* confusion is likely.  In his declaration, Mr. Jain highlights specifically his concern

6   about consumers who mean to use a TARI NFT or digital wallet but instead "select[]" a TARO

7   product, whose flaws they will blame on Tari Labs.  Jain Decl. ¶¶ 42–43.  But Lightning Labs

8   does not intend to ever offer NFTs, digital wallets, or any other products for end-consumers under

9   the TARO mark, rendering this concern meaningless.  In the real world, there has been no

10  confusion despite ten months of coexistence; clearly, the relevant consumers understand that the

11  two marks belong to different companies that do different things.  Tari Labs has not, and will not,

12  suffer irreparable harm.

13  **III.    The Balance of Equities Tips Sharply in Lightning Labs' Favor.**

14      While Tari Labs will not be harmed by Lightning Labs continuing the development

15  process for TARO it announced over ten months ago, Lightning Labs' business would be

16  irreparably damaged by an injunction.  The balance of equities strongly favors Lightning Labs.

17      A TRO will cause reputational damage to Lightning Labs.  Lightning Labs cannot simply

18  rename the protocol, which is already widely known in the developer community as TARO, as

19  many external developers have already begun building on TARO under that name.  Lightning

20  Labs' use of another name would result only in newfound confusion, frustration, and unnecessary

21  redundancy in code development, which will irreparably damage Lightning Labs' reputation

22  among developers.  Stark Decl., at ¶¶ 101–110.

23      These harms are far from the "minor inconvenience" that Tari Labs describes and cannot

24  be justified in the face of Tari Labs' ten-month delay in seeking a TRO, during which time no

25  actual confusion or concrete harm to Tari Labs occurred.  *See Cutting Edge Sols., LLC v.*

26  *Sustainable Low Maint. Grass, LLC*, 14-CV-2770, 2014 WL 5361548, at *14 (N.D. Cal. Oct. 20,

27  2014) (finding balance of equities favored defendant because "in the absence of any evidence of

28  actual confusion—or diminished sales or tarnishment of [plaintiff's] products due to the ongoing

23

sales of [defendant's product]—there is little support for [plaintiff's] claims of harm," compared to significant costs of defendant's rebranding and lost sales).

Even if the analysis were close on the merits—and it is not—Tari Labs' long delay in requesting emergency relief precludes a finding that the balance of equities tips in its favor. *See* 5 McCarthy on Trademarks and Unfair Competition § 30:51 (5th ed.) ("[W]hen a plaintiff delays in filing suit in a case closely balanced on the merits, [emergency relief] may be denied on the basis that *the harm to the defendant increases* with the passage of time." (emphasis added)).  For the foregoing reasons, the balance of the equities clearly favors Lightning Labs.

### IV.  <u>A TRO Is Not in the Public Interest.</u>

The TRO Tari Labs seeks would not just harm Lightning Labs—it would also negatively affect the many developers who are testing or contributing to TARO, and who have built it in directions beyond those contemplated or controlled by Lightning Labs.  As explained in Lightning Labs executives' declarations, to comply with the Order's prohibition on "publish[ing] or provid[ing] its software update," Lightning Labs had to cease all public work on the open-source TARO code that Lightning Labs had been continuously updating—on a weekly and often daily basis—since April 2022.  Although the Order permitted Lightning Labs to "continue any internal work on its product," open-source software development is an inherently public and collaborative process, so Lightning Labs' work has been significantly hindered. *Id.* ¶¶ 101–07.

Lightning Labs is the steward of the open-source code for TARO, but an active community of external contributors is central to the development of TARO.  For example, as Tari Labs' own evidence demonstrates, third parties like Wolf that are not part of Lightning Labs have begun to use the TARO code and the TARO name for developer-facing projects unaffiliated with Lightning Labs.  Those contributors request new features, submit bug reports, submit code for review, provide feedback on the open-source code, participate in community calls regarding the code, and generally participate in the development process. *Id.* ¶¶ 47, 101–09.  In order to comply with the Order, Lightning Labs had to create a new private Github repository for the TARO code.  That means there are now two repositories of the TARO code—one public and one private—that will eventually need to be merged, which will be difficult and time-consuming (more so with every

passing day, as the public developer community will be working in the public repository without any visibility into the work Lightning Labs is doing internally).  *Id.* ¶ 101.  A TRO would compound those burdens and inhibit Lightning Labs' mission to build technology to facilitate financial freedom for those in countries left behind by the traditional finance system, with no benefit to Tari Labs.

## **CONCLUSION**

The Court should deny Tari Labs' motion for a TRO, vacate the existing order (ECF No. 34), and order the parties to confer regarding a schedule for briefing Tari Labs' motion for a preliminary injunction, along with any necessary expedited discovery.[8]

Dated: February 27, 2023

DEBEVOISE & PLIMPTON LLP

By: /s/ Megan K. Bannigan
Megan K. Bannigan (*Pro Hac Vice*)
  mkbannigan@debevoise.com
Timothy Cuffman (*Pro Hac Vice*)
  tcuffman@debevoise.com
66 Hudson Boulevard
New York, NY 10001
Tel: 212-909-6000

Christopher S. Ford (State Bar No. 337795)
  csford@debevoise.com
650 California Street
San Francisco, CA 94108
Tel: 415-644-5628

*Attorneys for Defendant Lightning Labs, Inc.*

---

[8] If the Court does grant Tari Labs' requested relief, it should order a significant bond pursuant to Rule 65, given Tari Labs' failure to show likely success on the merits and the substantial disruption a TRO will cause to Lightning Labs' business.  Tari Labs cites *Cognizant Technology Solutions v. McAfee*, 14-CV-1146 (N.D. Cal. Mar. 21, 2021), in an attempt to convince the Court to waive bond entirely.  But in *Cognizant*, the plaintiff sought a TRO against a person whose whereabouts were unknown after he fled numerous countries to avoid questioning on a murder investigation; whose infringing software had already launched; and who was unlikely to succeed on the merits.  *See id.* at Dkt. 13-1.  The facts of that case are entirely inapplicable here and do not support its request to be entirely exempted from any bond requirement.