J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Mitchell C. Stein, Esq. (*Pro Hac Vice*)
  stein@braunhagey.com
Kirsten Jackson, Esq. (*Pro Hac Vice*)
  dooley@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W. 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (646) 403-4089

ATTORNEYS FOR PLAINTIFF
TARI LABS, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARI LABS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>LIGHTNING LABS, INC.,<br><br>Defendant. | Case No. 3:22-cv-07789-WHO<br><br>**REPLY DECLARATION OF DR. ROBERT PALMATIER**<br><br>Date:      March 8, 2023<br>Time:      2:00 p.m.<br>Judge:     Hon. William H. Orrick<br>Courtroom: Via Zoom videoconference |

I, Robert W. Palmatier, Ph.D., John C. Narver Endowed Chair in Business Administration and Professor of Marketing at the University of Washington, Foster School of Business, declare that the following are my expert opinions.

1. I have been retained as a marketing expert by Plaintiff Tari Labs, LLC. ("Plaintiff" or "Tari") to survey and evaluate the level of consumer confusion caused by Defendant Lightning Labs, Inc. ("Defendant," "Lightning Labs," or "Taro") and its impact on Tari's brand, reputation, and marketing performance.

2. As explained in my February 21, 2023 Declaration and Preliminary Expert Report ("Opening Report"), I conducted a scientific survey of potential consumers to analyze the level of confusion with the TARI® mark caused by Defendant's "TARO" mark, considering both marks as they are used in the marketplace. Specifically, I designed a "*Squirt*" format survey of relevant customers using images of the marks from the parties' marketing materials (the "Survey").

3. The results of the survey showed that Defendant's use of the "TARO" mark causes high levels of consumer confusion. 51% of relevant consumers believed that TARO products and services were owned by, endorsed by, or otherwise affiliated with Tari. Compared to the "control" brands in the survey, this represents 35.3% "net" confusion – nearly double the threshold that marketing scientists and courts consider to be substantial.

4. I understand that Defendant has submitted a Declaration by Sarah Butler dated February 27, 2023 ("Butler Declaration"), which argues that the results of the Survey should be discounted due to various criticisms of its design. I disagree with Ms. Butler's conclusions and believe that her criticisms are unfounded as a matter of marketing science and fundamental principles of survey design. I briefly address each of these points below in the order in which they are addressed in the Butler Declaration.

**I.   SQUIRT METHODOLOGY IS APPROPRIATE IN THIS CONTEXT**

5. As explained in my Opening Report, I selected a *Squirt* survey design, which is recognized as an appropriate format for assessing likelihood of confusion when the products are proximate in the marketplace and the senior brand (here, TARI®) is not "accessible" or "top of mind" for consumers.

6. The Butler Declaration argues that a *Squirt* survey methodology is inappropriate because Tari and Taro are not proximate in the market.[1] However, Ms. Butler gives insufficient consideration to the extensive evidence of overlap in the products, consumers, and markets for TARI® and TARO.

7. ***Similar Products.*** Fundamentally, Tari and Taro offer the same type of product – blockchain protocols that will allow users to create and transfer digital assets. When used by consumers and adopted by developers, these products will be in immediate proximity in the marketplace. The products are so similar that both firms use nearly identical "tag lines" next to their wordmarks on their web sites. Tari's website for the TARI® protocol calls it "**The Protocol for Digital Assets**", while Defendant's website of the TARO protocol describes it as a "... **protocol for issuing digital assets**..." as shown below in green boxes.



8. Both parties have indicated that the protocols will be used in connection with a variety of digital assets as they are adopted widely in the market. *Thus, the products are very similar.*

---

[1] *Butler Declaration*, ¶ 27.

9. *Similar Customers.* The end users for the protocol are also similar. Defendant has described its "ideal consumer" in broad terms as "somebody who doesn't want to understand the protocol or bitcoin. It's just somebody who wants to transact cheaply and globally without holding bitcoin themselves."[2] Similarly, Tari has long targeted both consumers and businesses for its products: "By leveraging blockchain technology, the Tari protocol enables **consumers** and business to break down walled gardens between businesses, sell and trade scarce digital assets with programmed rules, and record immutable transfer and verification of ownership."[3] *Thus, both Tari and Taro will ultimately be used by consumers as a protocol for transacting digital assets.*

10. Additionally, Ms. Butler's narrow definition of the relevant consumer base as "developers" is short-sighted because the TARO protocol will not remain the development stage forever. Once the product is fully launched to the market, it will be seen not only by developers but also by relatively low knowledge consumers, who are likely to be confused between products with very similar wordmarks. Taro and Tari have described their ultimate products, consumers, and market applications in detail. There is a high degree of overlap in both firms' products, consumers, and markets as described above/below.

11. *Similar Markets.* The market applications for the TARI® and TARO protocols are also largely the same. Taro describes its market as anywhere it can be used to sell "all kinds of assets" where "these assets can represent, including stablecoins, shares, tickets, ownership rights or art."[4] Similarly, Tari also focuses on being used for transactions in "concert tickets", "digital collectable" and "game" markets.[5] Both firms will be used for conducting transactions of digital assets in the "ticket", "digital collectable" and "art" markets. *Thus, both Tari and Taro will be used by consumers as a protocol for transacting digital assets in many of the same markets.*

---

[2] Lightning & Taro: Towards a Multi-Asset Crypto Payment Network (2022), AAX Trends, July 8, 2022.
[3] "Tari Introduces a Blockchain Protocol for Digital Assets Built on Monero," *Bitcoin Magazine*, May 22, 2018 (https://bitcoinmagazine.com/business/tari-introduces-blockchain-protocol-digital-assets-built-monero).
[4] https://docs.lightning.engineering/the-lightning-network/taro/faq
[5] https://www.tari.com/#tari-for-creators

12. As an example of the products' proximity in the market, both parties intend for their protocols to be used in digital wallet applications. Tari already markets a mobile wallet app called TARI® Aurora.[6] Defendant also intends for the TARO protocol to be used in wallet applications and provides instructions in its website FAQ section answering the question "How do I hold Taro assets in my wallet?[7] As third parties develop wallet applications using the TARI® and TARO protocols, they will increasingly appear in proximity to one another as developers and consumers choose the appropriate protocols for their digital assets.

13. ***Similar Marketing Channels***. The parties also both market their protocols using the same internet platforms, including Github, Twitter, Reddit, Discord, and Substack.[8] They also promote their protocols in the same industry press publications, including *Bitcoin Magazine* and other outlets.[9] And both parties market their products at the same trade shows and conferences, including appearing together at the Magical Crypto Conference in 2019 and 2020, where both companies' leaders were featured speakers.[10] As these examples show, the parties' marketing channels are highly similar.

14. In summary, the TARI® and TARO protocols serve the same basic function, target the same consumers, are intended for use in similar markets, and will overlap in multiple marketplace contexts. *Where products compete directly in this manner, they are by definition proximate in the marketplace.*

---

[6] https://www.tari.com/#mobile-wallet
[7] https://docs.lightning.engineering/the-lightning-network/taro/faq
[8] *Github* https://github.com/tari-project/tari, https://github.com/lightninglabs/taro#readme, Twitter: https://twitter.com/tari_labs, https://twitter.com/lightning; Reddit: https://www.reddit.com/r/tari/, https://www.reddit.com/r/lightningnetwork/; Discord: https://discord.com/invite/q3Sfzb8S2V, https://discord.com/invite/qEzTQMqJc7; Substack: https://tari.substack.com/, https://lightninglabs.substack.com/;
[9] *Compare* Bitcoin Magazine, Tari Introduces a Blockchain Protocol for Digital Assets Built on Monero, available at https://bitcoinmagazine.com/business/tari-introduces-blockchain-protocol-digital-assets-built-monero *with* Bitcoin Magazine, How Taro Brings Assets to Bitcoin Through Taproot and Lightning, available at https://bitcoinmagazine.com/technical/how-bitcoin-taro-protocol-works.
[10] 2019: https://cryptoslate.com/event/magical-crypto-conference/; 2020: https://app.qwoted.com/opportunities/event-magical-crypto-conference-2020

15. *Criticism #1: Internet Searches*. In arguing that the products are not proximate despite these similarities, Ms. Butler claims that she was able to construct various internet searches of Google, social media platforms, and other websites in which the products did not appear together.[11] While Ms. Butler may have been able to construct such searches, this does not undermine the conclusion that the products are proximate in the marketplace.

16. To begin with, Ms. Butler's claim that TARI® and TARO <u>never appear</u> together in search results appears to be suspect. To test this claim, I conducted a Google search for "tari taro protocols." The second listed result was an article in which "TARO" and "TARI" are both discussed, a copy of which is attached as **Exhibit 1**.[12] In the article, the author appears to have set out to discuss the TARO protocol but switched midway through the article to referring to "TARI," in a real-world example of confusion between the two names (as shown below in the red boxes). The fact that a Google search quickly turns up evidence of confusion undermines Ms. Butler's reliance on search results to argue that the products are never proximate.

> TARO is an open-source payment network that runs in parallel with Lightning Network. TARI is a bridge between Lightning Network and Ethereum Classic (ETC), which was created after TARI's inception. Because of this, the main focus of TARI development is on the Ethereum Classic (ETC) side of things.

17. Additionally, Ms. Butler's reliance on search results is misplaced because it ignores the effect of temporal proximity in sequential viewing. Products may be proximate in the marketplace when they are likely to be encountered in succession (i.e., "temporally proximate"), not just when they appear in the same search results or store shelf (i.e., "physically proximate"), where a *Squirt* survey design is applicable for both forms of marketplace proximity.[13] Because TARI® and TARO appear in the same publications and use the same marketing channels, potential consumers are likely to encounter them in succession – *e.g.*, while browsing different digital asset

---

[11] *Butler Declaration*, ¶ 21.
[12] https://www.tryspeed.com/what-is-taro
[13] Swann, Jerre B. (2012), "Likelihood of Confusion," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, (Chicago: ABA Publishing), p. 68.

protocols or exploring different online forums related to blockchain protocols – which presents an opportunity for confusion just as much as encountering two products together on a store shelf in physical proximity.

18. ***Criticism #2: Alleged Lack of Consumer-Facing Brand***. Ms. Butler also argues that the products are not proximate because Taro does not plan to launch a "consumer-facing brand" or "homepage." As an initial matter, Defendant's own statements indicate that TARO is likely to have a consumer-facing presence, where Defendant has described its "ideal consumer" in broad terms as "somebody who doesn't want to understand the protocol or bitcoin. It's just somebody who wants to transact cheaply and globally without holding bitcoin themselves."[14]

19. Moreover, even if Defendant itself does not promote TARO to consumers, this does not undermine the likelihood of confusion because both TARI® and TARO protocols are intended to be adopted by third parties, who will use the protocols in consumer-facing applications like buying tickets, gaming, collectible digital assets. Thus, even if Defendant does not promote the TARO protocol to consumers itself, it will still be proximate with TARI® in these scenarios (e.g., digital wallets) – just as products can share a shelf in a retailer even if the upstream manufacturer does not promote the product to the end consumer.

20. ***Criticism #3: Alleged Technical Differences Between Protocols***. Ms. Butler's argument that technical differences between the two protocols will negate the possibility of consumer confusion is also faulty. Many digital asset marketplaces support multiple blockchains and protocols, meaning that TARI® and TARO-compatible assets are likely to be listed in close proximity despite any technical differences. Similarly, cryptocurrency wallets frequently support multiple blockchains and protocols, which makes wallet applications another environment where the products are likely to appear in proximity.[15] Thus, any differences in their underlying technology do not by themselves mean that TARI® and TARO are not proximate in the marketplace.

---

[14] Lightning & Taro: Towards a Multi-Asset Crypto Payment Network (2022), AAX Trends, July 8, 2022.

[15] https://money.com/best-crypto-wallets/; https://coinsutra.com/best-multi-cryptocurrency-wallets/

21. In summary, both Tari and Taro offer the same products (i.e., protocols for digital assets), to the same consumers interested in making transactions of digital assets, in the same markets (e.g., games, tickets, art, digital collectibles), and potentially will be carried on the same third-party digital wallets. These two firms' products and respective wordmarks when fully launched will be proximate in the market, which makes a *Squirt* survey an appropriate approach for analyzing the likelihood of customer confusion.

## II. SURVEY QUESTIONNAIRE DESIGN

22. The Butler Declaration also addresses the questionnaire design of the Survey. As explained in my Opening Report, the Survey used appropriate survey images and neutral, non-leading prompts that provide an accurate assessment of consumer perceptions regarding source affiliation between TARI®, TARO, and the control brands used in the Survey.

23. In her Declaration, Ms. Butler argues that the *Squirt* design lacked marketplace reality and that the survey questions are somehow leading or biased, which undermines the reliability of the results.[16] However, the design followed a standard protocol which is relatively similar to what a consumer may face when evaluating these two firms' brands as a protocol for a digital asset in the marketplace for games, tickets, or other digital assets. There is nothing in the design that would significantly impact the measured levels of confusion.

24. With respect to the selection of survey images, the Survey used images of the TARI®, TARO, and control marks as they are used in commerce, including on the TARI® and TARO websites. (Opening Report ¶ 48.) These stimuli accurately capture marketplace reality and are the type of images that are routinely used in trademark surveys, as explained by Jacob Jacoby in *Trademark Surveys, Volume 1, Designing, Implementing, and Evaluating Surveys* 483 (American Bar Association 2013):

> The stimuli used in trademark surveys can take many forms. These include actual marks and products, photographs of marks or products, brochures, business cards, circulars and pamphlets describing products or services, disclaimers, information provided by product labels, TV or radio commercials, print advertisements, other printed matter used by one of the parties during their normal course of business or extracted from newspapers or magazines, content from

---

[16] *Butler Declaration*, ¶ 28-39.

the Internet, sounds (such as the sound of a motorcycle or the chirp of a push-to-talk phone signal) and so on.

25. The survey design also took extensive precautions to reduce "demand effects."[17] Below is the list of answers that survey participants were shown for each question after viewing the test and control images:

> Q1. Now thinking back to Product No. 1 (the first product image you saw), do you think any of the products pictured on this screen is (are) **likely to be made or put out by the same company** that makes or puts out Product No. 1? If you don't know, feel free to say so.
>
> Yes (is likely)
> No (is NOT likely)
> Don't know

26. This design reflects multiple precautions to reduce demand effects. First, before each question there was a statement (shown in red box) "If you don't know, feel free to say so," which made clear that respondents were not being pressured to guess. Second, the option of "Don't know" (shown in green box) was added to each question so that respondents would not be forced to respond "yes" or "no". Third, the respondent only went to the next step of actually selecting the products from the lineup when they answered this precursor question with a "Yes", which eliminates any potential demand effect from immediately asking respondents to identify one of the products from the line up (shown in blue box). Given these precautions, the likelihood that survey respondents would have felt pressured to "guess" is extremely low.

27. Ms. Butler's argument that using the word, "likely", in the survey questions asking whether the products are "likely to be made or put out" by the same company amounts to a "leading" question is also wrong. As the question above shows, the word "likely" is used for both the affirmative **"Yes (is likely)"** and negative **"No (is not likely)"** responses, so the question does not place any more emphasis on an affirmative response than a negative one. In other words, the respondent is using the same degree of judgment for choosing yes or no, which renders the question non-leading.

---

[17] Swann, Jerre B. (2012), "Likelihood of Confusion," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, (Chicago: ABA Publishing), pp. 53 – 78.

28. In summary, there is nothing in the design of the survey or stimuli that is that different than how a consumer would see any of these word marks in the marketplace (e.g., listed in a digital wallet) that would "inflate" the level of consumer confusion or undermine the reliability of the results.

**III.  CONTROLS USED IN SURVEY**

29. As explained in my Opening Report, I selected the controls for the survey by choosing firms in the same general product category whose marks shared various characteristics with Defendant's TARO mark in terms of appearance, color, design, fonts, number of letters, ending in a vowel, nature of business, and prominence of the respective marks. This was done to control for confusion produced by guessing or extraneous factors and thus to isolate the unique confusion produced by the "TARO" mark.

30. The Butler Declaration argues that the design and selection of controls used in the survey was problematic and could somehow impact the results. This is incorrect for numerous reasons.

31. First, Ms. Butler argues that the Survey should have used an "external control" rather than an "internal control." This criticism is misplaced because the *Squirt* survey format is inherently designed to use an internal control – *i.e.*, by including control marks in the lineup shown to survey respondents along with the test mark. This standard *Squirt* survey format is described in the classic reference on this subject by Jerre Swann on "Likelihood of Confusion" surveys quoted below[18]

> [T]he fair and non-leading way in which experts now conduct this type of survey is to show the plaintiff's and defendant's product in the context of a number of products about which they will be questioned. This removes the spotlight from the products of the plaintiff and defendant, helps avoid making obvious what the survey is about, and makes the survey more realistic and less leading.

Because the Survey followed this standard *Squirt* format and properly used internal controls, Ms. Butler's complaint about the lack of external controls is without merit.

---

[18] Swann, Jerre B. (2012), "Likelihood of Confusion," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, (Chicago: ABA Publishing), pp. 53 – 78.

32.     Second, the Butler Declaration argues that there are other firms that could have been selected as controls. This will always be the case in survey design. What is more critical is that the controls were selected appropriately including similar types of firms and/or products which share characteristics with the test mark (i.e., Taro), but do not share the characteristic whose influence is being assessed.[19]

33.     The three controls used in the study (*Corda*, *Polygon*, and *Echo)* each share various characteristics with Defendant's TARO mark, in terms of appearance, color, design, fonts, number of letters, ending in a vowel, nature of business, and prominence of the respective marks (see below). Importantly, each of the firms used as a control is a "plausible member of the same product category" to prevent lack of product category similarity being an alternative explanation for high confusion between the TARI and TARO marks if the controls were in different product categories.[20] Equally important, none of the control brands had the targeted characteristic being tested, namely, the use of "Taro" in the mark. I used multiple control marks that had a variety of color, fonts, logo, number of letters, in recognition of the absence of a "perfect control" and to provide a more conservative test of the likelihood of consumer confusion.

**34.     Stimuli Used in Survey**

| Product A[21] | Product D[22] |
|---|---|
| ⬢ TARI | ⬡ polygon |

---

[19] Rappeport, Mike (2012), "Design Issues for Controls," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, (Chicago: ABA Publishing), pp. 217-239.
[20] Diamond, Shari Seidman (2012), "Control Foundations: Rationales and Approaches," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, (Chicago: ABA Publishing), p. 212.
[21] https://www.tari.com
[22] https://polygon.technology

| Product B[23] | Taro | Product E[24] | Echo |
|---|---|---|---|
| Product C[25] | c•rda | | |

35. I also intentionally included Tari's stylized "T" logo in the depiction of the TARI® mark (as shown as Product A above), consistent with Tari's branding in the market. This makes the Survey a more conservative test since (1) this logo provides a point of differentiation between Plaintiff's TARI® mark (with logo) and Defendant's "TARO" mark (with no logo), and (2) it also provides a point of similarity between TARI and the Polygon control mark (as both have logos). These two points reduce the levels of total and net confusions and thus make the results a more conservative measure of confusion.

36. While Ms. Butler offers some suggestions for "better" controls, it appears they were chosen to artificially suppress the level of measured confusion. All of the marks proposed by Ms. Butler have logos (symbols) included with the word mark, which TARI® has but TARO does not have. Including controls that all share the same common feature with TARI® but not with TARO – leaving TARO as the "odd one out," so to speak – would be a very poor choice of controls since it would make it impossible to isolate the effect of the name versus the inclusion of a logo. This choice of controls would artificially suppress the level of confusion by steering respondents to select controls with a logo that match Tari's logo and avoid Taro's mark that does not have a logo.

37. As explained by Shari Diamond in her widely-read treatise chapter on survey controls, "features that characterize a good control stimulus" include "it does not contain cues that will artificially depress confusion responses by leading the respondent in another direction."[26] Ms.

---

[23] https://docs.lightning.engineering/the-lightning-network/taro
[24] https://pixelplex.io/work/smart-contract-layer-2-blockchain-protocol/
[25] https://corda.net
[26] Diamond, Shari Seidman (2012), "Control Foundations: Rationales and Approaches," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, (Chicago: ABA Publishing), p. 212.

Butler's proposed controls would violate this fundamental survey design rule and would thus prevent an accurate test of confusion produced by the "TARO" mark.

38. In summary, there was nothing in the design or selection or controls that does not follow the best practice for controls or could be expected to significantly change the level of measured consumer confusion.

**IV.  SURVEY POPULATION**

39. The Butler Declaration's criticisms of the Survey population used are also without merit. As explained in my Opening Report, the relevant consumer population for the Survey was defined as adult consumers (age 21 years or older) in the United States who in the past 6 months "Bought or considered using Bitcoin, stablecoins, cryptocurrencies, NFTs, or other digital assets" or plan to "Buy or use Bitcoin, stablecoins, cryptocurrencies, NFTs, or other digital assets" in the next 6 months. This is an appropriate population to test confusion of consumers most likely to "partake of the infringer's goods" in the marketplace (i.e. Taro).

40. Ms. Butler argues that the population used in the survey was overly broad based on the premise that the target market for Taro is only "developers."[27] However, as discussed above in connection with marketplace proximity, both parties have expressed a desire to target consumers as end users of their products in addition to developers. And both parties make their protocols available for developers to integrate into applications that ultimately target consumers as end users.

41. In addition, the CEO of Lightning Labs (i.e., Taro) has also drawn a parallel between its products and credit cards in the sense that consumers do not know how either works (shown below in red box).[28] This again reinforces that the target consumers for the Taro products and services are largely ordinary consumers.

> "It's one of those things where people don't really know how the credit card system works – and it just works," Lightning Labs CEO Elizabeth Stark told CNBC.

---

[27] *Butler Declaration*, ¶ 47-48.
[28] https://www.cnbc.com/2022/04/05/bitcoin-powers-a-fast-new-way-to-send-us-dollars-around-the-world.html

42. Because the appropriate survey population includes all likely consumers – not just one subset of customers like developers – the screening criteria used in the Survey were appropriate.

43. Ms. Butler also argues that the screening questions for building the survey sample is overly broad and does not represent Taro's potential customers, but this too is incorrect. Ms. Butler takes issue with the screening criteria for consumers who have bought or considered using "Bitcoin, stablecoins, cryptocurrencies, NFTs, or other digital assets." However, these screening criteria are closely related to the use cases identified on Defendant's own website, which describes the TARO protocol as capable of being used to sell "all kinds of assets" where "these assets can represent, including stablecoins, shares, tickets, ownership rights or art."[29] Moreover, Defendant has defined its target consumers as "somebody who wants to transact cheaply and globally without holding bitcoin themselves."[30] These public statements by Defendant confirm that the screening questions appropriately identified potential consumers of the "TARO" products.

44. Finally, Ms. Butler argues that matching the Survey sample to the gender and age of the US population was inappropriate because cryptocurrency consumers tend to be younger and male. This position is inconsistent with the broad description of TARO's potential consumers identified by Defendant. In any event, this criticism has no effect on the reliability of the Survey because Defendant received the raw data for the survey and could easily have re-analyzed it based on subgroups based on these demographic characteristics to identify any variance in the results. Ms. Butler does not perform any supplementary analysis or suggest that the results would have been different, which suggests that these sampling criteria had no significant effect on the survey outcome.

\* \* \*

45. For each of these reasons, I conclude that the criticisms of the Survey identified in the Butler Declaration are without merit and do not call into question the reliability of the Survey's

---

[29] https://docs.lightning.engineering/the-lightning-network/taro/faq
[30] Lightning & Taro: Towards a Multi-Asset Crypto Payment Network (2022), AAX Trends, July 8, 2022.

results. These results show that widespread consumer confusion is likely to occur if Defendant's TARO protocol is launched at scale.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and represents my expert opinion in this matter based on the materials and information I have reviewed to date.

Dated:  March 2, 2023

By: Robert W. Palmatier, PhD