J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Mitchell C. Stein, Esq. (*Pro Hac Vice*)
  stein@braunhagey.com
Kirsten Jackson, Esq. (*Pro Hac Vice*)
  dooley@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W. 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (646) 403-4089

ATTORNEYS FOR PLAINTIFF
TARI LABS, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TARI LABS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> LIGHTNING LABS, INC., <br><br> Defendant. | Case No. 3:22-cv-07789-WHO <br><br> **PLAINTIFF'S CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:       March 8, 2023 <br> Time:       2:00 p.m. <br> Judge:      Hon. William H. Orrick <br> Courtroom:  Via Zoom Videoconference |

# **TABLE OF CONTENTS**

ARGUMENT ............................................................................................................................... 2

I.  TARI'S REQUESTED RELIEF WILL PREVENT IRREPARABLE HARM ................. 2

II. TARI ACTED TIMELY AND TOOK REASONABLE STEPS TO AVOID THE NEED FOR THIS MOTION ........................................................................................... 4

III. AN INJUNCTION POSES LITTLE TO NO BURDEN ON DEFENDANT AND WILL PROTECT INNOCENT USERS ......................................................................... 6

IV. TARI IS LIKELY TO SUCEED ON THE MERITS ....................................................... 7

    A.  TARI® is Strong ................................................................................................... 7

    B.  Defendant's TARO Product is Consumer-Facing ................................................ 8

    C.  The Parties' Markets Are the Same and Overlap in Numerous Ways ................... 9

        1.  TARO Wallet v. TARI® Wallet ................................................................ 9

        2.  Defendant's Purported Distinctions Between TARO and TARI® are Distinctions Without a Difference .............................................................. 9

        3.  Tari's Examples of Confusion Show Real-World Inevitabilities ............. 10

        4.  Illustration of Public Facing Protocols Like TARO: Ordinals ................ 11

        5.  Illustration of Real-World Confusion: BASE Token v. BASE the Second Layer ........................................................................................... 12

    D.  The Marks Are Virtually Identical in Sight and Sound ...................................... 12

    E.  Tari Has Demonstrated Actual Confusion .......................................................... 13

CONCLUSION .......................................................................................................................... 16

# TABLE OF AUTHORITIES

**CASES**                                                                                                              **PAGE(S)**

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
   174 F.3d 1036 (9th Cir. 1999) .................................................................................................. 4, 14

*Citibank N.A. v. City Bank of San Francisco*,
   206 U.S.P.Q. 997 (N.D. Cal. 1980) ................................................................................................ 13

*Cohn v. Petsmart Inc.*,
   281 F.3d 837 (9th Cir. 2002) ............................................................................................................ 8

*Coop. Regions of Organic Producer Pools v. Stueve's Certified Organic Dairy*,
   14-CV-1123, 2014 WL 12571393 (E.D. Cal. July 25, 2014) .......................................................... 6

*Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*,
   No. 17-CV-06393-YGR, 2018 WL 659105 (N.D. Cal. Feb. 1, 2018) ........................................... 16

*FAZE Apparel, LLC v. Faze Clan, Inc.*,
   No. 218CV02052RGKJEM, 2018 WL 3830027 (C.D. Cal. May 22, 2018) .................................. 3

*FieldTurf USA Inc. v. Tencate Thiolon Middle East, LLC*,
   945 F. Supp. 2d 1379 (N.D. Ga. 2013) .......................................................................................... 14

*Guess?, Inc. v. Tres Hermanos*,
   993 F. Supp. 1277 (C.D. Cal. 1997) ................................................................................................ 6

*Haven Cap. Mgmt., Inc. v. Havens Advisors, L.L.C.*,
   965 F. Supp. 528 (S.D.N.Y. 1997) ................................................................................................. 13

*iCall, Inc. v. Tribair, Inc.*,
   2012 WL 5878389, (N.D. Cal. Nov. 21, 2012) .............................................................................. 13

*Interstate Brands Corp. v. McKee Foods Corp.*,
   53 U.S.P.Q. 2d 1910 (T.T.A.B. 2000) ............................................................................................ 13

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
   2 F.4th 1150 ............................................................................................................................ 4, 6, 8

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
   828 F.3d 1098 (9th Cir. 2016) ......................................................................................................... 7

*Khadavi v. Stagi, Inc.*,
   20-CV-7948, 2021 WL 4057526 (C.D. Cal. Apr. 8, 2021) .............................................................. 6

*M2 Software, Inc., v. Madacy Entertainment*,
   421 F.3d 1073 (9th Cir. 2005) ......................................................................................................... 8

Case 3:22-cv-07789-WHO   Document 46   Filed 03/02/23   Page 4 of 20

*Matrix Motor Co. Inc. v. Toyota Jidosha Kabushiki Kaisha*,
   290 F. Supp. 2d 1083 (C.D. Cal. 2003) .................................................................................. 16

*Perez v. City of Petaluma*,
   21-CV-6190, 2021 WL 3934327 (N.D. Cal. Aug. 13, 2021) ...................................................... 6

*PerkinElmer Health Scis., Inc. v. Atlas Database Software Corp.*,
   No. 92046554, 2011 WL 7005538 (T.T.A.B. Dec. 22, 2011) .................................................. 10

*Rearden LLC v. Rearden Com., Inc.*,
   683 F.3d 1190 (9th Cir. 2012) ................................................................................................ 14

*Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*,
   907 F. Supp. 2d 1086 (N.D. Cal. 2012) .................................................................................... 6

*Stone Brewing Co., LLC v. MillerCoors LLC*,
   18-CV-331, 2022 WL 4596570 (S.D. Cal. Aug. 4, 2022) ........................................................ 15

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
   875 F.3d 426 (9th Cir. 2017) .................................................................................................. 14

*TrafficSchool.com, Inc. v. Edriver Inc.*,
   653 F.3d 820 (9th Cir. 2011) .................................................................................................. 15

*Warner Bros. Ent. v. Glob. Asylum, Inc.*,
   2012 WL 6951315 (C.D. Cal. Dec. 10, 2012) .......................................................................... 4

*Waterloo Sparkling Water Corp. v. Treaty Oak Brewing & Distilling Co*., LLC,
   21-CV-161, 2021 WL 5568159 (W.D. Tex. Nov. 28, 2021) ................................................... 15

**STATUTES**

15 U.S.C. §1060(a)(1) ..................................................................................................................... 8

15 U.S.C. § 1116(a) ........................................................................................................................ 2

1      Plaintiff Tari Labs, LLC ("Tari Labs") respectfully submits this Reply in further support of its Motion for Preliminary Injunction (ECF 25).  Defendant's Opposition essentially admits that its TARO protocol was pending imminent release and commercialization, and presents almost no evidence to address the obvious and substantial harm Tari presented in the Motion.  The Opposition instead paints a glossy picture of a world where TARO is not "consumer-facing", where blockchain and NFT users engage with only one protocol, and where people typing on keyboards and looking at brand names could not be confused by TARI® and TARO. This picture is make-believe and contradicted by innumerable public-facing TARO statements and advertisements, not to mention decades of caselaw precluding trademarks in similar classes of products.

       The Opposition hinges most of its defense on the false idea that, despite all its public-facing blogs, Youtube videos, website posts and advertisements, "TARO" will never be seen by consumers (Opp. at 1).  But just yesterday, Tari discovered that, in addition to the new contemplated release of TARO, its development partners and users also are intending to launch an infringing "TARO Web Wallet" that will compete directly with the existing TARI® Aurora Wallet on Apple's App Store (Jain Supp. Decl. 17.):



       The TARO WEB WALLET is precisely the kind of product which Tari anticipated in its opening brief (Mot. at 12-15), and which Defendant barely addresses.  The Opposition also fails to seriously dispute that both TARI® and TARO are blockchain-related protocols for digital assets; that they market to the same consumer and developer base using the same marketing channels like the Apple Store, GitHub, and social media; that they are covered by the same industry publications; that they are featured at the same industry conferences; and that they share common venture investors.  Only

1  TARO®, however, has a federally-registered trademark long preceding the other in commerce. If the
2  TARO protocol is allowed to further develop and launched, consumer-facing TARO apps will
3  multiply and sow precisely the confusion that our trademarks laws were designed to prevent.
4        The requested [Proposed] Preliminary Injunction (ECF 25-2) will help protect TARI® and
5  the general public during the pendency of this case and impose little burden on Defendant who, if it
6  elects, could easily adopt a better name in far less time than it took to draft its opposition brief.

7  **ARGUMENT**

8  **I.    TARI'S REQUESTED RELIEF WILL PREVENT IRREPARABLE HARM**

9        Defendant's opposition spends little time addressing the evidence of harm Tari presented in
10 its opening papers, including the five vignettes described by Tari's CEO Naveen Jain where
11 consumers will inevitably interact with the two protocols, often mistaking them for one another,
12 resulting in broken transactions, lost digital assets and a deeply unsatisfactory user experience.
13 (Mot. at 12-15.)  Defendant do not even contest that irreparable harm is presumed from trademark
14 infringement under the Lanham Act, 15 U.S.C. § 1116(a).  Instead, the Opposition relies on bald
15 assertions that the harms evidenced by Tari are merely "speculative," which is contradicted by the
16 substantive evidence set forth in Tari's declarations, expert reports and related case law examples
17 (Opp. at 1.)
18       Defendant also focuses on a single piece of evidence to dispute irreparable harm, arguing
19 that Tari's practical marketplace scenarios where confusion will occur (Mot. at 12-15) are
20 unrealistic because "Lightning Labs does not intend to ever offer NFTs, *digital wallets*, or any
21 other products for end-consumers under the TARO mark." (Opp. at 23.) But Defendant fails to
22 inform the Court, as shown in the introduction above, that ***there is already a consumer-facing***
23 ***Taro Digital Wallet application in the marketplace.***  (Jain Decl. Ex. 13; *see*
24 https://testnet.tarowallet.net/walletapp/.)
25       This evidence alone proves precisely the kind of viral harm which Tari is concerned about.
26 Defendant's protocol project admittedly is based on encouraging developers to develop consumer-
27 facing applications using the "TARO" mark once its protocol is launched at scale.  As Defendant
28 states: "many external developers have already begun building on TARO under that name." (Opp.

at 23.) Because Defendant is admittedly aware that developers are creating consumer-facing applications using the "TARO" name, its repeated protestations throughout its brief to the contrary are hollow and are misleading. That the marketplace scenarios identified by Tari are already being borne out even before Defendant's formal launch is strong evidence that mass confusion and irreparable harm will continue to occur if Defendant's infringement is not enjoined – with existential stakes for Tari.

Defendant otherwise fails to meaningfully rebut that potential customers are likely to become confused while creating NFTs, browsing digital assets, selecting a TARI®-compatible wallet, creating smart contracts, or selecting development tools. (Jain Decl. ¶ 42; Palmatier Expert Decl. ¶ 91.) Such users are likely to conclude that Tari's technology did not work as intended and blame Tari for their negative experiences. (*Id.*) Likewise, developers concerned about end-user confusion are likely to avoid incorporating Tari's technology. (Jain Decl. ¶ 43; Palmatier Expert Decl. ¶ 95.) Such harm to reputation and goodwill is a classic example of irreparable harm, as demonstrated by authority that Defendant does not address or distinguish. *FAZE Apparel, LLC v. Faze Clan, Inc.*, No. 218CV02052RGKJEM, 2018 WL 3830027, at *7 (C.D. Cal. May 22, 2018) ("[e]vidence of loss of control over business reputation and damage to goodwill can constitute evidence of a likelihood of irreparable harm").

Defendant also does not meaningfully address the effect that infringement will have on reducing Tari's business opportunities – damages that would be almost impossible to establish before a jury with the kind of certainty required under federal law.

Defendant next argues that initial interest confusion between TARO and TARI® is not "taken seriously," Opp. at 35, but the Ninth Circuit disagrees. The threat of initial interest confusion has been upheld throughout district courts in California, and by the Ninth Circuit itself as sufficient justification to warrant preliminary injunctive relief. See *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1063–64 (9th Cir. 1999) (reversing with instructions to enter preliminary injunction based in part on "initial interest" confusion). Because of the near-exact similarity between TARI® and TARO – including their proximity on the keyboard – potential customers are likely to experience "initial interest" confusion and investigate

Defendant's infringing protocol instead of Tari's. (Palmatier Expert Decl. ¶ 92.)

The Opposition also fails to address or distinguish Tari's authority that the intended infringement will cause reverse confusion and swamp TARI® in the marketplace, thereby undermining its efforts to create broad goodwill in TARI® products and services. (*See* Jain Decl. ¶ 45; Palmatier Expert Decl. ¶ 98-100.) Defendant ignores the authority cited by Tari showing that such harm is not only irreparable but existential: "The result of reverse confusion 'is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets'" *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150 at 1160.

Finally, Defendant argues, without evidence, that any potential confusion would be limited and of very little consequence to either business (Opp. at 22-23). In fact, there is a substantial, almost geometric, "network effect" created by the kind of infringement envisioned by Defendant. Each user who is confused or misled by Defendant's infringing protocol not only represents a lost business opportunity, but also reduces the value of the TARI® protocol for other users by reducing the "network effect" that each user enjoys. (Jain. Dec. ¶ 30.) This threatens to create a downward spiral similar to a "run on the bank," preventing TARI® ever from achieving its potential. (*Id.*)

## II.   TARI ACTED TIMELY AND TOOK REASONABLE STEPS TO AVOID THE NEED FOR THIS MOTION

Tari filed suit promptly after investigating its claims and attempting to resolve the dispute prior to Defendant's launch announcement. *See Warner Bros. Ent. v. Glob. Asylum, Inc.*, 2012 WL 6951315, at *21 (C.D. Cal. Dec. 10, 2012), *aff'd*, 544 F. App'x 683 (9th Cir. 2013). Defendant's response —that Tari sat on its rights since April, 2022—is undermined by its own evidence, and further proves that Tari has been diligent in protecting its rights.

Defendant points to a direct message exchange from April 2022 between Tari's CEO, Naveen Jain, and Defendant's CEO, Elizabeth Starke (Dkt. No. 30), as purported evidence of Tari's awareness of TARO. Defendant neglects to mention, however, that this message exchange was only the first in a series of attempts to dissuade Defendant from using the infringing TARO name. (Reply Declaration of Tari's CEO, Naveen Jain ("Jain Supp.") ¶¶ 5-9.) Tari first reached

out in April 2022 while the Parties were attending Crypto Bahamas. (*Id.* ¶ 5.) The message exchange was followed up by a face-to-face meeting in the Bahamas, where Stark misled Mr. Jain by telling him that TARO would not be public-facing (*Id.* ¶ 6.), when, as demonstrated by Tari, the soon-to-be-launched TARO protocol has proven to be incredibly public-facing. (*Id.* ¶ 14-16.). In June 2022, Tari tried again. (Jain Supp. Exh. 1). Because the Parties were friends and socialized and attended business meetings together, Tari attempted to resolve the dispute amicably. (Jain Supp. ¶ 3). "[L]ooking for the smoothest path to resolve this," another Tari principle, and friend of Starke, wrote. (Jain Supp. Exh. 1). Tari offered to help TARO "brainstorm a new name," come up "with some logo concepts," and "frame the announcement of the name change so that it is a positive, joyous thing." (*Id.*) Tari also extended use of its "excellent team of designers." (*Id.*) Tari shared a screenshot of actual confusion that occurred in its Tari Telegram Channel. (*Id.*) A user posted "wtf" alongside a TARO article. (*Id.*) Tari indicated that it had spoken with its GC and outside legal counsel and intended to defend its trademark. Stark ignored these messages and a follow-up.[1] (*Id.*)

Frustrated in its efforts, on September 12, Tari sent a cease-and-desist letter warning Defendant against using the infringing TARO mark. (Hagey Decl. ¶ 2 Ex. 1.) Tari received a response from Defendant's counsel at Wilson Sonsini again mischaracterizing the scope of the TARO Project and rejecting Tari's request on September 27, 2022. (*Id*. ¶ 3 Ex. 2.) As discussed in Tari's Motion, the response letter also provided a vivid illustration of confusion by mixing up TARI® and TARO in the body of the letter itself. (*Id*.) The next day, Defendant launched the alpha version of TARO. Since filing suit on December 8, 2022 and prior to filing this motion, Tari has twice requested that Defendant voluntarily cease its infringement, both times in response to defense counsel's requests for extensions of time to respond to the complaint in December and January. (*Id*. ¶ Ex. 3 and Ex. 4.)

Defendants' argument that Tari unduly delayed rings hollow because the delay was caused

---

[1] TARO's claim that "there is no evidence that it was doing anything to 'persuade' Lightning Labs'" from infringing (Dkt. No. 35 at 26), and that Tari "made no serious effort to contact Lightning Labs about its plans until September 2022" (*id.*) — is patently false.

in large part by Defendants' deceit. When a defendant delays preliminary relief by means of misdirection or withholding information, however, the alleged delay is not attributable to plaintiff, but to defendant. *Cf.*, *Guess?, Inc. v. Tres Hermanos*, 993 F. Supp. 1277, 1286 (C.D. Cal. 1997) (granting motion for preliminary injunction filed 11 months after initial cease and desist where defense' counsel induced plaintiffs to believe that defendants "intended to resolve the problems between their respective clients").[2] Defendants' deceit in the face of being notified of their infringement additionally constitutes willful infringement. *See Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1167 ("Use of an infringing mark, in the face of warnings about potential infringement, is strong evidence of willful infringement").

In such circumstances, Tari acted prudently and carefully to avoid the necessity of this motion against a much larger, more highly funded competitor. And, for its part, Defendant should not be entitled to rely on its own false assurances and misleading statements about TARO's supposed "non-public facing" in order to deny Tari's requested equitable relief.

### III. AN INJUNCTION POSES LITTLE TO NO BURDEN ON DEFENDANT AND WILL PROTECT INNOCENT USERS

Defendant fails to articulate any meaningful hardship it would face in changing its name. Unlike TARI®, the name Taro is not integral to Defendant's brand. Its affinity for the root vegetable of the same name does not justify infringement, no matter how clever Defendant believes the name to be. Moreover, Defendant's venture into digital assets is not a service that is core to its business. Defendant could change its name with little to no cost and no more than a couple of hours of its time. (Declaration of Michael Berry ("Berry Decl.") ¶ 7-9.) This is evidenced by Defendant's

---

[2] Defendant's cases, (Dkt No. 35 at 26), are nothing like the present case, where Defendant has misled Plaintiff, and misrepresented its infringement in the face of Plaintiff's good faith efforts towards resolution. *See Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1097 (N.D. Cal. 2012) (finding that "evidentiary shortcomings," failure to meet the legal standard, and an untimely filing counseled against injunctive relief); *Perez v. City of Petaluma*, 21-CV-6190, 2021 WL 3934327, at *1 (N.D. Cal. Aug. 13, 2021) (finding that Plaintiff failed to address or even explain delay in denying ex parte TRO but setting hearing on preliminary injunction); *Coop. Regions of Organic Producer Pools v. Stueve's Certified Organic Dairy*, 14-CV-1123, 2014 WL 12571393, at *2 (E.D. Cal. July 25, 2014) (denying ex parte TRO because Plaintiff failed to explain why it did not seek injunctive relief earlier); *Khadavi v. Stagi, Inc.*, 20-CV-7948, 2021 WL 4057526, at *3 (C.D. Cal. Apr. 8, 2021) (same).

own inaction on the name Taro.

Defendant protests that it would somehow be harmful or burdensome to comply with an injunction, Opp. at 23, but in reality it would be trivially easy for Defendant to change its name to another root vegetable, say Beetroot, for example. (*Id.*) All that would be required would be the following three simple steps: (i) rename TARO to BEETROOT for the repository folder name on Defendant's GitHub page and all folder and subfolders with the name TARO within that repository folder; (ii) run a "search and replace" command within the code itself; and (iii) issue a press release and contacting appropriate industry media outlets, such as CoinDesk and BitCoin Magazine.. (*Id.*) Changing file names could be completed in minutes, and checking that the changes were complete and accurate would take less than an hour. (*Id.*)

Public interest also favors an injunction to stop confusion before it occurs. (Jain Supp. Decl. ¶ 40) The blockchain industry has been roiled by recent negative press and is under pressure to weed out bad actors and malfeasance. Preventing further consumer losses and confusion clearly serves the public interest. Defendant's launch will engender further potential frustration amongst an innocent public and should be enjoined if for no other reason than this.

## IV.   TARI IS LIKELY TO SUCEED ON THE MERITS

### A.   TARI® is Strong

In determining the strength of the mark, courts consider both a mark's conceptual strength and its commercial strength. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106-09 (9th Cir. 2016). Defendant concedes that TARI® occupies the highest category of conceptual strength as an "arbitrary" mark (Opp at 9 n. 3), and instead disputes only commercial strength. (Dkt. No. 35 at 13.)

Defendant's commercial strength argument miss the mark: where the trademark plaintiff has alleged reverse confusion, like here, courts are required to consider not only the senior user's commercial strength, but also that of the *junior user's* mark – i.e., TARO. As the Ninth Circuit has noted, in situations of reverse confusion, "a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1163 (9th Cir. 2021) (quoting *Cohn v. Petsmart Inc.*, 281 F.3d 837 (9th Cir. 2002) (per

curiam)). Thus, even if Defendant were correct with respect to commercial strength, that would help, rather than hurt, Tari's likelihood of success on its infringement claims with respect to reverse confusion.

In any event, Tari's mark is commercially strong, as demonstrated in Mr. Jain's original declaration.  (Jain Dec. ¶ 10, Exhs. 1, 2); *see also id*. at ¶ 11.  There have been over 1,000 downloads of the TARI Aurora Wallet from the Google Play Store, over 2,000 members on each of Tari's site on the apps Discord and Telegram, and nearly 8,000 followers on @Tari's Twitter account.  (Jain Supp. Exh. 2).  Where, as here, Tari is a young company at a relatively early stage of development, this level of commercial activity more than satisfies the use requirements for the Lanham Act, since otherwise a better funded junior user like Defendant could snuff out the senior user's inherently distinctive mark before the senior user gets a chance to market it.  *See M2 Software, Inc., v. Madacy Entertainment*, 421 F.3d 1073, 1081 (9th Cir. 2005) *cert. denied*, 126 S.Ct. 1772 (U.S. 2006).  This factor favors grant of the injunction.[3]

### B. Defendant's TARO Product is Consumer-Facing

Defendant insists throughout its Opposition that TARO will not be consumer-facing. However, these claims are contradicted by its consumer-facing statements, tweets, interviews, podcast features, and YouTube videos, each of which can found in Mr. Jain's original declaration, including (1) statements by Defendant's CEO Elizabeth Stark regarding ideal TARO customers, and that TARO will be used to create NFTs and other digital assets, (2) statements by Ms. Stark, Defendant's CTO, and Defendant's Technical Contact Lead, that TARO will be used to create , buy and sell NFTs and other digital assets, included tokenized baseball cards and digital in-game items, (3) a statement by Defendant's content lead that "The biggest hurdle for the Lightning Network at this moment is "finding people that are willing to sell products over the Lightning

---

[3] Defendants' speculation in footnote 2 of its brief that the assignment of the TARI® application from AccessCoin, LLC to Tari LLC was somehow deficient is without merit.  The Lanham Act permits assignment of intent-to-use applications "for an assignment to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing."  15 U.S.C. §1060(a)(1).  That is what happened here: AccessCoin LLC assigned its protocol business, including trademarks, to Tari, its subsidiary. See Jain Supp. Decl. ¶ 18.  Even a cursory look at public records show that the entities are registered to the same address, and that AccessCoin, LLC is a manager of Tari.  *Id*. and Ex. 3.

Network, and others who want to buy things with it," and (4) statements by Defendant's CTO illustrating an example of TARO usage by positing individuals engaged in an exchange of a stablecoin worth $10. (Jain Decl. ¶12, 13, 20 and 22 and Jain Supp. Decl. at ¶ 14), These statements demonstrate conclusively that Defendants' TARO protocol will be used by everyday consumers for a wide range of digital assets. .Moreover, these consumers will be *required* to know the difference between TARI and TARO if they want to store, purchase and sell their digital assets: otherwise their transactions will fail.

### C. The Parties' Markets Are the Same and Overlap in Numerous Ways

Defendant's arguments with respect to marketplace proximity are an exercise in hair-splitting, claiming that TARI® and TARO are somehow unrelated despite the fact that both are blockchain protocols for issuing and transferring digital assets. (Opp. at 9-12.) As shown below, it is obvious that end users will be confused based on the current state of the market.

#### 1. TARO Wallet v. TARI® Wallet

TARO is very public-facing, very confusing, and very-imminent. Despite Defendant's claim that a wallet developer would use the name of the blockchain rather than the name of its protocol, a new wallet developer shows otherwise. The TARO wallet is a "[c]ryptocurrency wallet for the Taro protocol. Trade, exchange and mint altcoins and NFTs directly on Bitcoin blockchain." (Jain Supp. Exh. 13). The TARO wallet will compete directly against the TARI® wallet for consumers. (Jain Supp. ¶ 32.) And end users will need to know whether they are purchasing a "TARO asset," or a "TARI® Asset," as denominated in articles already. (Jain Dec. Ex. 20 at 8) ("Transferring a Taro Asset"). Likewise, invoices for digital assets will specify whether it is a TARO asset or a TARI® asset. (*Id.*)

#### 2. Defendant's Purported Distinctions Between TARO and TARI® are Distinctions Without a Difference

**First**, Defendant attempts to create a binary world of Bitcoin and Monero enthusiasts is divorced from reality and fundamentally misunderstands Tari, Tari's trademark, and Tari's trademark rights. (Opp. at 9-12, 17.) Neither crypto enthusiasts nor developers are siloed to one blockchain as Defendant suggests, and neither is Tari. While Tari currently leverages Monero as a

foundational security level, Taro can operate independently of Monero. (Berry Decl. ¶¶10-16.) This is It can also be made interoperable with other blockchains. Moreover, Tari's trademark is for "cryptocurrency trading and exchange services," and is silent as to which blockchain these services are tied. In 2018, well before TARO's inception, Tari announced plans to build "a standards compliant [] router," that would make "compatible [] Bitcoin, Monero, and Tari." (Jain Supp. ¶ 20.) Any efforts by Defendant to force Tari into one corner of cryptocurrency trading and exchange services, and foreclose its natural expansion into other blockchains, should be rejected.

Second, consumers, developers, and creators are not beholden to just one blockchain. This is obvious and Defendant knows it. Defendant's CTO admitted this at the Starkware Sessions 2023 conference in Tel Aviv. (Jain Supp. Exhs. 6-7). Starkware is a software company that works on the Ethereum blockchain, and Starkware Sessions 2023 is an event to "bring together the Ethereum community for a two-day event of talks, panels, workshops, round tables, show casing and more." (Jain Supp. Exh. 6). TARO is not on Ethereum, but Mr. Osuntokun showed how STARKs "can be introduced into the Bitcoin development ecosystem." (Jain. Supp. Exh. 7) (cleaned up).

And whether Defendant's protocol is on Bitcoin and Tari's protocol is on Monero does not matter. Many wallets support both Bitcoin and Monero, such as Edge and Exodus And most consumers simply do not care. If consumers wish to buy "a tokenized rare baseball card, for example" they will do so, regardless of the blockchain on which the asset resides.[4] (Jain Supp., ¶ 18.).

### 3.     Tari's Examples of Confusion Show Real-World Inevitabilities

Defendants attempts to undercut Plaintiff's examples of confusion by arguing that sites like OpenSea and OpenZeppelin do not currently support Bitcoin, and that the examples reference and list blockchains, not protocols, are easily disposed of.

---

[4] Defendant's citation to *PerkinElmer Health Scis., Inc. v. Atlas Database Software Corp.*, No. 92046554, 2011 WL 7005538, at *14 (T.T.A.B. Dec. 22, 2011) (Dkt No. 35 at 14) is distinguishable as in that case the consumers involved were sophisticed public health departments, not potential purchaser of tokenized rare baseball cards.

It is not surprising that OpenSea and OpenZeppelin[5] do not currently support Bitcoin. Until the recent upgrade to Bitcoin, the Taproot Asset Representation Overlay that enabled TARO, the creation of digital assets on Bitcoin was not feasible. (Jain Supp. ¶ 37.). With this new functionality, however, it is likely that current NFT marketplaces like OpenSea, and coding wizards, like OpenZeppelin, will expand to support other blockchains and protocols, or new marketplaces and wizards will emerge to meet demand. (*Id.*)

The digital assets ecosystem is evolving, and Defendant's attempts to impose rigid lines where few fit is misplaced. For example, Polygon, which OpenSea and the Coinbase Wallet support is a Layer 2 protocol built on the Ethereum blockchain. (*See* Jain Dec. Exhs. 36-39). Like TARI, it also functions as its own blockchain.

### 4.     Illustration of Public Facing Protocols Like TARO: Ordinals

Despite Defendant's claims to the contrary, expansion into other blockchains is a common enough trajectory for blockchain products and services, and especially where related to digital assets. (Jain Supp., ¶ Ordinals, another digital assets protocol (similar to TARI® and TARO), provides a clear example of TARO's very-public-and-confusing trajectory if it's permitted to launch under its infringing name.

The world's leading NFT creator, Yuga Labs, recently announced that it was expanding from Ethereum, another blockchain, to the Bitcoin blockchain. (Jain Supp. ¶ 25.). In doing so, it is using the newly launched digital assets focused protocol, Ordinals, and will auction off NFTs. (Jain Supp. ¶ 29.). Ordinals and Yuga Labs recommend that potential buyers of its digital assets set up an Ordinals wallet in anticipation of the auction. (*Id.*) Although the Ordinals protocol just launched on January 21st, wallet developers have risen to the occasion. On February 15 Xverse Wallet announced that it had "launched 1st class support for ordinals"; on February 16 an unaffiliated "Ordinals Wallet" launched; and Hiro Wallet released that it would "roll out expansive support for both Stacks-based NFTs and Ordinal inscriptions." (*Id.*) Because the Ordinals protocol code is

---

[5] Defendant also argues that OpenZeppelin is specific to sophisticated developers. This is false, hence OpenZeppelin's entire learning library for those that are "new to smart contract development," https://docs.openzeppelin.com/contracts/2.x/, providing "[c]omprehensive guides for *every step* of your development journey," https://docs.openzeppelin.com/learn/.

open-source, developers will build on top of it and market that their respective Ordinal wallets and applications and will denominate assets like NFTs made with the Ordinals protocol as Ordinals assets. Likewise, platforms like OpenSea will need to disclose whether they sell TARI® and/or TARO assets to consumers.

This will be the case with TARO once it launches. Whether these developers choose to list TARI® and/or TARO under Chains, Network, by logo, or by name, will ultimately be up to the developers, and under a free open-source code, it is less about precise nomenclature (which is increasingly becoming ambiguous with the advent of app chains, second layers, sidechains, etc…) and is solely to alert consumers that the platform or app in question sells what consumers came to buy. Other wallets and applications, as shown in Plaintiff's examples (Jain Dec. Exh. 11), will need to indicate whether they support TARI® and/or TARO, regardless of blockchain. Otherwise, it will be rendered useless by consumers.

### 5. Illustration of Real-World Confusion: BASE Token v. BASE the Second Layer

Even though Defendant claims it does not intend to create a TARO token, confusion will still occur. Because one can create a token using the TARO protocol, it will still be denominated a TARO asset in crypto parlance. (Jain Supp. ¶ 38; Jain Supp. Exh. 10). Even on its own website, Defendant acknowledges that confusion and scams are abound." (*See* Jain Dec. Exh. 13).

This was precisely the case last week in connection with an announcement by popular crypto exchange site Coinbase. (Jain Supp. Exh. 10). On February 23, Coinbase announced the launch of a layer two blockchain network, called Base. Despite Coinbase's explicit statements that it had no plans to launch a token in connection with the BASE network, cryptocurrency enthusiasts bought an unrelated and unaffiliated token named BASE, causing the token's price temporarily to rise 250%. (*Id.*)

### D. The Marks Are Virtually Identical in Sight and Sound

That TARI® and TARO may have different dictionary definitions does not change the fact that the marks are nearly identical in sight and sound, differing only by one letter.  Similarity of either sight, sound or meaning is enough to establish similarity for the purposes of likelihood of

confusion. *See, e.g., Citibank N.A. v. City Bank of San Francisco*, 206 U.S.P.Q. 997 (N.D. Cal. 1980) (CITIBANK and CITY BANK held similar).[6]

The obvious visual and phonetic similarity of TARI and TARO is made more problematic by the fact that the differing letters – I and O – lie next to each other on a standard QWERTY keyboard. (Jain Supp. Exh. 12) (compiling instances where users have mistyped Tar*o* when meaning to Tar*i* on Tari's page on the social media platform, Telegram). Where, as here, consumers and developers will be encountering both parties' services exclusively online where keyboard strokes matter, it is trivially easy for an unsuspecting user of the parties' goods and services to mistype the name. This occurs often. (*Id.*) Imagine, for example, a new credit card company that issues a credit card called VISO. There would be no doubt that the mark is too similar to the registered mark VISA® for identical services.

Nor does it matter that there may be other parties who, according to Defendant, are offering tokens with names similar to TARI. There is no evidence that a single one of these other token providers are viable businesses and/or competitive threats to Tari. And, as recent events have shown, the co-existence of similar names for similar services in the cryptocurrency space has resulted in confusion. (*See* Jain Supp. Exh. 10). If sophisticated investors in cryptocurrency companies can be so easily confused, it is easy to imagine the same type of confusion arising over Tari and TARO.[7]

### E.    Tari Has Demonstrated Actual Confusion

---

[6] *See also Interstate Brands Corp. v. McKee Foods Corp.*, 53 U.S.P.Q. 2d 1910 (T.T.A.B. 2000) ("Similarity in either form, spelling or sound alone may be sufficient to support a finding of likelihood of confusion;" finding YO-YO'S to be similar to HOHOS based solely on phonetic similarity).

[7] Defendant's cited cases do not help their cause. In *Haven Cap. Mgmt., Inc. v. Havens Advisors, L.L.C.*, 965 F. Supp. 528 (S.D.N.Y. 1997), the court acknowledged "obviously [the marks] are similar" despite differences in one letter. Id. at 531. In *iCall, Inc. v. Tribair, Inc.*, 2012 WL 5878389, (N.D. Cal. Nov. 21, 2012), the Court found dissimilarity between iCall and WiCall on the grounds that "I" and "Wi" were the dominant parts of the mark, and that "CALL" was merely descriptive. Here, Tari and TARO are single words, incapable of such division. Finally, in *FieldTurf USA Inc. v. Tencate Thiolon Middle East, LLC*, 945 F. Supp. 2d 1379 (N.D. Ga. 2013), the court found no likelihood of confusion based on similarity of the trademark owner's EVOLUTION mark and the alleged infringer's use of REVOLUTION for competing goods, because, in part, the infringer used a motto in its marketing materials that "It's not evolution, it's REVOLUTION." This factor favors grant of the preliminary injunction.

1      Tari has also demonstrated actual confusion, which goes above and beyond what is required
2 to prove trademark infringement. *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426,
3 433 (9th Cir. 2017) ("Such evidence is not necessary for a finding of likelihood of confusion, but it
4 bears on the inquiry and is particularly potent"); *Brookfield*, 174 F.3d at 1050 ("because actual
5 confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence
6 generally unnoteworthy"). As discussed above, as early as June 2022, Tari identified and disclosed
7 to Defendant evidence that social media users were being confused by the "TARO" mark.
8 Additional evidence has since come to light, including an internet article purporting to describe the
9 TARO protocol that includes an erroneous reference to TARI® as being affiliated with TARO.
10 (Palmatier Reply Decl. ¶ 16.) While such proof of actual confusion is not required at this stage, it
11 provides strong evidence that further consumer confusion is likely.

12      Defendant seeks to downplay evidence that Defendant's own counsel confused "TARI" and
13 "TARO" in response to Tari's cease-and-desist letter. (Opp. at 19-20.) Defendant claims that this
14 was not consumer confusion or reflected a mistake by counsel. (*Id.*) However, courts in this Circuit
15 recognize that "non-consumer confusion can serve as a proxy for consumer confusion" because
16 "confusion on the part of a sophisticated nonconsumer may reasonably signal that less
17 sophisticated consumers would also be confused." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d
18 1190, 1215 (9th Cir. 2012). A trademark lawyer working on an infringement dispute can be
19 expected to be exceptionally careful and discriminating with respect to differences between the
20 disputed marks. The fact that Defendant's own counsel was confused by the similarity between
21 TARI® and TARO is strong evidence that consumers – who are not expected to exercise such a
22 heightened degree of care – will certainly be confused. *See Rearden*, 683 F.3d at 1215 (crediting
23 confusion among party's "patent attorneys" as "evidence of actual confusion on the part of other
24 non-consumers" that served as "proxy" for consumer confusion); *TrafficSchool.com, Inc. v.*
25 *Edriver Inc.*, 653 F.3d 820, 828 (9th Cir. 2011) (crediting evidence that "a private law firm in
26 Texas […] mistakenly linked their websites to [defendant's website]" as actual confusion in
27 Lanham Act false advertising case).

28      Tari has also proven actual confusion through the scientific survey conducted by Dr.

Palmatier. Defendant does not dispute that net confusion of 35.3% far exceeds the threshold at which courts have awarded preliminary injunctive relief. (Mot. at 17.) Defendant levels various technical criticisms at Dr. Palmatier's survey design, but none has merit. As explained in detail in Dr. Palmatier's Preliminary Expert Report and his Reply Declaration that accompanies this brief, his survey (i) appropriately used survey images based on the parties' actual presentation of their marks in the marketplace[8] (ii) appropriately used a *Squirt* design to reflect the degree of marketplace proximity between TARI® and TARO, including based on Defendant's own marketing channels and descriptions of its intended customers (iii) appropriately used non-leading prompts in the survey questionnaire, (iv) used appropriate survey controls, rather than the biased alternatives suggested by Defendant, and (v) surveyed an appropriate set of potential consumers, unlike Defendant's artificially narrow proposed subset.[9]

Grasping at straws, Defendant also argues that confusion is not likely because the TARI® and TARO protocols have "coexisted" without consumer confusion. (Opp. at 35.) This is mistaken because Tari identified examples of confusion as detailed above. And the argument lacks merit because the TARO product is still in its pre-launch phase, so widespread confusion would not yet be expected. In all of the cases cited by Defendant, products had been launched in the market and coexisted on a large scale for a significant time with no confusion.[10] There is nothing remotely comparable here. Instead, Tari brought this motion for preliminary relief precisely to *prevent* such

---

[8] Defendant's cases dealing with "notecard" type surveys (Opp. at 16) are all distinguishable because they presented marks in plain text – a far cry from Dr. Palmatier's survey design, which faithfully captured the marks as they are actually used by Plaintiff and Defendant on their respective internet marketing materials.

[9] Defendant's assertion that other courts have "rejected" Dr. Palmatier's surveys is false. (Opp. at 16.) In the *Stone Brewing* case, Dr. Palmatier's survey testimony was admitted at trial, not "rejected." *Stone Brewing Co., LLC v. MillerCoors LLC*, 18-CV-331, 2022 WL 4596570, at *1 (S.D. Cal. Aug. 4, 2022). And in the *Waterloo* case, the court expressly declined to address the opposing party's criticisms of Dr. Palmatier's survey because the motion was resolved on other grounds. *Waterloo Sparkling Water Corp. v. Treaty Oak Brewing & Distilling Co.*, LLC, 21-CV-161, 2021 WL 5568159, at *9 (W.D. Tex. Nov. 28, 2021). In neither of these cases was Dr. Palmatier's testimony "rejected" as Defendant claims.

[10] *Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*, No. 17-CV-06393-YGR, 2018 WL 659105, at *8 (N.D. Cal. Feb. 1, 2018) (2.5 years in market with no confusion); *Matrix Motor Co. Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1093 (C.D. Cal. 2003) (nationwide car sales for more than a year without significant confusion);

1  confusion from occurring in the first place. Because there is strong direct and circumstantial
2  evidence of actual confusion even at this early stage, this factor strongly favors a temporary
3  restraining order and preliminary injunction.

## CONCLUSION

For the foregoing reasons, Tari's requested Preliminary Injunction should be granted.

Dated:  March 2, 2023                                             Respectfully submitted,

                                                                  BRAUNHAGEY & BORDEN LLP


                                                                  By:   */s/ J. Noah Hagey*
                                                                              J. Noah Hagey

                                                                  *Attorneys for Plaintiff*
                                                                  *Tari Labs, LLC*