Pages 1-38

1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
2                       SAN FRANCISCO DIVISION

3

4    TARI LABS, LLC,                 )  Case No.   22-cv-07789-WHO
                                     )
5               Plaintiff,           )  San Francisco, California
                                     )  Wednesday, March 8, 2023
6         v.                         )
                                     )  ZOOM WEBINAR PROCEEDINGS
7    LIGHTNING LABS, INC.,           )
                                     )
8               Defendant.           )
                                     )
9    _____)

10

11                    TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE WILLIAM H. ORRICK
12                UNITED STATES DISTRICT COURT JUDGE

13
     APPEARANCES:  (Via Zoom Webinar)
14
     For Plaintiff:              JONAS NOAH HAGEY, ESQ.
15                               BraunHagey & Borden LLP
                                 351 California Street, 10th Floor
16                               San Francisco, California 94104
                                 (415)599-0210
17
                                 KIRSTEN L. DOOLEY, ESQ.
18                               BraunHagey & Borden LLP
                                 118 W. 22nd Street, 12th Floor
19                               New York, New York 10011
                                 (646) 829-9403
20
     For Defendant:             CHRISTOPHER S. FORD, ESQ.
21                               Debevoise & Plimpton LLP
                                 650 California Street
22                               San Francisco, California 94108
                                 (415) 644-5628
23

24   **[Additional Attorney Appearances Continue on the Following Page]**

25

     Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.

2

```
 1   APPEARANCES:  (Cont'd.)

 2   For Defendant:              MEGAN K. BANNIGAN, ESQ.
                                 Debevoise & Plimpton LLP
 3                               66 Hudson Boulevard
                                 New York, New York 10001
 4                               (212) 909-6000

 5   Transcription Service:      Peggy Schuerger
                                 Ad Hoc Reporting
 6                               2220 Otay Lakes Road, Suite 502-85
                                 Chula Vista, California 91915
 7                               (619) 236-9325

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>SAN FRANCISCO, CALIFORNIA  WEDNESDAY, MARCH 8, 2023  3:06 P.M.</u>

--oOo--

THE CLERK:  Okay.  So this is Case Number 22-7789, Tari Labs, LLC v. Lightning Labs, Inc.  Counsel, if you would please state your appearance for the record.

MR. HAGEY:  This is Noah Hagey for Plaintiff Tari Labs, and I have with me Kirsten Dooley, my associate.  Depending on how the argument goes, she will be playing a role as well.

THE COURT:  Okay.

MS. BANNIGAN:  Good afternoon, Your Honor.  This is Megan Bannigan from Debevoise & Plimpton on behalf of Defendant Lightning Labs.  With me is my colleague, Christopher Ford, also from Debevoise & Plimpton.

THE COURT:  Great.  Good afternoon to you, to everybody. So let me tell you how I understand things.  On the merits of this motion, I would say that Tari's likely to succeed.  It has the trademark at a high level.  Both companies made a protocol, the goal of which is to make products such as wallets to transfer assets on blockchains.  Lightning says it does it for developers and not consumers, but the fear is that the developers will eventually make consumer-facing products and already one developer-facing product exists called a Taro wallet.  Tari has a strong mark conceptually but it's weak in recognition.  The protocols seem more weighted and proximate in the market.  The marks are similar.  They have overlapping marketing channels.

1   Lightning knew of the name and the potential for reverse

2   confusion, and there's a likelihood of product expansion.

3         So those -- those factors make me think that Tari is

4   likely to succeed.  I am interested in hearing, Mr. Hagey or Ms.

5   Dooley, about irreparable harm.  I'd like to know why Tari waited

6   so long.  And given the reply that Lightning had just made, where

7   is the harm right now?

8         MR. HAGEY:  Certainly, Your Honor.  Thank you.  I -- the

9   harm is existential.  You can put that product to use.  I'd be

10  happy to take you through -- for a company like Tari who's house-

11  smart, every single product, the vast majority of products and

12  services that my client creates have and carry the Tari name.  It

13  is what they have invested in.  It is what they have invested in.

14  It is what they spent time not only just applying and registering

15  for, but it is how they're out in the world.

16        And if you look at the comparative statements from both

17  companies about what their goals and objectives are, which are

18  incredibly similar -- to create safe, secure, efficient methods

19  for digital asset creation and transfer, the idea that we could

20  lose that position to an organization that is much larger, that

21  has much broader reach and who literally doesn't care about the

22  name Taro.  They haven't sought to register it.  They don't care

23  whether they trademark it.  They're happy to see it carved into

24  the market by developers and used however it might be used.

25        It is that asymmetry of risk to my client that not only

1   just balances the equities but creates this ever-present fear for

2   management, for investors that should the restraining order that

3   Your Honor has already granted not be continued, that what we're

4   going to see is precisely what Your Honor's already seen in the

5   evidence.  There is concrete example after concrete example --

6           THE COURT:  Well, just so that I make it very clear --

7   and I tried to make it very clear the last time -- I didn't enter

8   a -- any sort of a traditional restraining order the last time.

9   I certainly made no findings.  So don't -- don't be going off on

10  that as a -- some sort of a basis of argument.

11          MR. HAGEY:  Well, thank you, Your Honor.  I mean, I'm

12  certainly not trying to extrapolate too strongly from the prior

13  hearing.  But the point in fact that I'm trying to make is we are

14  seeing -- and we've seen -- and I think we have examples after

15  examples -- and I'd be happy to walk through them with Your Honor

16  -- of situations where my client's internal users and my client's

17  external users who communicate with us are like, How could there

18  be a Taro out on the market?  And I refer you to our client CEO's

19  Exhibit 1 in his reply declaration where he has a contact, a

20  relationship identifying there's a new Taro protocol out there and

21  emailing him and saying, We're putting on Telegram -- their

22  internal messaging program -- WTF.

23          If you look at even a raw Google search -- and this is

24  Exhibit 1 to the Dr. Palmatier reply declaration -- you see that

25  third parties are communicating about these protocols

1    interchangeably.  It's not just that they're proximate.  It's that
2    they're communicating regarding Tari and Taro interchangeably.

3           Your Honor asked a very pointed question about harm.
4    When you are looking to develop in a very emerging market, like
5    Tari, so this is explained throughout our client CEO's
6    declaration, and it is common sensical, and you risk losing the
7    traction of having a unique name or you risk a third party like
8    Lightning Labs putting out a competing protocol, not only could
9    developers decide not to work with you, but if both parties are
10   putting out the same protocols at the same time, we have these
11   concrete vignettes, these concrete examples where you're going to
12   see the marks in a lab.  And I actually think Ms. Dooley was the
13   person who was closely tied to the research investigation and the
14   client interviews on that, and in response to Your Honor's
15   question I think has a very short summary of exactly what we're
16   talking about, the common sense harm that we believe is going to
17   come in which, frankly, Your Honor, did not appear until very late
18   in the day to us.  And I would like for Your Honor to give Ms.
19   Dooley an opportunity to very briefly explain those common sense
20   examples that will demonstrate the kind of harm that our client is
21   concerned about.

22          THE COURT:  Okay.  Ms. Dooley.

23          MS. DOOLEY:  Good afternoon, Your Honor.  So in our
24   opening brief, we put forward five examples -- creating an NFT,
25   browsing for NFTs, connecting the wallet, using wizards in order

1  to develop a tool, and infrastructure tools generally.  We think

2  that all five of those examples have been -- they were utilized

3  within the Taro web wallet alone.

4          I'll just take you -- is it possible for me to share my

5  screen?

6          THE COURT:  If you know how to do that, yes, it is.

7          MS. DOOLEY:  I think I'm all set, Your Honor.

8          THE COURT:  Okay.

9          MS. DOOLEY:  So I'll scroll through for the sake of time

10  and just show you the Taro web wallet and how all of these

11  examples are available on that site alone.  So I was able to make

12  a wallet account, create a Taro NFT in Taro cryptocurrency within

13  a matter of a couple of minutes.

14          You'll see here you can mint an NFT just like, for

15  example, one OpenSea page.

16          And then Example 2 you'll see it says Taro NFTs, Taro

17  cryptocurrencies.  These are really clear instances of confusion

18  if you just search for a rare token on a baseball card, for

19  example, and then run into both Taro and Tari on the same

20  platform.  And already this is happening just on the first Taro

21  protocol wallet that we've seen.

22          Saying here the wallet functions allow you to send Taro

23  assets, withdraw Taro assets, and submit Taro invoices.  You know,

24  if a user gets confused and thinks that they have a Tari invoice

25  and they actually have a Taro invoice, this is horrible for our

1   client.  This is the exact type of damage that we were trying to

2   prevent with the TRO and preliminary hearing injunction.

3          It also allows me to send Taro as a currency.  So

4   despite Defendant's claim that they will never have a Taro test

5   token, they'll never have Taro tokens out there, they already have

6   them, Your Honor.

7          And saying -- actually, here it's mint currency and

8   examples are numerous within the Taro web wallet alone.  And so we

9   really believe that our five examples have come to fruition within

10  a matter of weeks and there's already over a hundred wallets

11  created on this website and we believe that just the instances of

12  confusion are clear and concrete, and this is the exact type of

13  activity that Defendants have encouraged on the website.  They

14  have talked about how wallet developers will need to have Taro

15  keys.  That means that it can't be just a Bitcoin key or a tablet

16  key.  The wallets have to be Taro-compatible in order for users to

17  use them.  And this is going to lead to the confusion that we have

18  discussed in our papers throughout, Your Honor.

19          THE COURT:  All right.  Thank you.

20          MS. DOOLEY:  Thank you.

21          MR. HAGEY:  Yeah, and I think that just the capstone on

22  that part of Your Honor's question is the viable nature in which

23  the Defendant is seeking to have its project, have its protocol be

24  embedded into the cryptocurrency and blockchain markets.  They

25  actively want third parties to take it and use it as broadly as

1    they can.

2           And so once that infringing virus, if you will, is out

3    of the lab, there's -- we're not going to be able to put it back.

4    We're not going to be able to stop users go out and get all these

5    third party inventory infringers all around the world and have

6    them cease what they're doing.

7           And by the same logic, if you think about the business

8    reputation risk, the transactional risk to innocent third parties

9    who are going to be searching for Tari or Taro transactions and

10   potentially running into situations where, just like if Your Honor

11   was, you know, at a supermarket or trying to make a transaction

12   online using Visa and there's a Viso credit card payment method

13   and you accidentally select the wrong one and then you see an

14   error message, that's going to render your interest in using that

15   method much more infer (ph).

16          And so we think this is the quintessential situation

17   where the Ninth Circuit has said in particular circumstances,

18   particularly where a product hasn't launched, where it hasn't gone

19   out into the market and affected the market yet, where it is my

20   client's house name, it is a name for Lightning Labs which is

21   literally almost, you know, some virtual kind of random name they

22   wanted to use as part of their cap root system (ph), where they

23   have an infinite number of alternatives and where it could take

24   hours, much less than a day -- certainly much less time than

25   counsel has spent opposing this motion -- to simply change, we

1    think the balance there is incredibly in favor of ensuring that

2    the status quo remain, that my client not suffer that kind of harm

3    to its name, trade, and reputation, that we don't put blockchain

4    and cryptocurrency consumers at risk for that kind of conduct.

5              Your Honor asked one other question.  That was, you

6    know, "Mr. Hagey, why -- why didn't you guys sue these people

7    right away?  Why didn't you race and run to court?"  And I have

8    several common sense very straightforward answers.

9              The first is we wanted to give peace a chance.  We know

10   how much Your Honor loves trademark cases, but we also know how

11   difficult and challenging and expensive it is for a client like

12   ours to raise a federal piece of litigation against an adversary

13   who's well-funded and large as Lightning is.  And it's not as

14   though we didn't make clear that we believe we own this and it was

15   a concern.  And in response to that, we got false assurances.

16   Hey, we're not going to be out there.  It's not going to be

17   public-facing.  You're not going to see people making Taro

18   wallets.  You're not going to see people making Taro tokens or

19   engaging in Taro-related transactions.  And that had an effect.

20   We heard those communications.  We still tried to reach out.  We

21   still tried to do the right thing.  And it -- and, frankly, Your

22   Honor, it wasn't until we saw that not only were they doubling

23   down after we filed this lawsuit and had their first Taro

24   developer conference, but then when we saw they had another one a

25   month later where they were planning to imminently launch

1   something that was going to be commercially-workable, that we

2   said, "Okay.  We have no choice here.  We're going to have an

3   expert.  We're going to have a survey." That takes time.  And

4   we're going to put an end to this.

5        And along that entire stretch of time, we were

6   constantly saying, Can't we just have you guys change your name?

7   Can't you just do a search and replace and change your name so

8   that we don't have to go through what is going to be an incredibly

9   expensive exercise in this court.  And that kind of burden on a

10  party of Tari's size is not insignificant.

11       And so, you know, there's many cases that we cited where

12  there's been longer delays.  The bottom line is we did not wait

13  until they launched.  We took action reasonably to ensure the

14  market wouldn't be affected and so we wouldn't put the Court in an

15  undesirable position of trying to grant this kind of relief after

16  the bell had already been rung.

17       And so in that context, we think it's not only

18  reasonable but that it is warranted under the circumstance, and I

19  appreciate Your Honor's consideration of my answer.

20       THE COURT:  Thank you.  All right.  Ms. Bannigan, why

21  don't you start -- start with irreparable injury and then go to

22  any arguments you want to make with respect to the merits.

23       MS. BANNIGAN:  Yes, Your Honor.  Thank you.  What I

24  haven't heard from Mr. Hagey today is any excuse for why -- any

25  reasonable and truthful excuse for the delay.  Because as the

1   Court knows, delay factors into the irreparable harm analysis when

2   looking at whether the Court should grant this extraordinary

3   emergency relief for a TRO.

4           The case law is clear.  To the extent that parties sit

5   on their rights and they unreasonably delay in seeking this

6   emergency relief, the emergency relief is not available.

7           Now, Mr. Hagey tells a story about -- well, a changing

8   story.  When Mr. Hagey first filed a brief and when Plaintiffs

9   first filed this brief, the notion of why they needed emergency

10  relief is this notion that there was a big acceleration in the

11  development process.

12          As Lightning last pointed out in its opposition, there

13  has been absolutely no acceleration in the development process.

14  And actually I'll share our screen also to make this point

15  perfectly clear.

16          Okay.  On the screen -- on the screen, you'll see a bar

17  graph.  That is included in ECF No. 39 of our filing.  And what

18  we've added to that is a timeline of what's happened.  Taro was

19  announced in April of 2022, nearly 11 months ago.  And you see

20  Taro -- you see that on the first bar graph all the way to the

21  left here.  The public announcement was followed by -- what the

22  public announcement was was Lightning Labs saying, We have this

23  great idea.  It's called Taro.  It's a protocol for highly

24  sophisticated Bitcoin developers.  We're beginning to develop the

25  software.

1          And so for the next -- from April to September, it

2     developed the software.  And you can see here from April to

3     September, that was the software development that was done after

4     this very public announcement.  And by the way, the announcement

5     was picked up by the press.  It was picked up by the community.

6     And it was picked up by Plaintiff because Plaintiff did approach

7     Lightning Labs in April -- and I'll get to that in a moment.

8          What happened in September -- and you can see the

9     September area -- that's the box that we put it onto our graph --

10    September is when Lightning Labs released the code, so they made

11    the code public through Dica.  This is an open-source protocol.

12    Open-source, by its very nature, means that it is public.  It

13    means that it's out in the open and it's not just Lightning Labs

14    developing the software.  The open software is -- the open-source

15    software is is the community comes together to help you develop

16    this.

17         So while Lightning Labs is where he's developed this

18    protocol, it's also getting feedback and it's getting software

19    requests and there's constantly code being spit out sometimes on

20    a daily basis, sometimes on an hourly basis.  So this chart shows

21    commits.  And what "commit" means in this language is a commit

22    means that a new piece of software is being spit out into the

23    open-source protocol.

24         And so starting in September, everything you see on this

25    chart highlighted in the box is the software code that was being

1  pushed out publicly by Lightning Labs.  And we can see that there

2  wasn't much variation in the amount of code that was being pushed

3  out, but it was consistent.  It was being pushed out again, like

4  I said, daily, sometimes weekly, sometimes even hourly.

5       Nothing has changed except for you can see the end of

6  the chart from two weeks when the Court issued the status quo

7  order, all software releases stopped.

8       We understood Your Honor's status quo order to say,

9  Plaintiffs are complaining that there's going to be an

10 acceleration if there's going to be a release of this new version.

11 Don't do any -- don't do that release of the new version before a

12 companion motion.

13      In the utmost caution to be sure that Defendants in no

14 way went awry the Court's order, we had Lightning Labs stop all

15 software development at all, so this is not just -- this has

16 nothing to do with releasing an actual new version, but that

17 software development that was happening every day since September

18 also put a halt to that.  And there have been serious implications

19 as a result of that which I will get to.

20      So -- so that's since September.  That was months ago.

21 That's what? -- five months ago?

22      MR. FORD:  Five months.

23      MS. BANNIGAN:  Five months ago -- sorry -- math in my

24 head -- clearly not my strong suit.  Five months that this

25 software development publicly has been going on.

1    Now, what Plaintiffs have said here today is, Well, we
2 didn't feel the need to file the lawsuit or to bring this
3 emergency motion because we were being misled.  We were having
4 ongoing negotiations and we thought that Defendant Lightning Labs
5 was going to do the right thing.  But let's look at what actually
6 happened.  What actually happened is that this protocol was
7 announced with a lot of attention on April 5th, 2022, almost 11
8 months ago.

9    Liz Stark, who is the CEO of Lightning Labs, ran into
10 Mr. Jain of Tari Labs, at a conference shortly thereafter.  Mr.
11 Jain sent her a text message, a screenshot of which we have
12 included in our papers, that said, "We need to talk about your
13 Taro Wee (ph).  We think it could cause confusion with our Tari
14 mark.  Ms. Stark responded very directly and said, "This is not a
15 consumer-facing protocol.  This is named after a root vegetable.
16 We don't think there's going to be any confusion."

17    What happened after that, I believe, as Liz Stark
18 explains in her declaration, the two ran into each other face-to-
19 face, still at the same conference.  The conversation was
20 exceedingly short.  And at no time did Ms. Stark say, "I'm
21 considering changing my name" or "I'll change my name."  Ms. Stark
22 has been clear from the very beginning.  She is committed to the
23 Taro name.  Lightning Labs is committed to the Taro name.  It has
24 a very big meaning to the Nigerian co-founder as a vegetable that
25 he grew up on.  He has given speeches holding taro chips.  This is

1  a highly, highly sophisticated environment.  Nobody is going to be

2  confused.  And by the way, we definitely don't want to be confused

3  with Tari Labs.  So, you know, we're not -- it's not that we're

4  overlooking confusion.  It's not that we don't care about the

5  name, as Mr. Hagey suggests.  It's that we truly believe that

6  there is no confusion here.

7          So that's an input.  In June, a couple of months later,

8  Taro is still getting attention in the press.  It's being

9  developed.  Mr. Spagni, who's one of the co-founders or Tari Labs,

10 sends a message to Ms. Stark saying something along the lines of

11 the same thing.  I believe what he said -- and I'm paraphrasing --

12 is, My attorney tells us that we're going to lose our trademark

13 rights if you don't change the name.  You have to change the name.

14         Ms. Stark did not respond to that.  She never said one

15 thing in response and she didn't like that there were attorneys

16 involved.  She continued to feel very strong that there's no

17 confusion here.  She didn't respond.  She absolutely did not send

18 a message that she was considering changing her name or that she

19 was doing anything different.

20         And fast forward to September 12th.  Again, months later

21 for the first time Tari Labs sends an official cease and desist

22 letter.  And Lightning Labs responded to the cease and desist

23 letter a week or two later.  The response to the cease and desist

24 letter once again makes clear, We are not changing the name.

25 There is no likelihood of confusion.

1    And then on -- just a day later, the code was issued
2  publicly under the Taro name, bringing us to the public software
3  code that's been happening every day since then.

4    Now, Mr. Hagey made representations today that there
5  were these conversations happening and that they tried to talk to
6  us.    There   were   two   conversations   that   happened.    One
7  conversation, as I understand it, is a former counsel from Wilson
8  Sonsini sent an email to Mr. Hagey and his team saying --
9  requesting an extension to filing an answer to the complaint.
10 They said, We won't give you the full extension.  We'll give you
11 half of the extension.  And we demand that you change your name.

12    There was no conversations about settlement.  It was a
13 straight-up demand.  We demand that you change your name.  Once
14 again, we did not agree to that.  Everything continued as is.

15    The next thing that happened is I replaced the Wilson
16 Sonsini lawyer as counsel to this case and that happened -- I
17 believe that was just last month.  The day I joined the case, I
18 sent an email to Mr. Hagey introducing myself, asking if we could
19 have a conversation because I wanted to see what the issues are
20 and to see if we could potentially resolve this.  Mr. Hagey did
21 not respond to that request, except for to point out a typo that
22 I made with respect to a name, a name having nothing to do with
23 Tari, saying, no, he would not give me an extension to file the
24 answer even though I had just joined the case, and once again
25 demanding that my client change the name.

1          I didn't respond to that email.

2          So this notion that there were conversations and that

3    they were somehow being misled in any way and software was out in

4    the public being worked on every day since September or that there

5    were ongoing conversations happening are just not true.

6          And the case law does not allow this gamesmanship to

7    raise emergency motions.  This is extraordinary relief and that is

8    not the basis, any basis, for Tari Labs sitting on their rights

9    for this long.  They may believe that they are going to be harmed.

10   We don't believe that to be true.  But the law is the law in terms

11   of this extraordinary immediate and temporary relief, and they

12   have not shown any cases that go to the otherwise, that they've

13   now changed their mind and think they might be harmed, or maybe

14   they weren't paying attention.  I don't know what it was.  But the

15   delay -- they haven't shown -- they were able to -- they were

16   perfectly fine with the delay until now.  Nothing has changed.

17   There is no basis on that factor alone for the grant of a TRO or

18   even an PI.

19          THE COURT:  So why don't you move to the merits, Ms.

20   Bannigan.

21          MS. BANNIGAN:  Yeah.  Absolutely.  It won't surprise you

22   to know that I do disagree that there's a likelihood of success on

23   the merits here.  And I think what's happened here is that Tari

24   Labs has thrown a lot of mud.  They've restated a lot of facts.

25   They've made a lot of misrepresentations.  They've grossly over-

1  exaggerated some facts.

2          THE COURT:  Okay.  So let's just go to the argument.

3  Okay?

4          MS. BANNIGAN:  Yes.  When you cut through the mud, the

5  question is:  Is there any likelihood of confusion?  And you have

6  to look at what the facts actually are.  And what the facts are is

7  that Lightning Labs is a developer of open -- to open-source Taro

8  protocol.  This is a specialized piece of software that can only

9  be used by Bitcoin developers on the Bitcoin blockchain.  Those

10 developers are the only audience for Taro and they have not been

11 and they will not be confused.

12         Now, it's important to understand what Taro actually is

13 meant to do.  To the extent that Taro works and becomes a fully-

14 functioning development protocol, the point is to help use Taro to

15 free the financial world and make monetary transactions securely

16 available in the emerging markets.

17         How is Taro going to help do that?  It's -- for the

18 first time, it's a valiant way to efficiently and securely and

19 more easily, to the extent it works, create digital assets on

20 Bitcoin.  Now, Bitcoin was the original blockchain.  It has had

21 several developer followers who believe that Bitcoin is the best

22 blockchain because it was the most secure blockchain, but the

23 problem with Bitcoin has been that you don't have the opportunity

24 to create these digital assets.

25         Now, there are other blockchains -- Ethereum and Monero

1  and it's much easier to create digital assets on those

2  blockchains.  Bitcoin has not had the capability.  But to give you

3  an example of what we're talking about with digital assets, one

4  common example -- and the example that Lightning Labs is laser-

5  focused on -- are the creation of stablecoins.  Right now on

6  digital assets, you cannot create stablecoins efficiently or

7  securely on Bitcoin.  Now, Bitcoin uses the Bitcoin currency.  The

8  Bitcoin currency is extremely volatile.  It fluctuates every day

9  and many people do not want to use it because of the ability to

10  lose its value so quickly.  Stablecoins are the opposite.

11  Stablecoins are stable currency, so one stablecoin will be backed

12  by a dollar.  One stablecoin equals one dollar in a common

13  example.

14       You can do this on Ethereum right now.  And I'm going on

15  about this because it is important to understand what we're doing.

16  On Ethereum, you can create stablecoins.  And how you create

17  stablecoins on Ethereum if you're a developer is that you use the

18  ERC-20 protocol.  That's the equivalent of Taro on Bitcoin.  And

19  this allows for the creation of stablecoins.

20       Now, Taro will work in Bitcoin the way that ERC-20 works

21  on Ethereum.  ERC-20 allows companies like Circle, Tether, Paxos

22  to create stablecoins.  They -- I think they are three of the most

23  popular stablecoins in the United States right now.

24       Now, consumers who use these stablecoins, they have

25  never heard of ERC-20.  They know nothing about this actual

1   developer protocol that allows them to create the stablecoins.
2   And some of them don't even know the companies that put out the
3   stablecoins -- the Circles, the Tethers, or the Paxos.  What they
4   know are the names -- the name of the stablecoin.  And in that
5   scenario, the name of the stablecoins for those three companies
6   are USDC, USDT, and USDP.  And these are used interchangeably, one
7   letter difference, with no confusion, and that's because there's
8   incredibly crowded field marks in the blockchains, and we'll get
9   to that point.

10          So what Tari Labs has done is they've repeatedly argued
11  over and over again that Taro is going to be used by ordinary
12  consumers and that Taro's going to be marketed towards ordinary
13  consumers.  And that's just not right.  Companies or developers
14  may use Taro to create other products.  That's the whole point of
15  Taro.  But those consumers are not going to use Taro itself.

16          And we talked about in our brief how Taro can be
17  analogized to other background protocols like MySQL or SMTP.  Tari
18  Labs has had no response to that.  Ordinary consumers watch TV
19  every day.  Ordinary consumers send email every day.  And they
20  know the brand names for their streaming services, like the
21  Netflixes and Plutos.  And they know the brand names for their
22  email servers, like GMAP or Apple.  But what they don't know are
23  the protocols that the companies use to make those streaming
24  services and email services work, like MySQL, which is the
25  background protocol that makes Netflix work, or SMTP, Simple Mail

1    Transfer Protocol, that makes our emails work.

2            You know, Taro would work the same way -- behind the

3    scenes, developers building things with different consumer-facing

4    needs.

5            As we said in our papers over and over again, Lightning

6    Labs does not offer and has no plans to ever offer Taro products

7    such as a Taro blockchain, a Taro wallet, a Taro token.  And I

8    will address the Taro web wallet now.

9            So Taro web wallet is something that Tari Labs brought

10   up in its reply.  And as we explained in our surreply submission,

11   the Taro web wallet we believe only further demonstrates that the

12   Taro Wee is used by sophisticated developers.  Now one look at the

13   website -- I have just a snippet here on this top slide -- but one

14   look at it makes clear that this is not something that's intended

15   for consumers.  This -- it says, "We expect these to work with

16   trees and Schnorr signatures," and this is not something that an

17   ordinary consumer would have any idea if they're looking at what

18   is Taro.

19           And this is clear by how this developer has actually

20   used the wallet and the feedback that he has -- he has been asked

21   in the developer community.  We found when we looked at posts that

22   he made on Stacker News.  Stacker News is a forum for technical

23   Bitcoin-enlightening discussion.  And, in fact, when we discussed

24   this Taro web wallet with the CEO, Elizabeth Stark, she said, "Oh,

25   let's look on Stacker News.  I'm sure if he's developing anything,

1   there will be comments on Stacker News" because apparently it's a

2   very common channel for Bitcoin developers to use to discuss the

3   protocol.

4          And what we see here is a recent post from the end of

5   January where he's asking for help and feedback on his development

6   of this Taro web wallet.  So what you see here is a Taro web

7   wallet that's in the incredibly early stage of development.  This

8   is -- it's found on the *testnet.tarowallet.net* website.  It is not

9   something that an ordinary consumer would ever find.  Contrary to

10  the images of Plaintiff's brief, it does not appear in the App

11  Store.  It will never appear next to Tari Aurora, and it's

12  something that even though we have no control over it, we fully

13  expect we will never actually be granted it in a consumer-facing

14  way as Taro, and that's because Taro for Bitcoin is going to be a

15  generic name.  There's not going to be this rush of everybody

16  naming everything Taro.  And we see that with the stablecoin

17  examples in our brief.  They're not named ERC-20 wallets.  They're

18  given their own name to the extent they ever get to consumers.

19          This is in such an early development stage, we don't

20  know that a consumer would ever use this wallet.  It's a separate

21  -- it's a side project for this developer who has a full-time job.

22  It's something that he does for fun.  It is way too early to give

23  it some kind of unique name for marketing.  Those are decisions

24  that are made much later when the product is actually going to

25  launch.

1      THE COURT:  Ms. Bannigan, why don't you respond to the

2  presentation that Ms. Dooley had and tell me why that is -- it

3  shouldn't concern me.

4      MS. BANNIGAN:  Absolutely.  I -- Your Honor, to be quite

5  candid, I was a little bit confused with the presentation that Ms.

6  Dooley made.  I have never seen those exhibits before.  They

7  aren't in my materials that were actually submitted with the reply

8  papers.  But it seems to me that what she was showing was

9  screenshots of what it might look like, so the extent that the

10  wallet launch and Taro was also the competing wallet.

11      I see Ms. Dooley shaking her head, but I truly did not

12  understand what it was.

13      But what I can say is what Plaintiffs have done is they

14  have said over and over again there are these five situations in

15  which we might see confusion and that's in the creation of NFTs,

16  that's in the sale of NFTs, that is in the creation of smart

17  contracts, and that is in -- on these developer websites.  And I'm

18  -- we're a bit perplexed of why they keep bringing up these

19  examples, and the only thing that we can think of is because they

20  weren't able to identify any real evidence of confusion.  So what

21  they did here -- and these are exhibits that were actually taken

22  from the reply brief -- they created Photoshop exhibits.  And I

23  believe that's what they did with Ms. Dooley.  And so what we see

24  here on the left -- this is -- what you see here on the left where

25  there's a "C" on top and this is what OpenSea currently looks

1    like.  OpenSea is a platform which ordinary consumers can indeed

2    go on to shop for, to create, and to buy NFTs.  And so when you're

3    creating an NFT, you have to check what blockchain your NFT is

4    going to live on.  And so if you see the arrows, the red box and

5    the arrows, that was put there by Plaintiffs when they submitted

6    the exhibit, and so when you look at the exhibit on the left, "C,"

7    this is what OpenSea looks like today.  And you look at all of

8    those names of blockchains.  Obviously, Tari is not there because

9    Tari is not an active blockchain right now.  And Taro is not there

10   because Taro is not a blockchain at all.

11           Now, if you go to "D," this is an exhibit they put in

12   and they say, Illustration.  This is what it will look like in the

13   future if you allow this harm to take place.  And we again sort of

14   box around blockchain.  And there, they're Photoshopping Tari and

15   Taro.  But this is completely out of the realm of what's possible.

16   And to assess likelihood of confusion, it has to be reasonable

17   confusion, actual -- actual confusion.  We have said there is

18   going to be no Taro blockchain.  This speculation that simply

19   because there's a Taro protocol, that somebody's going to go make

20   a  completely  separate  blockchain  and  name  it  Taro  because

21   Lightning  Labs  has  this  development  protocol,  it's  just  not

22   realistic.    It's  completely  speculative.    And  Photoshopped

23   evidence  cannot  be  the  basis  for  any  decision  on  this

24   extraordinary emergency relief.

25           If  this  is  what  we're  dealing  with,  if  this  could

1  potentially --

2          THE COURT:  Ms. Bannigan -- Ms. Bannigan, rather than go

3  off on flights of rhetoric, if you can focus -- I'm going to give

4  you ten --

5          MS. BANNIGAN:  Yes.

6          THE COURT:  -- more minutes to -- or less -- to say

7  anything else that you think will change my mind.  And I -- my

8  mind is not going to be changed by rhetoric.

9          MS. BANNIGAN:  Thank you, Your Honor.  And I just feel

10  so passionate about this, but I --

11          THE COURT:  I can tell.

12          MS. BANNIGAN:  -- appreciate your -- and I do truly

13  believe in this case, so thank you very much, Your Honor.

14          So, you know, put simply, Tari Labs' five examples that

15  they have shown where its ordinary consumers might see the names

16  of blockchains, it's just not realistic, and Taro might be the

17  name of a blockchain like one day if all goes well.  It's

18  possible. But Taro is a protocol that's used to trade assets on

19  Bitcoin blockchain and so these examples, they just are not

20  realistic.

21          But I want to bring the Court back to some of the other

22  important CPACT (ph) factors here which I really do believe show

23  real likelihood of confusion.  And the first one is

24  sophistication.  Understanding the consumers who are actually

25  going to be -- encounter this mark is just absolutely essential to

1   understanding whether these consumers are likely to be confused.

2   And here, the consumers of the Taro protocol are not ordinary

3   consumers at all.  They're extremely sophisticated technical users

4   who are extraordinarily careful about what they use.

5           And I think it's important to pause here for a moment

6   and address some of the charges that Tari Labs has been leveling

7   at Elizabeth Stark, the CEO.  And Ms. Stark is a highly technical,

8   accomplished woman at the very top of her field.  And she didn't

9   ever mislead Tari Labs about the Taro -- that Tari Labs was

10  somehow going to be confused for Taro.  And I've already explained

11  how she was clear in her interactions that she wouldn't change the

12  name.  But she was also clear in one interaction she had that this

13  was not a consumer-facing product.  And that's because it's not.

14  They've repeatedly twisted her words to say that her saying it's

15  not consumer-facing means that it's not public-facing.  But open-

16  source code is public by its very nature.  And you can see here

17  this is a conference that happened -- I believe this was April

18  6th, the day after the Taro protocol was announced, and you see a

19  picture of Mr. Osuntokun who is the Nigerian co-founder who's

20  eating a bag of taro chips.  I'm not sure if that's legible.  And

21  here's a slide that he presents it.

22          And these conferences that he goes to to present are

23  highly technical conferences with highly sophisticated Bitcoin

24  developers.  You see there -- and I've been looking for a way to

25  say "Merkle Sun Sparse Merkle Tree," and I can't pretend that I

1   understand what that means, but it comes up over and over and over

2   again in these presentations.

3          Asset ID generation.  Even if an ordinary consumer

4   somehow stumbled upon this, an ordinary consumer would not

5   understand what this is and certainly not that it was related to

6   Tari Labs in any way.

7          Sophisticated developers like Ms. Stark, like Professor

8   Jake Cusin (ph), who is the head of Cusin University's Center for

9   Decentralized Power through Blockchain Technology in the DeCenter

10  at (indiscernible), that's one of the most prominent universities

11  and centers in the country right now studying this technology.  As

12  they have all said, these developers understand the difference

13  between consumer-facing products and developers-facing products.

14  And this creator of the Taro web wallet certainly did, which is

15  why he asked developers to (indiscernible) it.

16         And it's just -- it's just not practical that this

17  underlying development protocol with SMTP or MySQL is something

18  that is going to be used by ordinary consumers.

19         We also have to take this in the context of the crowded

20  field, and that's -- I appreciated Your Honor's statement that

21  this mark may be strong conceptually but that it's weak

22  commercially.  I agree with that.  But it's also weak because

23  there is a very crowded field.  And in a crowded field, consumers

24  know how to take care because there's a lot of overlapping ways.

25  Cryptocurrency is perhaps the quintessential crowded field.  And

1  here on this slide, you see there's the Taraxa Project which has

2  the Tara token, different from Taro and Tari by one letter.  There

3  is the Taki token, again different by one letter.  There is the

4  Atari token, adding one letter, and then there is Tari.  And

5  that's just the tip of the iceberg.  We have several examples in

6  our brief of ways in which Bitcoin, Monero, Blockchain,

7  Cryptocurrency -- it's an incredibly crowded field, including with

8  the stablecoin examples I gave earlier.

9       Now, it's important to consider this also when we're

10 thinking about another CPACT factor which is that Tari and Taro

11 are different in sight, sound, and special meaning.  Yes, it's

12 true that they have only one letter difference, but it's important

13 to compare these two marks in the context of this crowded field

14 where consumers are seeing Taro and Taki and Tara and Tari and

15 Atari.  The differences among those marks are sharpened and

16 consumers take extra care.  Although Tari and Taro share that --

17 those first three letters, courts have held that even a single-

18 letter difference can be significant and, as here, when the marks

19 have fundamentally different meanings, and we're looking at the

20 context of how these words are actually going to appear to

21 consumers.

22      Now, that brings me to actual confusion.  We know that

23 Tari (indiscernible) to Taro because it has actually

24 (indiscernible) to Taro for the 11 months since it announced its

25 protocol and the five months since it's been spitting out code.

1        I'll start by briefly addressing Dr. Palmatier's survey

2   that Tari Labs submitted with its motion.  That survey is nothing

3   more than a screening test, which courts routinely reject.  Courts

4   -- and we've cited to cases -- Mr. Hagey is also counsel of record

5   for both of those cases -- in which the court rejected the survey

6   saying -- one saying it was seriously flawed, another saying it

7   was flawed, both declining to rely on it.

8        And that's because the consumer -- the survey showed

9   consumers single words, they called those words products

10  sometimes, and then asked consumers in a leading question which

11  words were likely from the same company.  Any one of those flaws

12  alone would make this survey unreliable.  But all of this taken

13  together mean that the survey can't be trusted at all.

14       And so without the survey, what's left?  What's left are

15  typos, one question or a comment, WTF, and one completely nonsense

16  article.  And that -- none of that evidence would stand screening.

17       I'll address first the article that Mr. Hagey mentioned

18  that was submitted with Dr. Palmatier's reply declaration.  And

19  you see an excerpt of that article here.  This was an article

20  published by a company, Speed.  The website is *tryspeed.com*.  And

21  this is incoherent at best.  My best guess is that this was

22  written by an artificial intelligence chatbot.  I'm actually

23  astonished that Tari Labs submitted this as evidence of confusion

24  because the -- the article doesn't even accurately describe Tari.

25  Its descriptions of Tari and of Taro are completely wrong.  I

1  don't know what it's talking about.  Neither one of them is on

2  Ethereum, and this article just has absolutely no relationship to

3  reality, so you certainly can't say that this was in any way

4  caused by the Tari protocol.

5          Going to the typos, the six typos, we need to be really

6  clear on that point.  Because it characterizes so much of what

7  Tari Labs is trying to do in this case.  They want to argue that

8  the stakes are the same as actionable confusion.  And it's not

9  actionable confusion that's important.  That's not the law.

10  Actionable confusion here is the relief that Tari Labs makes to

11  Taro protocol.  And that people who would go to use the Taro

12  protocol or go to use Tari Labs' products, wherever they are,

13  would somehow be confused.  And there is absolutely no evidence of

14  that in any way, shape, or form.

15          THE COURT:  Okay.  Ms. Bannigan, you'll want to wrap up

16  right now.  We've got to --

17          MS. BANNIGAN:  Absolutely.  I'll address one more point

18  very, very shortly and that's the last CPACT, the last factor,

19  which is marketing, and marketing is -- you know, the Internet

20  marketing channels that are used by the parties, such as Twitter,

21  Substack, and GitHub, they're ubiquitous.  And the Ninth Circuit

22  has made very clear over and over again that when you're dealing

23  with these marketing channels on the Internet, that's irrelevant

24  to the CPACT analysis because all software development companies

25  use those channels.  And that goes along very well with the -- the

1    (indiscernible) and the *Dfinity* case that this Court made where

2    the Court says -- ties it back to -- it purports -- mentions that

3    this marketing factor is irrelevant and also says that in dealing

4    with these blockchain developers, in dealing with developers who

5    are highly sophisticated in these intricacies -- this intricate

6    tech, it is implausible that they would be confused.   In that

7    *Dfinity* case -- it's *Dfinity v. Meta Labs* and it's directly on

8    point.

9            The very last thing that I will say, Your Honor, in

10   closing is that to the extent Your Honor believes that Tari Labs'

11   likelihood of success is a close call, we do not believe it is a

12   close call.  But if the Court does believe it is a close call, the

13   irreparable harm factor is especially important because companies

14   that are truly harmed by trademark infringement don't wait months

15   before filing a complaint.   They don't wait an additional four

16   months before filing for relief.   And as the cases in the Ninth

17   Circuit make clear, that this is a balancing test and if

18   likelihood of success on the merits is questionable even at a

19   close call, more weight needs to be given to the irreparable harm

20   factor.

21           THE COURT:  Thank you, Ms. Bannigan.

22           MS. BANNIGAN:  Thank you, Your Honor.

23           THE COURT:  All right.  Mr. Hagey, I'll give you ten

24   minutes to respond.

25           MR. HAGEY:  I'm happy to, Your Honor.  The first thing

1    I will say is the Defendant's client, when she's out in the market

2    describing what they're trying to do here, is saying that "Taro

3    user is somebody who doesn't want to understand the protocol of

4    Bitcoin.  It's just somebody who wants to transact cheaply and

5    verbally without holding the coins themselves."  And that's a

6    quote from the statement that she made that's attached in

7    connection with the Jain declaration.

8         She then analogizes Taro to the credit card system.  And

9    we don't disagree that, you know, a lot of consumers don't know

10   how Visa or MasterCard or American Express work.  But in order to

11   know whether you can actually transact business on that network,

12   you've got to know whether you're using a Visa card.  And for us,

13   the situation here is no different.  The reason those vignettes

14   that Ms. Dooley was walking through are so important is because

15   these are concrete examples of what's going to happen if somebody

16   makes -- creates an NFT or a token using the Taro protocol and

17   they want to sell it and it's worth something, they need to know

18   whether the recipient and the transfer system is going to work.

19   And the only way to do that -- and this is how -- we gave examples

20   of how this is done through wallets.  We gave examples of how this

21   is done through OpenSea.  You go and you look and you determine

22   what protocol or what blockchain system is available to make that

23   transaction, and that's the dropdown name that we're going to see

24   if Taro is allowed to proceed.

25        So that is first one just very, very basic point.  The

1  entire project around Taro is to embed something into our

2  financial system within cryptocurrency and digital assets that is

3  going to be, as counsel said, generic.  They want to generify the

4  word "Taro" and have users use it all over the place.  And we

5  agree that's the problem.  Once this genie is out of the bottle,

6  we can't put it back in.  Once protocols are put into place and

7  the system replicates throughout the entire Internet, the entire

8  cryptocurrency universe, we're not going to be able to stop that.

9  The only time to do that is now.

10         And when we think about the -- you know, the questions

11  about what does the case law say, what is the likelihood of

12  confusion or weight into irreparable harm, here you have marks

13  that are virtually identical, we have companies that are operating

14  in the same space, they use all the same methods to communicate

15  with their clients, they attend the same conferences, they acutely

16  know each other.  And my client worked hard to try to convince

17  Lightning Labs to stop doing this.

18         We don't have an obligation to immediately go after

19  somebody or everybody who might be out in the market, and we

20  certainly have an opportunity to wait and see and determine

21  whether there is going to actually be a launch and whether

22  something is actually going to happen.  A lot of projects that

23  come and go in cryptocurrency never get off the ground fully.

24         And so before you spend a lot of money and a lot of

25  time, and you go up against an organization as large at Lightning

1   Labs, you are definitely going to make sure that there is

2   something that you need to move with this.

3        And I think that's the primary area of concern here, is

4   that we moved -- as soon as it was clear that they were actually

5   going to release something commercially, that it was going to come

6   into effect in less than a month, we filed our papers as quickly

7   as we could pull them together and pull in a survey which, by the

8   way, was using the marks in the same manner in which Lightning

9   Labs itself shows and demonstrates on their own website.

10       I'll just close with this.  Your Honor has been very

11  patient with the parties and allowed us to do quite a bit of

12  argument.  To me, this comes down to a (indiscernible) situation.

13  You have one party that cares very deeply about its name.  Its

14  name is everything for the company.  Tari is -- is synonymous with

15  what my clients have been trying to build.  They are very

16  passionate about their work.

17       And they applaud the work that Lightning Labs does.  But

18  they cannot create a situation where all of their work is suddenly

19  put at risk and consumers and developers are put at risk to be

20  confused in the manner in which we clearly have shown not only is

21  likely to occur but in fact has occurred.  In fact, Defendant's

22  own counsel couldn't keep the names straight in their

23  correspondence with us, and there's many court cases, particularly

24  from the patent infringement context, where it's shown that that

25  is itself demonstrative of a potential confusion or infringement.

1        So we ask that, you know, you not chop up this baby.  We

2   ask that our Tari baby be allowed to proceed intact and that the

3   existing restraint -- the existing stand-still order remain in

4   effect so that our client can go forward with its business without

5   fear or risk of having the world change should Taro release their

6   (indiscernible) and become commercially available as their CTO

7   said within a matter of weeks.

8        And with that, I appreciate Your Honor's patience with

9   us.

10        THE COURT:  All right.  Thank you, all, for your

11   argument.  I do -- I will get an order out as quickly as I can.

12   I recognize the difficulties that -- that any order poses to both

13   sides, but certainly to stop people from operating is -- requires

14   some disruption.

15        And -- and then after that comes out, we'll see where we

16   go as -- as quickly as we can so that whichever side is unhappy

17   with my decision will get another crack at it and get a crack on

18   the merits as quickly as possible.  But that will wait for another

19   moment or two.

20        Thank you, all, for your argument.

21        MS. BANNIGAN:  Your Honor, can I just bring up one

22   clarifying question about the order that is currently in place

23   right now, please?

24        THE COURT:  Yeah.

25        MS. BANNIGAN:  So our understanding is that order is to

1 keep the status quo as it was at the time.  As I mentioned

2 earlier, we took that to mean that Lightning Labs should not

3 release this version -- Version 0.02 that Plaintiffs were worried

4 about.

5          THE COURT:  Uh-huh.

6          MS. BANNIGAN:  And out of the utmost caution, we also

7 stopped what we had been doing on a daily basis, which is just

8 working on the open-source protocol in public which involves

9 spitting out new code, not in a new version or anything like that.

10 To truly keep the status quo, it would be to allow Lightning to

11 continue doing everything it had been doing since September.  It

12 would be very helpful for the Court to clarify the order so we can

13 make sure that Lightning Labs does not run afoul of it.

14          THE COURT:  Well, so I didn't -- so I think you did the

15 right thing in advising your client to stop because I was not --

16 I am learning more and more as time goes on, but I -- the --

17 working on open-source is -- I was concerned about.  And I think

18 I would keep that advice for the next day or two and I will try to

19 -- I won't get out a full-blown order in that period of time, but

20 I -- I will try to be as clear as I can be at that point.

21          MS. BANNIGAN:  Thank you very much, Your Honor.

22          THE COURT:  Thank you, all.

23          MR. HAGEY:  Thanks, Your Honor.

24          MS. DOOLEY:  Thank you, Your Honor.

25          THE CLERK:   And that concludes this afternoon's

38

1    calendar.  Thank you, all.

2        (Proceedings adjourned at 4:06 p.m.)

3

4        I, Peggy Schuerger, certify that the foregoing is a

5    correct transcript from the official electronic sound recording

6    provided to me of the proceedings in the above-entitled matter.

7            *Peggy Schuerger*                 March 15, 2023
                                                _____
8    Signature of Approved Transcriber          Date

9
     Peggy Schuerger
     _____
10   **Ad Hoc Reporting**
     Approved Transcription Provider
11   for the U.S. District Court,
     Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25